# EXHIBIT N

**EXHIBIT N**

# Legislation
## Meeting Agenda



Committee Chair: Colin Smith

800 Michaellan Office Bldg.
148 Martine Avenue, 8th Floor
White Plains, NY 10601
www.westchesterlegislators.com

| | | |
|---|---|---|
| **Monday, May 23, 2022** | **1:00 PM** | **Committee Room** |

## CALL TO ORDER

Joint with the Committee on Health

## MINUTES APPROVAL

May 16, 2022 at 1:00 PM Minutes

May 18, 2022 at 3:00 PM Minutes

## I. ITEMS FOR DISCUSSION

2022-257    **HON. BORGIA, SHIMSKY, BARR, JOHNSON, ALVARADO, SMITH, PIERCE, GASHI, BOYKIN, PARKER, WILLIAMS JOHNSON, MAHER, CLEMENTS, WOODSON-SAMUELS - PH - Clinic Access Legislation**

A RESOLUTION to set a Public Hearing on "A LOCAL LAW adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities."  [Public Hearing set for _____, 2022 at _____ .m.]  LOCAL LAW INTRO 2022-258.
*COMMITTEE REFERRAL: COMMITTEES ON LEGISLATION AND HEALTH*

Guests: Department of Law - John Nonna, County Attorney, Stacey Dolgin-Kmetz, Chief Deputy County Attorney, Shawna MacLeod, Senior Assistant County Attorney; All Women's Healthcare - Constance Considine, Chief Medical Adminstrator; WCLA Choice Matters - Catherine Lederer-Plaskett, President; Planned Parenthood Hudson Peconic - Vincent Russell, President & CEO

2022-258    **HON. BORGIA, SHIMSKY, BARR, JOHNSON, ALVARADO, SMITH, PIERCE, GASHI, BOYKIN, PARKER, WILLIAMS JOHNSON, MAHER, CLEMENTS, WOODSON-SAMUELS - LL - Proposed Clinic Access Legislation**

A LOCAL LAW adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities.
*COMMITTEE REFERRAL: COMMITTEES ON LEGISLATION AND HEALTH*

Guests: Department of Law - John Nonna, County Attorney, Stacey Dolgin-Kmetz, Chief Deputy County Attorney, Shawna MacLeod, Senior Assistant County Attorney; All Women's Healthcare - Constance Considine, Chief Medical Adminstrator; WCLA Choice Matters - Catherine Lederer-Plaskett, President; Planned Parenthood Hudson Peconic - Vincent Russell, President & CEO

1

**EXHIBIT N**

2022-291     **RES - HOME RULE A9670-S8448**

A New York State Home Rule Resolution requesting the enactment of Assembly Bill No. 9670/Senate Bill No. 8448 entitled "AN ACT to amend the retirement and social security law, in relation to providing certain death benefits to correction officers, correction officer-sergeants, correction officer-captains, assistant wardens, associate wardens or wardens employed by Westchester County."

Guests: Department of Law - John Nonna, County Attorney

## II.  OTHER BUSINESS

## III.  RECEIVE & FILE

## ADJOURNMENT

**EXHIBIT N**

TO:     BOARD OF LEGISLATORS
        COUNTY OF WESTCHESTER


Your Committee recommends passage of "A Local Law adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities."


Your Committee finds that the right to access reproductive health care facilities and the right to obtain reproductive health care services, treatments, and/or procedures, are essential personal rights protected by state and federal law. Equally, the right to peaceably protest and express one's views is an essential right protected by state and federal law. Such actions include, but are not limited to, the right to speak, march, demonstrate, picket, pray, associate with others in expressive behavior, or engage in other activity protected by the First Amendment.


Your Committee notes that concerns have been raised about individuals or groups of individuals who may exceed the boundaries of lawful First Amendment expression by engaging in activities that physically prevent individuals from accessing reproductive health care facilities or obtaining reproductive health care services; or by engaging in activities that unlawfully harass or intimidate individuals trying to access such facilities and services. In fact, for example, on March 17, 2022, three men were found guilty of unlawfully trespassing at All Women's Health & Medical Services, a reproductive health care facility in White Plains, in order to prevent patients from obtaining reproductive health care services on November 27, 2021. These defendants are affiliated with Red Rose Rescue, an anti-abortion activist group that has carried out similar unlawful actions all across the country. Indeed, the perpetrators convicted in White Plains have also apparently been involved in prior similar conduct—each has now been convicted multiple

times of such conduct, and has faced (or is currently facing) criminal charges in some of the following places: Nassau County, New York; Michigan; Pennsylvania; Washington, D.C.; and Virginia. Such activities can impede access to reproductive health care facilities not only for those seeking to obtain reproductive health care services, treatments, and/or procedures, but for providers of those services as well.

Your Committee finds that current law does not adequately protect reproductive health care facilities, and those who work in, seek access to, or obtain services from such facilities. Therefore, your Committee has determined that it is appropriate to enact legislation to prohibit interference with accessing reproductive health care facilities and obtaining reproductive health care services within the parameters established by precedent of the United States Supreme Court and the Second Circuit Court of Appeals, in order to: protect and promote the public health, safety, and welfare; ensure order; protect freedom of access to reproductive health care facilities; protect the freedom to obtain reproductive health care services; promote the free flow of traffic in the public way; advance medical privacy and the well-being of patients seeking access to reproductive health care facilities and obtaining reproductive health care services; and safeguard private property.

Your Committee is advised that this proposed Local Law is modeled upon various federal, state, and municipal laws, including the federal Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248; the New York State Clinic Access Act, N.Y. Penal L. §§ 240.70-240.71, N.Y. Civil Rights L. 79-m; the New York City Access to Reproductive Health Care Facilities Law, N.Y.C. Admin. Code §§ 10-1001, *et seq*.; and Colo. Rev. Stat. § 18-9-

122(3) (1999) ("Preventing passage to and from a health care facility – engaging in prohibited activities near facility").

Your Committee is further advised that this proposed Local Law, if adopted, would protect persons seeking access to reproductive health care facilities and services both within facilities as well as outside said facilities. The Local Law would prohibit the use or threat of force against, physical obstruction or blocking of, or interference with any person seeking to access reproductive health care facilities or obtaining reproductive health care services. This proposed Local Law would also make it unlawful for any person to strike, shove, restrain, grab, kick, or otherwise subject to unwanted physical contact, another person seeking access to or exiting from, or obtaining services from, reproductive health care facilities. The proposed law also prohibits engaging in a course of conduct or repeatedly committing acts within 25 feet of the premises a reproductive health care facility when such behavior places another person in reasonable fear of physical harm, and prohibits following and harassing another person within 25 feet of the premises of a reproductive health care facility.  As used in the relevant violation section, the meaning of "harass" is derived, in part, from New York State Penal Law § 240.26(3) and related interpretations in the case law.  In addition, this Local Law will make it unlawful to physically damage or interfere with the operations of any reproductive health care facility. Further, the proposed Local Law provides that within a 100-foot radius from any door to a reproductive health care facility, no individual can, in the public way, knowingly approach within eight feet of another person, unless that other person consents, for the purpose of passing a leaflet, handbill, food, or liquid to; displaying a sign to; or engaging in oral protest, education,

EXHIBIT N

or counseling with such other person.  This provision applies equally to all, regardless of the content of their speech.

Your Committee notes that the proposed legislation will, if adopted, provide for both criminal penalties and civil remedies for violations of its provisions. Specifically, violation of this Local Law would be a misdemeanor, punishable by fines and/or imprisonment; and aggrieved persons would be authorized to institute civil actions for injunctive relief, damages, attorney's fees, and costs, in any court of competent jurisdiction, including state courts. In addition, the County Attorney would be authorized to commence civil actions for equitable relief.

Your Committee finds that this legislation would expressly ensure that First Amendment rights regarding freedom of speech are protected while, at the same time, provide relief for persons whose rights are interfered with in seeking or delivering reproductive health care services. Indeed, this Local Law does not prohibit conduct normally protected by the First Amendment.  However, "true threats" and expression that takes place while trespassing on private property are not protected under the First Amendment.  The right to engage in legitimate First Amendment activity does not shield individuals who trespass on private property or otherwise run afoul of the law. And to the extent any First Amendment conduct is affected at all, the law acts as a modest and reasonable time, place, and manner restriction that leaves ample room to communicate messages through speech and other protected First Amendment activity.

EXHIBIT N

Finally, your Committee is informed that this Local Law does not meet the definition of an action under SEQRA and its implementing regulations 6 NYCRR Part 617. Please refer to the memorandum from the Department of Planning dated January 14, 2022, which is on file with the Clerk of the Board of Legislators.

Your Committee recommends adoption of this Local Law.

Dated:             , 2022
White Plains, New York

COMMITTEE ON

SCM-05/16/2022

**EXHIBIT N**

**RESOLUTION NO. ____ – 2022**

RESOLVED, that this Board hold a public hearing pursuant to Section 209.141(4) of the Laws of Westchester County on Local Law Intro. No. ___ - 2022, entitled "A Local Law adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities." The public hearing will be held at __.m. on the _____ day of _____, 2022, in the Chambers of the Board of Legislators, 8th Floor, Michaelian Office Building, White Plains, New York. The Clerk of the Board shall cause notice of the time and date of such hearing to be published at least once in one or more newspapers published in the County of Westchester and selected by the Clerk of the Board for that purpose in the manner and time required by law.

**EXHIBIT N**

**LOCAL LAW INTRO. NO.     - 2022**

A LOCAL LAW adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities.

BE IT ENACTED by the County Board of the County of Westchester as follows:

**Section 1**. A new Chapter 425 is hereby added to the Laws of Westchester to read as follows:

## CHAPTER 425

## REPRODUCTIVE HEALTH CARE FACILITIES ACCESS ACT

**Sec. 425.01. Short title.**
**Sec. 425.11. Legislative intent.**
**Sec. 425.21. Definitions.**
**Sec. 425.31. Prohibited conduct.**
**Sec. 425.41. Violations.**
**Sec. 425.51. Civil cause of action.**
**Sec. 425.61. Civil action by County of Westchester.**
**Sec. 425.71. Joint and several liability.**
**Sec. 425.81. Construction.**
**Sec. 425.91. Severability.**

**Sec. 425.01. Short title.**

This title shall be known as and may be cited as the "Reproductive Health Care Facilities Access Act."

**Sec. 425.11. Legislative intent.**

The County Board of Legislators finds that the right to access reproductive health care facilities and the right to obtain reproductive health care services, treatments, and/or procedures

are essential personal rights protected by state and federal law. Equally, the right to peaceably protest and express one's views is an essential right protected by state and federal law. Such actions include, but are not limited to, the right to speak, march, demonstrate, picket, pray, associate with others in expressive behavior, or engage in other activity protected by the First Amendment.

The County Board is aware that there are individuals and/or groups of individuals who may exceed the boundaries of lawful First Amendment expression by engaging in activities that prevent individuals from accessing reproductive health care facilities or obtaining reproductive health care services, treatments, or procedures, or by engaging in activities that unlawfully harass or intimidate individuals trying to access such facilities and services. Such activities unlawfully interfere with both the operators of reproductive health care facilities and all individuals seeking free entrance to and egress from such facilities.

The County Board finds that current law does not adequately protect reproductive health care facilities, and those who work in, seek access to, or obtain services from such facilities. Therefore, the County Board of Legislators has determined that it is appropriate to enact legislation to prohibit interference with accessing reproductive health care facilities and obtaining reproductive health care services, in order to: protect and promote the public health, safety, and welfare; ensure order; protect the freedom of access to reproductive health care facilities; protect the freedom to obtain reproductive health care services; promote the free flow of traffic in the public way; advance medical privacy and the well-being of patients seeking access to reproductive health care facilities and obtaining reproductive health care services; and safeguard private property. This proposed Local Law protects persons seeking access to reproductive health care facilities and services both inside facilities as well as outside said

facilities.  The County Board finds that this Local Law does not prohibit conduct normally protected by the First Amendment.  However, "true threats" and expression that takes place while trespassing on private property are not protected under the First Amendment. The right to engage in legitimate First Amendment activity does not shield individuals who trespass on private property or otherwise run afoul of the law. And to the extent any First Amendment conduct is affected by this Local Law at all, the law acts as a modest and reasonable time, place, and manner restriction that leaves ample room to communicate messages through speech and other protected First Amendment activity.

The County Board has further determined that persons harmed by such interfering conduct should be able to seek redress in the courts, including state courts, for injunctive relief, damages, and attorney's fees and costs, and that the County of Westchester should be able to obtain appropriate injunctive relief under this Local Law.

**Sec. 425.21. Definitions.**

Whenever used in this Chapter, the following words and phrases shall have the meanings indicated, unless the context or subject matter otherwise requires:

a.  "Approach" shall mean to move nearer in distance to someone.

b.  "Eight (8) feet" shall be measured from the part of a person's body that is nearest to the closest part of another person's body, where the term "body" includes any natural or artificial extension of a person, including, but not limited to, an outstretched arm or hand-held sign.

EXHIBIT N

c.  "Harass" shall mean to engage in a course of conduct or repeatedly commit acts that alarm or seriously annoy another person, where such conduct continues after a request to cease has been made.

d.  "Interfere with" shall mean to stop or to restrict a person's freedom of movement.

e.  "Intimidate" shall mean to place a person in reasonable apprehension of physical injury to such person or to another person.

f.  "Invitee" shall mean an individual who enters another's premises as a result of an express or implied invitation of the owner or occupant for their mutual gain or benefit.

g.  "Person" shall mean an individual, corporation, not-for-profit organization, partnership, association, group, or any other entity.

h.  "Physically obstruct or block" shall mean to physically hinder, restrain, or impede, or to attempt to physically hinder, restrain or impede, or to otherwise render ingress to or egress from, or render passage to or from the premises of a reproductive health care facility impassable, unreasonably difficult, or hazardous.

i.  "Premises of a reproductive health care facility" shall include the driveway, entrance, entryway, or exit of the reproductive health care facility, the building in which such facility is located, any parking lot in which the facility has an ownership or leasehold interest, and the entrance to any public parking lot that serves the reproductive health care facility and is located within one-hundred (100) feet of any door to that reproductive health care facility.

j.  "Reproductive health care facility" shall mean any building, structure, or place, or any portion thereof, at which licensed, certified, or otherwise legally authorized persons provide reproductive health care services.

4

k. "Reproductive health care services" shall mean medical, surgical, counseling, or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.

**Sec. 425.31. Prohibited conduct.**

It shall be unlawful for any person to do the following:

a. knowingly physically obstruct or block another person from entering into or exiting from the premises of a reproductive health care facility, in order to prevent that person from obtaining or rendering, or assisting in obtaining or rendering, medical treatment or reproductive health care services; or

b. strike, shove, restrain, grab, kick, or otherwise subject to unwanted physical contact or injury any person seeking to legally enter or exit the premises of a reproductive health care facility; or

c. knowingly follow and harass another person within twenty-five (25) feet of the premises of a reproductive health care facility; or

d. knowingly engage in a course of conduct or repeatedly commit acts within twenty-five (25) feet of the premises of a reproductive health care facility when such behavior places another person in reasonable fear of physical harm, or attempt to do the same; or

e. by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate, or interfere with, another person in order to discourage such other person or any other person or persons from obtaining or providing, or assisting in obtaining or providing, reproductive health care services; or

5

f.  by force or threat of force, or by physically obstructing or blocking, knowingly injure, intimidate, or interfere with, or attempt to injure, intimidate or interfere with, another person because such person was or is obtaining or providing reproductive health care services; or

g.  physically damage a reproductive health care facility so as to interfere with its operation, or attempt to do the same; or

h.  knowingly interfere with the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, interfering with, or attempting to interfere with (i) medical procedures or treatments being performed at such reproductive health care facility; (ii) the delivery of goods or services to such reproductive health care facility; or (iii) persons inside the facility; or

i.  knowingly approach another person within eight (8) feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill or food or liquid to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility.


**Sec. 425.41. Violations.**

a.  Any person who shall violate any provision of section 425.31 shall be guilty of  a misdemeanor, punishable by a fine not to exceed one thousand dollars ($1,000), or imprisonment not to exceed six (6) months, or both, for a first conviction under section 425.31; and

    b.   For a second and each subsequent conviction under section 425.31, the penalty shall be a fine not to exceed five thousand dollars ($5,000), or imprisonment not to exceed one (1) year, or both.

**Sec. 425.51. Civil cause of action.**

Where there has been a violation of section 425.31, any person whose ability to access the premises of a reproductive health care facility has been interfered with, and any owner or operator of a reproductive health care facility or owner of a building in which such facility is located, and any employee, paid or unpaid, and any volunteer working for such facility, and any invitee, may bring a civil action in any court of competent jurisdiction, within five years of such violation, for any or all of the following relief: injunctive relief; actual damages suffered as a result of such violation, including, where applicable, pain and suffering, psychological, and emotional distress damages; treble the amount of actual damages suffered as a result of such violation; and attorney's fees and costs.

**Sec. 425.61. Civil action by County of Westchester.**

The County Attorney may bring a civil action on behalf of the County, in accordance with the provisions of Sec. 158.11(3) of the Laws of Westchester County, in any court of competent jurisdiction for injunctive and other appropriate equitable relief in order to prevent or cure a violation of section 425.31.

**Sec. 425.71. Joint and several liability.**

If it is found, in any action brought pursuant to the provisions of this chapter, that two (2) or more of the named defendants acted in concert pursuant to a common plan or design to violate

**EXHIBIT N**

any provision of section 425.31, such defendants shall each be held jointly and severally liable for any fines or penalties imposed or any damages, costs, and fees awarded.

**Sec. 425.81. Construction.**

a. No provision of this chapter shall be construed or interpreted so as to limit the right of any person or entity to seek other available criminal penalties or civil remedies, including either the Attorney General for the State of New York or the District Attorney for the County of Westchester.

b. No provision of this chapter shall be construed or interpreted so as to prohibit expression protected by the First Amendment of the Constitution of the United States or section eight of article one of the Constitution of the State of New York.

c. No provision of this chapter shall be construed or interpreted so as to limit the lawful exercise of any authority vested in the owner or operator of a reproductive health care facility, the owner of the premises in which such a facility is located, or a law enforcement officer of Westchester County or of any municipality within Westchester County, or of New York State or the United States, acting within the scope of such person's official duties.

**Sec. 425.91. Severability.**

If any clause, sentence, paragraph, section, or part of this Local Law shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section, or part thereof directly involved in the controversy in which such judgment shall have been rendered.

EXHIBIT N

**Section 2.**  This Local Law shall take effect immediately.

SCM-05/16/2022

9

**17**

### HOME RULE REQUEST RESOLUTION NO. ___ - 2022

RESOLVED, that the Westchester County Board of Legislators approves the making of a Home Rule Request in the following format:

*To the Legislature:*

Pursuant to Article IX of the Constitution, the County of Westchester requests the enactment of Assembly Bill No. 9670/Senate Bill No. 8448 entitled "AN ACT to amend the retirement and social security law, in relation to providing certain death benefits to correction officers, correction officer-sergeants, correction officer-captains, assistant wardens, associate wardens or wardens employed by Westchester county."

A necessity exists for the enactment of this legislation because the local government does not have the power to enact such legislation by local law.

Dated:                          2022
White Plains, New York

# STATE OF NEW YORK

9670

# IN ASSEMBLY

March 28, 2022

Introduced by M. of A. ABBATE -- read once and referred to the Committee on Governmental Employees

AN ACT to amend the retirement and social security law, in relation to providing certain death benefits to correction officers, correction officer-sergeants, correction officer-captains, assistant wardens, associate wardens or wardens employed by Westchester county

The People of the State of New York, represented in Senate and Assembly, do enact as follows:

1   Section 1.  Section 89-e of the retirement and social security law is
2  amended by adding a new subdivision k to read as follows:
3   k. Notwithstanding any provision of law to the contrary, where a
4  correction officer would have been entitled to retire pursuant to this
5  section at the time of his or her death and where his or her death
6  occurs on or after the effective date of the chapter of the laws of two
7  thousand twenty-two that added this subdivision, the beneficiary or
8  beneficiaries may elect to receive, in a lump sum, an amount payable
9  which shall be equal to the pension reserve that would have been estab-
10 lished had the member retired on the date of his or her death, or the
11 value of the death benefit and the reserve-for-increased-take-home-pay,
12 if any, whichever is greater.
13  § 2. The retirement and social security law is amended by adding a new
14 section 606-c to read as follows:
15  § 606-c. Death benefits for correction officers employed by Westches-
16 ter county. a. As used in this section, the term "correction officer"
17 shall mean a person employed by the Westchester county correction
18 department with a title of correction officer, correction officer-ser-
19 geant, correction officer-captain, assistant warden, associate warden or
20 warden.
21  b. Notwithstanding any provision of law to the contrary, where a
22 correction officer would have been entitled to a service retirement
23 benefit at the time of his or her death and where his or her death
24 occurs on or after the effective date of the chapter of the laws of two
25 thousand twenty-two that added this section, the beneficiary or benefi-
26 ciaries may elect to receive, in a lump sum, an amount payable which

EXPLANATION--Matter in _italics_ (underscored) is new; matter in brackets
[ ] is old law to be omitted.

LBD14541-02-2


PRINTED ON RECYCLED PAPER

A. 9670                                    2

1   shall be equal to the pension reserve that would have been established
2   had the member retired on the date of his or her death, or the value of
3   the death benefit and the reserve-for-increased-take-home-pay, if any,
4   whichever is greater.
5      § 3. All past service costs associated with implementing the
6   provisions of this act shall be borne by the county of Westchester and
7   may be amortized over a period of ten years.
8      § 4. Notwithstanding any other provision of law to the contrary, none
9   of the provisions of this act shall be subject to the appropriation
10  requirement of section 25 of the retirement and social security law.
11     § 5. This act shall take effect immediately.

    FISCAL NOTE.--Pursuant to Legislative Law, Section 50:
    This bill would modify the in-service death benefit for tiers 2
through 6 Westchester County correction officers. The in-service death
benefit will be the value of the pension reserve as if the member had
retired on their date of death.
    If this bill is enacted during the 2022 legislative session, we antic-
ipate that there will be an increase of approximately #93,000 in the
annual contributions of Westchester County for the fiscal year ending
March 31, 2023. In future years, this cost will vary as the billing
rates and salary of the affected members change.
    In addition to the annual contributions discussed above, there will be
an immediate past service cost of approximately #681,000 which will be
borne by Westchester County as a one-time payment. This estimate is
based on the assumption that payment will be made on February 1, 2023.
If Westchester County elects to amortize this cost over a 10-year peri-
od, the cost for the first year including interest would be #87,000.
    These estimated costs are based on 776 affected members employed by
the State of New York, with annual salary of approximately #88.3 million
as of March 31, 2021.
    Summary of relevant resources:
    Membership data as of March 31, 2021 was used in measuring the impact
of the proposed change, the same data used in the April 1, 2021 actuari-
al valuation.  Distributions and other statistics can be found in the
2021 Report of the Actuary and the 2021 Comprehensive Annual Financial
Report.
    The actuarial assumptions and methods used are described in the 2020
and 2021 Annual Report to the Comptroller on Actuarial Assumptions, and
the Codes, Rules and Regulations of the State of New York: Audit and
Control.
    The Market Assets and GASB Disclosures are found in the March 31, 2021
New York State and Local Retirement System Financial Statements and
Supplementary Information.
    I am a member of the American Academy of Actuaries and meet the Quali-
fication Standards to render the actuarial opinion contained herein.
    This fiscal note does not constitute a legal opinion on the viability
of the proposed change nor is it intended to serve as a substitute for
the professional judgment of an attorney.
    This estimate, dated February 25, 2022, and intended for use only
during the 2022 Legislative Session, is Fiscal Note No. 2022-77 Revised,
prepared by the Actuary for the New York State and Local Retirement
System.

 PRINTED ON RECYCLED PAPER



## NEW YORK STATE ASSEMBLY
## MEMORANDUM IN SUPPORT OF LEGISLATION
### submitted in accordance with Assembly Rule III, Sec 1(f)

**BILL NUMBER:** A9670

**SPONSOR:** Abbate

**TITLE OF BILL**:

An act to amend the retirement and social security law, in relation to providing certain death benefits to correction officers, correction officer-sergeants, correction officer-captains, assistant wardens, associate wardens or wardens employed by Westchester county

**PURPOSE::**

The purpose of this bill is to provide a death gamble amortization for correctional officers employed by Westchester County.

**SUMMARY OF PROVISIONS::**

Section 1 adds a new subdivision k to Section 89-E of the Retirement and Social Security Law that allows correction officer beneficiaries to elect to receive, in a lump sum, an amount payable equal to the pension reserve that would have been established had the correction officer retired on the date of their death, or the value of the death benefit and the reserve-for-increased-takehome-pay, if any, whichever is greater.

Section 2 adds a new Section 606-C to the Retirement and Social

Security Law that defines death benefits for corrections officers employed by Westchester County.

Section 3 states that all past service costs associated with implementing this bill shall be borne by Westchester County and may be amortized over a period of 10 years.

Section 4 states that none of the provisions of this bill shall be subject to the appropriation requirement of Section 25 of the Retirement and Social Security Law.



Section 5 is the effective date.


**JUSTIFICATION**:

This bill provides Westchester County correction officers with death
gamble benefits. The death gamble was enacted for New York law enforce-
ment officers, firefighters and teachers in 2000 (Chapter 554 of the
Laws of 2000) to incentivize public employees who wish to work past
retirement age by providing that, should the employee pass away before
taking retirement, his or her family shall be able to receive the full
value of his or her pension benefit. In extending this benefit to West-
chester County correction officers, this bill helps both officers and
local governments as the County is then able to retain correction offi-
cers who may have retired instead of working past normal retirement age.


**LEGISLATIVE HISTORY:**:

New bill.


**STATE AND LOCAL FISCAL IMPLICATIONS**:

See the fiscal note.


**EFFECTIVE DATE:**:

This act shall take effect immediately.

**EXHIBIT N**

# Legislation
## BOL Meeting Minutes - Final



800 Michaelian Office Bldg.
148 Martine Avenue, 8th Floor
White Plains, NY 10601
www.westchesterlegislators.com

Committee Chair: Colin Smith

---

| Monday, May 23, 2022 | 1:00 PM | Committee Room |
|---|---|---|

---

## CALL TO ORDER

Joint with the Committee on Health

*This meeting will be held pursuant to Chapter 1 of the New York State Laws of 2022 and Executive Order 11, as extended, which authorize any public body to meet and take such action authorized by law without permitting in public-in-person access to meetings and authorize such meetings to be held remotely by conference call or similar service, provided that the public has the ability to view or listen to such proceeding and that such meetings are recorded and later transcribed. To access the meeting, please visit: https://westchestercountyny.legistar.com*

*With a quorum present, Chair Smith called the meeting to order at 1:10 PM.*

*Others in Attendance: BOL - Legislator Erika Pierce, Legislator David Tubiolo, Legislator Tyrae Woodson-Samuels, Legislator Jewel Williams Johnson, Melanie Montalto, Marcello Figueroa, Lisa Hochman, Dayana Gomez, Anand Singh, Amy Vele; Department of Law - Jordan Hardy; Choice Matters - Charlotte Baron; Westchester County Correction Superior Officers Association - Peter DiChiara; Westchester County Correction Benevolent Association, Neil Pellone*

**Present:** Committee Chair Smith, Legislator Barr, Legislator Cunzio, Committee Vice-Chair Gashi and Legislator Maher

**Absent:** Legislator Borgia

**Remote:** Legislator Boykin, Legislator Johnson and Legislator Shimsky

## MINUTES APPROVAL

May 16, 2022 at 1:00 PM Minutes

On motion of Legislator Barr, seconded by Committee Chair Smith, the above item was approved.  The motion carried unanimously.

May 18, 2022 at 3:00 PM Minutes

On motion of Legislator Barr, seconded by Committee Chair Smith, the above item was approved.

## I.     ITEMS FOR DISCUSSION

**RES-2022-93     PH - Clinic Access Legislation**

A Public Hearing on "A LOCAL LAW adding Chapter 425 to the Laws of Westchester County

---

to ensure safe access to reproductive health care facilities."  [Public Hearing set for June 13, 2022 at 7:30 p.m.]  LOCAL LAW INTRO 2022-258.
*Submitted by: COMMITTEES ON LEGISLATION AND HEALTH*

Guests: Department of Law - John Nonna, County Attorney, Stacey Dolgin-Kmetz, Chief Deputy County Attorney, Shawna MacLeod, Senior Assistant County Attorney; All Women's Healthcare - Constance Considine, Chief Medical Adminstrator; WCLA Choice Matters - Catherine Lederer-Plaskett, President; Planned Parenthood Hudson Peconic - Vincent Russell, President & CEO

*Chair Smith briefly spoke on the item and shared several communications pertinent to the discussion and requested that they be added to the legislative record as evidence of the need for this legislation. Ms. Considine spoke first about the incident at All Women's Healthcare that occurred last year. She stated that the first members of Rose Red Rescue (RRR) arrived at the clinic at approximately 8:15AM, and seemed to know what they were doing and had seemingly done this before. She said they circumvented screening procedures by having two women make fake appointments and when they arrived they let others from their group inside of the facility. She said her staff responded by locking egress points, being unsure of which entrance they arrived from on either Maple Avenue or Mamaroneck Ave. She said they have closed circuit video systems in place, and when her staff realized what was happening, they contacted her. She instructed her staff to stop letting anyone enter except those who absolutely had to get in and told patients and staff to wait in the Maple Avenue parking lot. Most of her staff were able to wait in their vehicles, however, many patients were dropped off for their appointments, so they had to stay inside while protestors were inside facility. She said three men and two women from RRR were obstructing access into and out of the building and were harassing those still in inside. She stated that at some point, the women who made the false appointments left, to potentially avoid arrest. She stated that once she was made aware of the situation, her office immediately called police, and that when police arrived, officers said they were waiting for a bus.  She continued that all the while, in addition to protestors on Mamaroneck Avenue, they were located in the parking lot and inside the premises – all of which is private property.*

*Ms. Considine backtracked, and said that when protestors initially entered, they were menacing and threatening, invaded people's personal space, and avoided putting hands on staff but clearly pushed past staff to get in. She said in those first couple of minutes, her staff moved patients into inner sanctum of office and away from protestors, and had patients waiting in hallways. She continued that patients conveyed feeling scared, threatened, that their privacy was being invaded, and were unsure whether they could be protected. Ms. Considine also stated her concern for those people they left in parking lot, as there was no sense or urgency or immediacy to act in the response from the police during hours-long incident. She noted that patients said that if something like this happened at a nearby convenience store down, they would have been immediately arrested. In this incident, police seemed not to know how to act towards the protestors, being most concerned about their perceived response. She also noted the distress from patients about protestors never being frisked, stating that nothing the police did made her patients feel protected. In spite of roughly two dozen officers being present, they were extremely passive, their response was piecemeal, and wholly inadequate. One of the officers on site told her that they were waiting for instructions from someone and that they couldn't make a move until then.*

*Ultimately Ms. Considine felt extremely frustrated that her staff and patients' rights were superseded by the right to protest by members of RRR. She also noted that she did not let*

doctors in and patients voiced concerns about being publicly identified by protestors, and that whenever anyone goes for a medical appointment, they have a right to privacy, and during this incident, it was a needless invasion of privacy. It was embarrasing and did not need to happen. She stated firmly that she doesn't want to deter first amendment rights, but pointed out that in any other healthcare setting it would not have been tolerated. She assumed the intent of the RRR was to slow down and inhibit their operations related to abortions, however only a third of her patients that day was for an abortion or related procedure.

Ms. Considine continued to speak about the incident stating that RRR seemed to be well versed with the layout of the building, shutting down both entrances and that inside of the facility they verbally harassed patients and staff. Chair Smith asked what kind of language was being used and she said that protestors used a mix of friendly, persuasive language combined with in-your-face condemnations about murdering babies. She said they also made a lot of references to scripture, even going so far as to throw red roses at patients in a menacing fashion meant to intimidate. She knows that people have heard about this case, but what she wants the most is for the protestors to feel that there are consequences to how they made her patients and staff feel last year. She continued that we're being forced to reinvent justice because no one knows how to manage this. She spoke about the huge cost this has been to her organization, having to hire security, additional training for staff, notwithstanding having trouble finding staff, concluding that these are extraordinary measures a business has to take to protect themselves.

Mr. Russell spoke next and referenced the list of incidents at the Planned Parenthood facilities he oversees. What he wants to make clear is that in light of recent events regarding Roe v. Wade, New York will likely see an influx of out of state patients looking for reproductive healthcare services, and a corresponding increase in protests, and that we have to be ready for this. Legislator Cunzio asked that it be clear that law enforcement don't determine the consequences, it is the judge and often police have to release suspects with a desk appearance ticket. Ms. Lederer-Plaskett responded that presently there are no consequences and that this would have never been allowed if it took place at the White Plains Galleria Mall, clarifying that what this law provides for is consequences for subsequent offences, noting that law enforcement hasn't been provided with adequate training for responding to these types of incidents. Legislator Shimsky added that she didn't think a desk ticket was issued, and Legislator Williams Johnson said that the point is that on that day there were no consequences, and what we're trying to achieve is immediate enforcement. Legislator Cunzio referenced existing federal legislation that is on the books regarding the protection of reproductive healthcare facilities, to which Ms. Lederer-Plaskett said that while those have been around since 1994, they are very difficult to enforce, and that after this invasion in White Plains, nine individuals were indicted in Washington, D.C., along with one member of red rose was indicted, before speaking about similar clinic access laws around the country. Further discussion ensued on existing legislation at the state and national level, and why the proposed legislation before committee was necessary.

Ms. Lederer-Plaskett spoke next and referenced video and photographic evidence from the day of the incident that she would be sharing with committee members. She said that a lot would be made clear from the video and wanted to clear up any misunderstanding that the impetus for this legislation is what happened inside the facility, despite what having happened outside being equally disturbing. Ms. Lederer-Plaskett then shared photographic and video evidence of the incident at at All Women's Healthcare in 2021, walking the committee members through the day's events chronologically from the initial arrival of RRR members through the full blown invasion of the clinic with over 20 protestors on the premises. She

*showed protestors verbally harassing patients and staff, photographing patients, blocking points of entry, and disrupting operations. She pointed our police officers helping patients get into the building but not stopping protestors from entering the premises. Legislator Williams Johnson asked that copies of the photos and videos be sent to the committee, which Ms. Lederer-Plaskett said she would. Ms. Lederer-Plaskett also showed aerial photographs and indicated that using measurements taken outside of the facility, the 25 foot buffer simply went up to the next driveway over.*

*Further discussion ensued on existing security measures that were in place and how the two women bypassed screening measures by using their real identities. Legislator Maher asked if our law is drawn broadly enough so that patients who entered are covered by this, and with respect to the increased costs for security and technology they've been forced to implement, can defendants be tried in civil court and judge's order them to pay restitution. County Attorney Nonna said that was a separate provision of NYS penal law and that a lot depended on the interpretation of the law. Legislator Barr asked if the two women who originally booked the fake appointments were ever charged and Ms. Lederer-Plaskett said they were not and reiterated her earlier point about law enforcement not being trained for these kinds of situations and Chair Smith said that ultimately it's on law enforcement to know the law and the intent behind it. A discussion ensued about the use of private security and Mr. Russell reiterated his comment from prior testimony of spending $2M to change the layout of the facility. Chair Smith commented on Legislator Maher's point of restitution, stating that as providers are now incurring additional costs, it stands to reason that it increases their liabilities as well.*

*Ms. Considine said that this issue has been important to all in attendance for a long time, and that something that was particularly troubling was that when her staff asked what they could have legally done to keep protestors out of the facility, they were told that there was nothing they could have using force to keep them out. Legislator Pierce commented that looking at the social media pages of RRR, it is clear that they are unabashedly proud of what they did, don't try and hide their identities, and use offensive language calling reproductive healthcare facilities "satanic temples, butcher shops, and murder factories" and really lean into the fact they engage in these activities within the confines of the law. She continued that the leader of the group touted that he engaged in similar activities 9 times prior to the incident at All Women's Healthcare and operate largely without consequence. She concluded that giving police clear directives will help this from reoccurring and voiced concern that police be properly trained and willing to enforce the law. Legislator Shimsky said that training can't happen for laws that don't exist.*

*Ms. Lederer-Plaskett spoke on a proposed amendment to add to the definition of premises by adding roadway and other access way between the foregoing. County Attorney Nonna asked for clarification if this meant we would be defining a public roadway as part of the premises and wasn't sure that was possible unless we incorporated it in the 100ft fixed buffer zone definition, and additionally asked for clarity on what foregoing meant. Ms. Lederer-Plaskett asked if there was a way to include roadways, to which County Attorney Nonna said he understands where she is coming from but cautioned that they had to be careful with the language. Chair Smith asked about the possibility of including object to the under 425.31h with further discussion ensuing on the merits. County Attorney Nonna said they will look at ways to tighten up the language and it was decided to hold off on making any changes for now.*

This RESOLUTION - Public Hearing was signed by committee to the Board of Legislators. due

back on 5/23/2022

**Aye:**   Committee Chair Smith, Legislator Barr, Legislator Cunzio, Committee Vice-Chair Gashi, Legislator Johnson, Legislator Maher and Legislator Shimsky

**Absent:**   Borgia and Legislator Boykin

[2022-258](#)   **LL - Proposed Clinic Access Legislation**

A LOCAL LAW adding Chapter 425 to the Laws of Westchester County to ensure safe access to reproductive health care facilities.
*Submitted by: COMMITTEES ON LEGISLATION AND HEALTH*
Guests: Department of Law - John Nonna, County Attorney, Stacey Dolgin-Kmetz, Chief Deputy County Attorney, Shawna MacLeod, Senior Assistant County Attorney; All Women's Healthcare - Constance Considine, Chief Medical Adminstrator; WCLA Choice Matters - Catherine Lederer-Plaskett, President; Planned Parenthood Hudson Peconic - Vincent Russell, President & CEO
*For discussion on the item, please refer to the previous item.*

[RES-2022-94](#)   **RES - HOME RULE A9670-S8448**

A New York State Home Rule Resolution requesting the enactment of Assembly Bill No. 9670/Senate Bill No. 8448 entitled "AN ACT to amend the retirement and social security law, in relation to providing certain death benefits to correction officers, correction officer-sergeants, correction officer-captains, assistant wardens, associate wardens or wardens employed by Westchester County."
*Submitted by: COMMITTEE ON LEGISLATION*

Guests: Department of Law - John Nonna, County Attorney

*Chair Smith Spoke briefly on the item before asking the Department of Law to explain the item. County Attorney Nonna said that previously New York State extended death benefits to police, firefighters, emergency services, noting that this legislation would extend it to corrections officers. Mr. Pellone briefly explained how the bill works, and that after having served a certain amount of time, an officer is entitled to a pension. He continued that several years ago, the state legislature passed a bill where someone could receive a lump sum payout if an officer passed away – noting that the beneficiary would only get $400,000 of the $1M. Mr. DiChiara added that this is important so that corrections officers, and their families, can get what they're entitled to in the event that something happens, with Mr. Pellone adding that the life expectancy of a corrections officer is only 58 years. He added that the general idea is that if someone decides to keep working after that 25 years, they would forego that death benefit. Further discussion ensued with the majority of members being supportive.*

This RESOLUTION - Home Rule Request was signed by committee to the Board of Legislators.due back on 5/23/2022

**Aye:**   Committee Chair Smith, Legislator Barr, Legislator Cunzio, Committee Vice-Chair Gashi, Legislator Johnson, Legislator Maher and Legislator Shimsky

**Absent:**   Borgia and Legislator Boykin

## II.   OTHER BUSINESS

## III.   RECEIVE & FILE

## ADJOURNMENT

Moved by Legislator Cunzio, seconded by Legislator Johnson, the Committee adjourned at 3:08 PM.