## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**40 DAYS FOR LIFE,** a nonprofit corporation of the State of Texas,

**WHITE PLAINS 40 DAYS FOR LIFE**, an unincorporated association of the State of New York,

**OKSANA HULINSKY,** and

**REGINA JOY CREARY MOLINELLI** (formerly suing as "Sally Roe"),

                  Plaintiffs,

             v.

**COUNTY OF WESTCHESTER**,

                  Defendant.

Case No.  7:22-cv-6950-PMH

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiffs herein complain of the Defendants as follows:

## NATURE OF ACTION

1.    This action by individual and organizational pro-life advocates seeks injunctive and declaratory relief from provisions of Chapter 425 of the Laws of Westchester County, adopted by the Westchester County Board of Legislators and signed into law by the Chief Executive of Westchester County, George Latimer, on June 28, 2022 (hereafter referred to in the aggregate as "Chapter 425").

2.    As more particularly alleged below, the pretext for adoption of the challenged provisions of Chapter 425 was a peaceful sit-in on November 27, 2021 at a Westchester County

medical facility that provides abortions, conducted by a Franciscan friar and Catholic priest, Father Christopher Moscinski, and two laymen who hand out roses to women contemplating abortions with a note attached that says: "You were made to love and be loved … Your goodness is greater than the difficulties of your situation. Circumstances change. A new life, however tiny, brings the promise of unrepeatable joy."[1]

3.     As shown below, the challenged provisions of Chapter 425 have nothing to do with preventing this kind of trespass as a form of civil disobedience – the same kind of peaceful civil disobedience exercised during the civil rights movement of the Sixties[2]—for which Father Moscinksi and the two laymen involved have been convicted and sentenced to jail under pre-existing laws—a penalty they were fully prepared to accept.[3]  Rather, as the text of Chapter 425 and its legislative history demonstrate, the challenged provisions—including "buffer" and "bubble" zones enforced by criminal penalties—were specifically designed to suppress speech and expressive conduct on public sidewalks and rights-of-way by the Plaintiffs and other pro-life advocates and counselors, who have never trespassed at any abortion clinic nor committed any other crime in connection with their peaceable First Amendment-protected activity.

---

[1] *See* "Priest, pro-lifers sentenced to three months in jail for counseling women inside abortion center"  @  https://www.lifesitenews.com/news/priest-pro-lifers-sentenced-to-three-months-in-jail-for-counseling-women-inside-abortion-center/?utm_source=daily-usa-2022-08-03&utm_medium=email

[2] Cf. Dr. Martin Luther King, Jr. "Letter from a Birmingham Jail" ("The answer lies in the fact that there are two types of laws: just and unjust. I would be the first to advocate obeying just laws. One has not only a legal but a moral responsibility to obey just laws. Conversely, one has a moral responsibility to disobey unjust laws. I would agree with St. Augustine that 'an unjust law is no law at all.'  Now, what is the difference between the two? How does one determine whether a law is just or unjust? A just law is a man made code that squares with the moral law or the law of God. An unjust law is a code that is out of harmony with the moral law. To put it in the terms of St. Thomas Aquinas: An unjust law is a human law that is not rooted in eternal law and natural law."

[3] *Id.*

**JURISDICTION AND VENUE**

4.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983. This action also arises under federal statutory laws, namely 42 U.S.C. § 1985(3) and 42 U.S.C. § 2000e-2.

5.     This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all the defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

6.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Fed. R. Civ. P. 57.

7.     This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

8.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

**PARTIES**[4]

9.     Plaintiff **40 DAYS FOR LIFE** (**40DFL**) is a Texas not-for-profit entity organized under IRS Code Section 501(C)3, located at 4112 East 29th Street, Bryan, Texas 77802  whose mission is to bring together the Body of Christ in a spirit of unity during a focused 40-day campaign of prayer, fasting, lawful and peaceful activism (more particularly described below) at local abortion facilities throughout the United States and the world, including a Planned Parenthood facility located in the unincorporated town of Greenburgh, NY, having a White Plains address.

---

[4] Former Plaintiff "Jane Doe" is no longer a party to this suit.

10.    The vigils and related activity ("Local Vigils") have the purpose of repentance, seeking God's favor to turn hearts and minds from a culture of death to a culture of life, thus bringing about an end to abortion.  Most Local Vigils are operated entirely by volunteers.  Some are operated by paid employees of local churches or pro-life organizations. All Local Vigils and associated activities are independent from 40DFL, which neither directs nor leads any Local Vigils.  40DFL is not an association and has no members, including Local Vigils.  40DFL provides training and support for Local Vigil leaders, as well as allowing the name "40 Days for Life" and associated registered trademarks ("logo") to be used in conjunction with Local Vigils, at the local leader's discretion.

11.    **WHITE PLAINS 40 DAYS FOR LIFE** (**WP-40DFL**), is an unincorporated association of pro-life advocates and a Local Vigil, suing in its own right and on their behalf, that engages in 40-day vigils and peaceful activism, including the offering of pro-life literature and sidewalk outreach, on the sidewalks and rights-of-way adjacent to the aforementioned Planned Parenthood facility in Greenburgh, NY, as more particularly described below.

12.    Plaintiff **OKSANA HULINSKY**, who replaces former Plaintiff "Jane Doe," is actively engaged in providing pro-life sidewalk outreach and counseling and resides in this judicial district.

13.    Plaintiff **REGINA JOY CREARY MOLINELLI** (formerly suing as "Sally Roe") is actively engaged in providing pro-life sidewalk outreach and counseling and resides in this judicial district.

14.    Defendant **COUNTY OF WESTCHESTER** is a duly incorporated county of the State of New York, whose local law Chapter 425 is the subject of this lawsuit seeking injunctive and declaratory relief as well as nominal damages. The defendant County is a "person" within the

meaning of 42 U.S.C. § 1983, and its officials, agents and employees have acted, or will act, under color of state law as to the matters alleged herein.

## PLAINTIFFS' FIRST AMENDMENT-PROTECTED ADVOCACY

### Plaintiff 40DFL's Pro-Life Advocacy

15.   Plaintiff 40DFL is an international pro-life advocacy organization whose activities include the promotion of 40-day Local Vigils on public sidewalks or in public-rights-of way adjacent to abortion facilities throughout the nation, including the Planned Parenthood facility in Greenburgh, NY.

16.   Local Vigils encompass hundreds of thousands of volunteers worldwide in over one thousand (1,000) Local Vigils each year.  Local Vigils have been successful in assisting over twenty-two thousand (22,000) women around the world to choose life for their unborn children. Local 40DFL Vigils have also been successful in helping hundreds of abortion workers leave the abortion industry.

17.   Local pro-life activists and groups are permitted to adopt the concept of "40 Days for Life", display 40DFL's logo, and to use 40DFL literature and signs for their independent activity during these 40-day vigils, provided they pledge to engage only in prayerful, peaceful and lawful advocacy and obey any police orders to disperse rather than risk arrest.  *See* "Statement of Peace" attached and incorporated as **Exhibit A**.

18.   40DFL offers training to and encourages participants in the Local Vigils to peacefully approach persons entering or leaving the facility, or passersby, to converse or offer literature on alternatives to abortion and other resources, which may include pregnancy help resources, adoption, post-abortion healing, abortion education information, and abortion pill reversal. In addition to prayer, this kind of sidewalk activism is an important part of 40DFL's mission.

19.   Local Vigils' activities have included displaying fetal models at the vigil, hosting prayer rallies at the vigil site, directing women to an ultrasound bus/mobile pregnancy help center stationed near the vigil site where legally permitted, processions to or around the vigil site, sidewalk outreach, counseling and advocacy, and referring women to pregnancy help centers.

20.   As more particularly pleaded below, Plaintiff 40DFL has suffered harm to its organizational interest as realized in Westchester County, and outside the Planned Parenthood facility in Greenburgh in particular, on account of the enactment of Chapter 425, which unconstitutionally restricts the First Amendment-protected activity of participants in Local Vigils at abortion facilities, which are essential to the accomplishment of 40DFL's mission.

## Plaintiff WP-40DFL's Pro-Life Advocacy

21.   Plaintiff WP-40DFL participates in 40DFL's National Campaign of Local Vigils as an independent unincorporated association for the common purpose of advocating for life and peacefully bringing about an end to abortion.

22.   During the 40-day Local Vigils at the Planned Parenthood facility in Greenburgh, WP-40DFL volunteers have gathered, and intend to gather, on the sidewalk and public right-of-way to engage in prayer and pro-life advocacy.  Representative photographs of such gatherings, taken before the enactment of Chapter 425, are annexed hereto as **Exhibit B.**

23.   During the Local Vigils at the Planned Parenthood facility in Greenburgh, WP-40DFL volunteers have engaged, and intend to engage, in approaching persons entering or leaving the facility for the purpose of discussion or the offering of literature on pregnancy help resources, adoption, post-abortion healing, abortion pill reversal, and abortion education information. Representative samples of the types of pro-life literature that are handed out at 40 Days for Life vigils  across the country, including New York, are annexed hereto as **Exhibit C**.

6

24.   As more particularly pleaded below, Plaintiff WP-40DFL has suffered harm to its associational interest as a pro-life advocacy group on account of the enactment of Chapter 425 because the challenged provisions of Chapter 425 render effective pro-life advocacy and counseling impossible without the risk of criminal and civil liability, and the activities of WP-40DFL have consequently either been chilled or altogether halted as shown below.

25.   As more particularly pleaded below Plaintiff WP-40DFL is also suing in a representational capacity on behalf of the individual participants in their First Amendment-protected activities.

**Plaintiff Oksana Hulinsky's Pro-Life Advocacy**

26.   Plaintiff OKSANA HULINSKY ("HULINSKY"), a retired public school guidance counselor, has been engaged in pro-life sidewalk counseling and related pro-life advocacy for approximately 4 years, each Thursday, at the Planned Parenthood facility currently located in New Rochelle.

27.   Plaintiff HULINSKY is motivated by her sincere religious belief as a Catholic Christian that abortion is the direct and wrongful taking of innocent human life in violation of the natural law, an intrinsic evil that cannot be justified under any circumstances.

28.   Plaintiff HULINSKY was inspired to become a pro-life sidewalk advocate when she saw color photos of the horrific results of abortion, depicting the brutal destruction of innocent human beings in the womb.

29.   Plaintiff HULINSKY's religious belief, which informs her conscience, compels her to oppose and publicly advocate and counsel against abortion.  Her conscience compels her to peacefully and lawfully encourage expectant mothers, face-to-face, to choose life for their unborn children.

7

30.     Prior to the adoption of Chapter 425, Plaintiff HULINSKY's First Amendment-protected activity included praying the Rosary, usually with others, on the public sidewalk and right-of-way adjacent to the Planned Parenthood facility in New Rochelle in order to bear witness against abortion.  *See* photographs of facility and adjacent public sidewalk at **Exhibit D** hereto.

31.     Plaintiff HULINSKY also peacefully approached expectant mothers and others going to or leaving the facility, in order to engage in a short, quiet conversation, at a normal conversational distance, while offering literature concerning the alternatives to abortion, which literature was first provided to her by former Plaintiff "Jane Doe."

32.     The literature Plaintiff HULINKSY has offered to women and others approaching or leaving the facility provides information concerning such alternatives to abortion as adoption and also financial, medical and housing assistance if an expectant mother contemplating an abortion elects not to abort her child. Samples of the handouts employed by Plaintiff HULINSKY are annexed hereto as **Exhibit E** and made part hereof.

33.     On occasion, when Plaintiff HULINSKY engages in pro-life advocacy and counseling, she has held a pro-life sign produced by Plaintiff 40DFL.

34.     Plaintiff OKSANA HULINSKY has also participated in Local Vigils conducted by Plaintiff WP-40FDL as part of Plaintiff 40DFL's national mission, and she desires to continue doing so if appropriate injunctive relief is granted.

35.     Plaintiff HULINSKY recognizes that the moments before expectant mothers enter, or the moments after they leave, a Planned Parenthood facility are the last best hope of encouraging them to seek an alternative to abortion if they have not yet undergone the procedure, and that in those moments it is crucially important to be able to approach these women in order to engage in quiet conversation rather than shouting pro-life slogans or merely holding a sign at a distance.

8

36.    Plaintiff HULINSKY believes many women are being coerced into decisions they may regret for the rest of their lives.  She is offering information and assistance for an informed choice, including the many possibilities available to women who simply fear they cannot support a child.

37.    As more particularly pleaded below, the challenged provisions of Chapter 425 have made Plaintiff HULINSKY's pro-life advocacy and counseling impossible without the grave risk of criminal and civil liability, and she has thus suspended her usual forms of advocacy pending judicial intervention.

**Plaintiff Regina Joy Creary Molinelli's Pro-Life Advocacy**

38.    Plaintiff **REGINA JOY CREARY MOLINELLI** ("MOLINELLI"), a Catholic school catechism teacher who is married with children, has been in engaged in sidewalk pro-life advocacy and counseling at Planned Parenthood abortion clinics in Westchester County for approximately eight years.

39.    Like Plaintiff HULINSKY, Plaintiff MOLINELLI is motivated by her sincere religious belief as a Catholic Christian that abortion is the intrinsically evil direct and wrongful taking of innocent human life that cannot be justified under any circumstances.   Plaintiff MOLINELLI'S religious belief, which informs her conscience, compels her to oppose and publicly advocate and counsel against abortion.  Plaintiff MOLINELLI believes that she would sin by passively accepting abortion as the status quo and doing nothing to encourage expectant mothers, face-to-face, not to commit the grave wrong of killing their own children in the womb and to choose life instead.

40.    Plaintiff MOLINELLI has received formal training in peaceful techniques of pro-life sidewalk advocacy and counseling.

41.   Like Plaintiff HULINSKY, Plaintiff MOLINELLI's advocacy consists of praying the Rosary, which she has frequently done on the sidewalk adjacent to a Planned Parenthood facility clinic in Greenburgh, including that portion of the sidewalk abutting the driveway leading to the facility's parking lot.   Photographs of the facility, adjacent public sidewalk, and right-of-way crossing the driveway (taken before enactment of Chapter 425) are **Exhibit F** hereto.

42.   Plaintiff MOLINELLI currently engages in this peaceful advocacy and counseling one day per week for several weeks at a time with others, generally in the Fall and Spring, as part of the WP-40DFL Vigils at the same Greenburgh Planned Parenthood facility.   Plaintiff MOLINELLI also advocates and counsels on her own in the manner described at various times at the same location.

43.   Like Plaintiff HULINSKY, Plaintiff MOLINELLI peacefully approaches expectant mothers and others going to or leaving the facility by car or on foot in order to engage in a short, quiet conversation, at a normal conversational distance.   She also offers literature relating to the physical and psychological risks of abortion, fetal development, and alternatives to abortion, including contact information for adoption, financial, medical and housing assistance if an expectant mother contemplating an abortion elects not to abort her child.   Samples of the handouts employed by Plaintiff MOLINELLI are annexed hereto as **Exhibit G**.   Of primary concern, in addition to the life of the unborn child, is the condition of the mother who under duress may be pushed into decisions she might regret later in life.   Plaintiff MOLINELLI is offering to provide information and assistance that would help the mother make an informed choice and with knowledge that life-saving alternatives with medical and financial assistance are available to her to help her keep her baby.

44.   Plaintiff MOLINELLI has also offered "Blessing Bags" to persons approaching or

leaving the Greenburgh Planned Parenthood facility. These "Blessing Bags" contain food and other items in addition to the aforesaid literature.  The offer of food in the "Blessing Bag" is an act of kindness that lends itself to conversation about alternatives to abortion.  On occasion, Plaintiff MOLINELLI has also offered roses to women and their companions as they approach or leave the facility as a gesture of friendship and respect.

45.   If a car approaching the Planned Parenthood facility in Greenburgh stops in the public portion of the driveway crossing the sidewalk in order to speak to Plaintiff MOLINELLI, either when she is there on her own or when she is participating in a WP-40DFL Prayer Vigil, she will walk up to the car to speak to the occupants and offer them literature and "Blessing Bags."

46.   Plaintiff MOLINELLI also holds pro-life signs during her advocacy when she is not engaging in sidewalk counseling, including a sign that states "Pray to End Abortion" and another displaying the name and telephone number of an organization that provides various forms of assistance to expectant mothers who elect not to proceed with an abortion.  In addition, she employs a fixed pro-life sign on the public right-of-way about 3 feet from the edge of the public portion of the driveway leading to the Planned Parenthood facility, stating "U R ❤D".  Samples of the signs Plaintiff MOLINELLI employs in the course of her pro-life advocacy are annexed hereto as **Exhibit H**.

47.   Like Plaintiff HULINSKY, Plaintiff MOLINELLI recognizes that the moments before expectant mothers enter, or the moments after they leave, a Planned Parenthood facility are the last best hope of encouraging them to seek alternatives to abortion if they have not yet undergone the procedure, and that in those moments it is crucially important to be able to approach these women in order to engage in quiet conversation rather than shouting pro-life slogans or displaying signs from a distance.

11

48.   Plaintiff MOLINELLI's sidewalk pro-life advocacy and counseling at the aforesaid Planned Parenthood location is not only adjacent to the facility's driveway on the public sidewalk, but also less than 100 feet from the facility's front entrance as shown in **Exhibit F** and also within the 25-foot "no follow and harass" zone. Although the front entrance is no longer left unlocked, a significant number of those approaching the facility attempt to use that entrance, to which they are admitted if they knock, and Plaintiff MOLINELLI has an opportunity to counsel women as they approach that entrance by car or on foot using the sidewalk shown in **Exhibit F**.

49.   As more particularly pleaded below, the challenged provisions of Chapter 425 have made Plaintiff MOLINELLI's pro-life advocacy and counseling impossible without the grave risk of criminal and civil liability, and she has thus suspended her advocacy pending judicial intervention.

## THE CHALLENGED PROVISIONS OF CHAPTER 425

50.   On June 27, 2022, the Westchester County Board of Legislators voted to adopt Chapter 425, a new section of the Laws of Westchester County.  On June 28, 2022, George Latimer, Chief Executive of Westchester County, signed Chapter 425 into law.

51.   As more particularly pleaded below, Chapter 425 is a content-based restriction on speech whose operative terms are vague, overly broad, or both.  A copy of the law as adopted and the accompanying Memorandum of the Board's Legislation Committee, and the subsequent Local Law Filing with New York State, are annexed hereto as **Exhibit I.**

52.   As revealed by the legislative history of Chapter 425, set forth below, the speech restrictions therein are justified in large part by explicit reliance in published Legislation Committee memoranda on an erroneous vacated decision of the Second Circuit in *New York v. Griepp*, respecting which the Board of Legislators was wrongly advised during the drafting process

12

that its First Amendment holdings were good law even though it had been *vacated in its entirety* approximately 11 months earlier by the same panel that had issued it.

53.   In pertinent part, the operative provisions of Chapter 425, challenged here, incorporating the italicized definitional provisions, are as follows:

**Sec. 425.31 Prohibited Conduct**

It shall be unlawful for any person to do the following:

a. knowingly *physically obstruct or block* another person from entering into or exiting from *the premises of a reproductive health care facility* or a public parking lot serving a reproductive health care facility, in order to prevent that person from obtaining or rendering, or assisting in obtaining or rendering, medical treatment or reproductive health care services; or

….

c. knowingly *follow and harass* another person within twenty-five (25) feet of (i) *the premises of a reproductive health care facility* or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

d. knowingly engage in a course of conduct or repeatedly commit acts when such behavior places another person in reasonable fear of physical harm, or *attempt to do the same*, within twenty-five (25) feet of (i) the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility; or

e. by force or threat of force, or by *physically obstructing or blocking*, knowingly injure, intimidate, or *interfere with*, or attempt to injure, intimidate, or *interfere with*, another person in order to discourage such other person or any other person or persons from obtaining or providing, or assisting in obtaining or providing, reproductive health care services; or

f. by force or threat of force, or by *physically obstructing or blocking*, knowingly injure, intimidate, *or interfere with*, or attempt to injure, intimidate *or interfere with*, another person because such person was or is obtaining or providing, or was or is assisting in obtaining or providing, reproductive health care services; or

….

h. knowingly *interfere with* the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, *interfering with*, or attempting to interfere with (i) medical procedures or treatments being performed at such reproductive health care facility; (ii) the delivery of goods or services to such reproductive health care facility; or (iii) persons inside the facility; or

i. knowingly *approach* another person *within eight (8) feet of such person*, unless such other person *consents*, for the purpose of passing *any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling* with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility. [5]

### A Summary of the Challenges Presented

54.    As the following allegations demonstrate, Chapter 425 is a poorly drafted "shotgun" statute, clumsily designed to suppress pro-life sidewalk advocacy and counseling in numerous different ways by using definitional "gotchas" that are repeated in the operative provisions, rendering those provisions substantially duplicative of each other and creating a statutory welter of interacting, cross-referenced speech-restrictions.

55.    Therefore, in order to clarify the muddle of Chapter 425's statutory scheme, Plaintiffs hereby summarize at the outset their challenges to Chapter 425 based on both its operative and definitional provisions, as fully discussed below:

- § 425.31 (a) is challenged both facially and as applied because of its incorporated vague and overbroad definitions of "physically obstruct or block" and "premises of a reproductive health care facility," including even public property at "the entrance or exit of a public parking lot serving a reproductive health care facility…"

- § 425.31 (c) is challenged both facially and as applied because of its incorporated content-based, vague and overbroad definitions of "follow and harass" and "premises of a reproductive health care facility."

- § 425.31 (d) is challenged both facially and as applied because it imposes criminal liability for a mere "attempt" to engage in a "course of conduct or repeated acts" (including speech) that allegedly "place another person in reasonable fear of physical harm" within a speech-restricting zone of twenty-five (25) feet from the overly broadly defined "premises of a reproductive health care facility."

- § 425.31 (e) is challenged both facially and as applied because of its overly broad and vague definition of "physically obstructing or blocking" and its vague, overly broad and content-based definition of "interfere with," which includes "deceptive means [i.e., speech] or otherwise," as well as its imposition of liability for a mere "attempt to … interfere with, another person…"  This section is further challenged

---

[5] Emphasis added. All emphasis in this Complaint is added unless otherwise indicated.

as applied, given that the term "intimidate" can readily be extended to speech that does not constitute a true threat, as the following discussion of the legislative history of Chapter 425 will show.

- § 425.31 (f) is challenged both facially and as applied because of its overly broad and vague definition of "physically obstructing or blocking" and its vague, overly broad and content-based definition of "interfere with," as well as its imposition of attempt liability under those terms. This section is likewise further challenged as applied, given the term "intimidate" as viewed in respect to the legislative history.

- § 425.31 (h) is challenged both facially and as applied because of its incorporation of the vague, overbroad and content-based definition of "interfere with," including a mere "attempt" to "interfere with" the "operation of a reproductive health care facility…"

- § 425.31 (i) is challenged both facially and as applied because it imposes an overly broadly defined eight-foot "floating bubble zone" prohibiting an "approach" to another person—also overly broadly defined—for the content-based purpose of punishing speech and expressive conduct which takes the form of the "passing any material, item, or object to, displaying a sign to, or engaging in oral protest, education, or counseling" within 100 feet "from any door to a reproductive health care facility."

### First Amendment Analysis of the Challenged Provisions

56.    These challenged operative provisions, including the repeated incorporation of the challenged defined terms, establish multi-layered zones and prohibitions each rigged with speech-restrictive hair-triggers and trip-wires, under which Plaintiffs' pro-life advocacy is subject to *de jure* and *de facto* total prohibition under pain of criminal and civil penalties.

57.    Under Sec. 425.31(i), within a 100-foot radius (measured from any facility door) any "approach" to another person to a distance of less than eight feet for purposes of *certain types* of speech and expressive conduct is prohibited unless the other person consents to the "approach" (the "100-foot 'no approach' zone"). This facially content-based provision prohibits only the following specified speech and expressive conduct in which Plaintiffs engage, as noted above: "***the purpose of passing any material, item or object to, displaying a sign to, or engaging in oral protest, education, or counseling*** with such other person." As more particularly pleaded

15

below, because of the threat of both criminal and civil liability for a non-consensual "approach," the 100-foot "trigger" for the eight-foot bubble zone forces sidewalk pro-life advocates and counselors, including the Plaintiffs, to retreat to a distance that, by legislative design, renders their face-to-face, conversational pro-life advocacy impossible.

58.    Worse, as further discussed below, even if pro-life advocates observe the floating eight-foot bubble zone, the numerous other speech-restrictions imposed by Chapter 425 render the entire 100-foot radius a First Amendment "no-go" zone due to the hair-triggers for criminal liability that Chapter 425 plants there.

59.    First among these other restrictions is the 25-foot zone established by § 425.31(c) and (d) in which it is forbidden to (a) "follow and harass" another person, or (b) engage in, or "attempt" to engage in, repeated acts or a course of conduct that places another person in "reasonable fear of physical harm" (the "no follow and harass zone"). As more particularly pleaded below, the speech restrictions in the "no follow and harass" zone are vague, overly broad or both, as well as content-based, and, like the floating eight-foot bubble zone, have the effect of nullifying Plaintiffs' pro-life advocacy due to the threat of criminal and civil liability.

60.    Further, under § 425.31 (a) the prohibition on "knowingly physically obstruct or block another person" has a vague and overbroad definition—as more particularly pleaded below—effectively reaching any First Amendment-protected activity, including conversation, the offering of literature or the display of a sign, that merely "hinders" the forward movement of the hearer or recipient, which would include cars stopping in order to converse with a pro-life advocate.

61.   Under Sec. 425.31(e) and (f), it is also a crime merely to "interfere with" another via "physical obstruction and blocking"—both of which phrases contain special definitions that make it possible to reach mere leafletting and sign-holding on sidewalks outside abortion clinics.

62.   Still worse, Sec. 425.31(h) makes it a crime to "interfere with" or attempt to "interfere with" the operations of a "reproductive health care facility" by *any* form of conduct—*apart from* a force or physical-obstruction predicate. Thus, mere speech that causes another *to "stop"*—say, to look at a leaflet—that enforcement authorities deem "deceptive *or otherwise*"—results in fines, possible imprisonment or both.  As more particularly alleged below, the non-"interference" provision is breathtakingly vague, overly broad, and content-based—thus likewise nullifying Plaintiffs' pro-life advocacy given the threat of criminal and civil liability.

63.   As more particularly pleaded below, each of these restrictions is unconstitutional in and of itself. But the combined effect of these multi-tiered, hair-trigger provisions is to categorically prohibit pro-life advocacy outside of abortion clinics, thereby creating a super-sized, combination *de facto*  and *de jure* buffer zone (with an overall radius of 100 feet from any facility's door) that dwarfs the 35-foot buffer zone the Supreme Court struck down in *McCullen v. Coakley*.

64.   The speech-suppressing effect of the foregoing provisions is amplified by the defined terms "approach," "eight feet," "follow," "harass," "intimidate," "interfere with," "physically obstruct or block," "premises of a reproductive health care facility" and "public parking lot of a reproductive health care facility", which are variously vague, overly broad and content-based. This is shown by the following facts.

65.   "Approach", as used in §425.31(i), is defined as "to move nearer in distance to someone"—that is, any distance at all within or that breaches the floating eight-foot bubble zone in the 100-foot "trigger" zone. *See* § 425.21 (a).  This term is both vague and overly broad.

66.    "Follows", as used in §425.31 (c), is undefined and is thus impermissibly vague as well as overly broad.  The term could embrace a movement of any distance deemed "following" within the 25-foot "no follow and harass" zone. As shown in the Exhibits discussed below, the "no follow and harass" zone of 25 feet overlaps all of the public sidewalk and rights-of-way, including the public portion of driveway cutouts, that lie within the 100-foot radius.  Thus, any supposed ability to engage in effective communication within the 100-foot radius is illusory—by design.

67.    "Eight (8) feet", as used in §425.31(i), is defined as "measured from the part of a person's body that is nearest to the closest part of another person's body, where the term 'body' includes any natural or artificial extension of a person, including, but not limited to, an outstretched arm or handheld sign." *See* § 425.21 (b).  Chapter 425 is thus violated if any part of a pro-life advocate's body, or his or her sign, "approaches" any distance to any point within the floating eight-foot bubble zone surrounding any part, or extension of, the body of anyone within that zone. The term is an obviously overly broad hair-trigger for criminal liability.

68.    "Harass", as used in §425.31(c) is defined as "to engage in a course of conduct or repeatedly commit conduct or acts that alarm or *seriously annoy* another person and which serve no legitimate purpose. For the purposes of this definition, conduct or acts that serve no legitimate purpose include, but are not limited to, *conduct or acts that continue after an express **or implied** request to cease has been made*." *See* § 425.21 (c) .  Chapter 425 thus criminalizes any speech or expressive conduct deemed "seriously annoying" to anyone who requests or merely *implies* a request that it cease. The term is both impermissibly vague and overly broad, as well as content-based because it prohibits speech based solely on the listener's reaction.

69.    "Intimidate", as used in §425.31 (e) and (f), overly broadly includes statements that are not "true threats," as the legislative history presented below reveals.  The legislators followed

18

the mistaken advice that the vacated *Griepp I* decision is good law on the question of "intimidation" by "threat of force."

70.    "Interfere with", as used in § 425.31 (e), (f) and (h), is defined as "to restrict a person's freedom of movement, or to stop, obstruct, or *prevent* [sic], *through deceptive means or otherwise*."   *See* § 425.21 (d).   As to this term, the following First Amendment violations are apparent:

(a) The embedded terms "deceptive means or otherwise" are not defined and are thus impermissibly vague as well as overly broad. "Deceptive means" could embrace merely alleged psychological restrictions of "freedom of movement" by speech— including an invitation to stop and read a pro-life pamphlet—deemed "deceptive" that causes the hearer to pause and speak to a pro-life advocate, slow his or her movement in response, or decide not to enter an abortion facility  —  all of which could also be deemed to "stop" or "prevent."   For example, these legitimate concerns for the mother and child could be deemed "deceptive" if shared by prolife advocates: "Your child has a beating heart and can feel pain."[6] "You will regret your abortion for the rest of your life."[7] "The rate of suicide is higher in women who have experienced abortion."[8] "Birth control pills can cause blood clots,"[9] and

---

[6] Yes, An Unborn Child Can Feel Pain: https://lozierinstitute.org/science-to-judge-jackson-yes-an-unborn-child-can-feel-pain/
[7] Pro-life advocate recounts 'abortion regret': https://www.10news.com/news/local-news/del-cerro-woman-pro-life-advocate-recounts-abortion-regret
[8] Elevated Suicide Rates Among Mothers after Abortion: https://lozierinstitute.org/new-study-elevated-suicide-rates-among-mothers-after-abortion/
[9] Birth control creates higher risk of blood clots: https://www.openaccessgovernment.org/risk-of-blood-clots/106257/

so forth.[10] This vague and overly broad term makes it impossible to know what speech or conduct is unduly "deceptive" or "otherwise" "interferes with" effectively giving unfettered discretion to enforcing authorities to make those determinations.

(b) The prohibition of "*deceptive* means" also renders it quintessentially content-based, as law enforcement must discern whether the chosen means are *deceitful*—an inherently speech-based characteristic that necessarily requires an evaluation of its *content*.

(c) The term "otherwise" is also not defined and literally could mean any "other" means of causing one to stop on the sidewalk outside the abortion clinic. This undefined term is breathtakingly vague and overbroad.

(d) The term "prevent" as used in §425.21(d) likewise has no definition and is thus both impermissibly vague and overly broad.   What constitutes "prevention"?

---

[10] *See, e.g.*, Jennifer Rubin, "The fundamental deception behind the 'pro-life' movement," Washington Post, Dec. 1, 2021, https://www.washingtonpost.com/opinions/2021/12/01/fundamental-deception-behind-pro-life-movement/; *see also* NARAL Pro-Choice America, "Crisis Pregancy Centers Lie: The Insidious Threat to Reproductive Freedom," 2015, https://www.prochoiceamerica.org/wp-content/uploads/2017/04/cpc-report-2015.pdf; Joanna Smith, "Deception used in counselling women against abortion," Toronto Star, Aug. 7, 2010, (https://www.thestar.com/news/canada/2010/08/07/deception_used_in_counselling_women_against_abortion.html (alleging that among the "misleading information" conveyed by (contd.) sidewalk counselors in 2010 was that abortion clinics sell fetal body parts for medical research); *compare, See e.g.*, Denise Grady and Nicholas St. Fleur, "Fetal Tissue From Abortions for Research Is Traded in a Gray Zone," New York Times, July 27, 2015, https://www.nytimes.com/2015/07/28/health/fetal-tissue-from-abortions-for-research-is-traded-in-a-gray-zone.html (reporting that, according to NYU Langone Medical Center Director of Medical Ethics, Arthur Caplan, "[t]he fees . . . can run to the thousands of dollars for a tiny vial of cells… [T]here appears to be little or no oversight of the processing of fees," and "[i]t's a very gray and musty area as to what you can charge").

Virtually any form of speech that alters another's actions could be deemed to "prevent" [sic] in violation of 425.31 (e), (f) and (h).

(e) Even *attempted* "interference with" triggers liability under Sec. 425.31 (e), (f) and (h)—without any actual physical restriction of "freedom of movement" and even if the alleged offender does not actually "stop," "obstruct," or "prevent" (whatever that might mean) by "deceptive means" (whatever that might mean).

71.    By comparison, the definition of "interfere with" in FACE is simply "to restrict a person's freedom of movement" without resort to such ambiguous terms as "prevent" or "stop" by "deceptive means or otherwise." 18 U.S.C.A. § 248.  Likewise, the New York State Clinic Access Act limits "interfere with" to "force or threat of force or by physical obstruction…" *See* N.Y. Penal Law § 240.70(1)(a) and (b) and (3)(b)(definition of "interferes with").

72.    "Physically obstruct or block", as used in § 425 (a), (c) and (f), is vaguely and overly broadly defined as "to physically *hinder*, restrain, or impede, or to *attempt* to physically *hinder*, restrain or impede, or to otherwise render ingress to or egress from, or render passage to or from the premises of a reproductive health care facility impassable, unreasonably difficult, or hazardous." *See* § 425.21(h) .  This sweeping definition presents the following First Amendment infringements:

(a) The definition, which embraces even an *attempt* to "physically obstruct or block," is far broader than that of FACE, which limits its prohibition of "physical obstruction" to "rendering impassable ingress to or egress from a facility… or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous."  *See* 18 U.S.C. § 248 (a)(1) and (e)(4) The definition is also far broader than that of the New York State equivalent of FACE,

which speaks only of "physical obstruction" *simpliciter*.

*See* N.Y. Penal Law § 240.70(1)(a)-(c) and 3(d)(definition of "physically obstruct").

(b) Under Chapter 425's definition of "physically obstruct *or block*" all manner of First Amendment-protected speech and expressive conduct could be deemed to "hinder, restrain, or impede, or to *attempt* to physically hinder, restrain or impede." For example, offering literature repeatedly; "blocking" by occupying a fraction of the sidewalk so that those approaching or leaving (or who could be *hypothetically* approaching or leaving) an abortion clinic have to pause or go around them; inducing someone to stop, on foot or in a car, in order to converse, and so forth— all without an actual physical obstruction.

(c) As the legislative history presented below reveals, this notion of *de minimis* "physical obstruction" appears in the vacated *Griepp I* decision the Westchester County legislators cite repeatedly in their legislative committee memoranda, up to and including the very date on which the Board voted to adopt Chapter 425.

73.   "Premises of a reproductive health care facility", as used in §425.31(a), (b), (c) and (d), is overly broadly defined to include "the driveway, entrance, entryway, or exit of the reproductive health care facility, the building in which such facility is located, and any parking lot in which the facility has an ownership or leasehold interest." *See* § 425.21(i).  The sweep of this provision criminalizes all protected speech or other expressive conduct deemed "seriously annoying"—an undefined, vague, overbroad, and content-based term—within the 25-foot "no follow and harass" zone embracing large swaths of public sidewalks and rights-of-way that are

22

traditional public forums, as pleaded more particularly below with respect to the locations at which Plaintiffs advocate and counsel.

74.    "Public parking lot of a reproductive health care facility", as used in § 425.31 (a), (b), (c) and (d) to **extend the definition** of "premises of a reproductive health facility," is defined as "any public parking lot that serves a reproductive health care facility and that has an entrance or exit located within one-hundred (100) feet of any door to that reproductive health care facility." § 425.21(j).  This term exacerbates the speech-restricting impact of the already overly broad 25-foot "no follow" zone **by adding public property to the "premises" of a privately owned facility,** thus commandeering public property for the private benefit of "reproductive health" facilities that seek to prohibit "unwanted" speech that counsels against patronizing their businesses.

75.    Chapter 425 further provides that "any person whose ability to access the premises of a reproductive health care facility has been interfered with, and any owner or operator of a reproductive health care facility or owner of a building in which such facility is located, and any employee, paid or unpaid, and any volunteer working for such facility, and any invitee" may bring a civil action for injunctive relief, triple damages and attorney fees within five years of the alleged violation. *See* § 425.51. This provision further burdens First Amendment rights with the threat of crushing monetary judgments for violation of any of Chapter 425's vague, overly broad, content-based speech restrictions

76.    Chapter 425 also authorizes the County Attorney to bring a civil action on behalf of the County for injunctive and other equitable "relief" from the prohibited conduct.  *See* § 425.61. This provision empowers a state actor to sue for imposition of Chapter 425's speech restrictions on pro-life advocates and counselors under threat of contempt of court and prosecution for civil or criminal contempt.

77.   Finally, Chapter 425 imposes joint and several liability for criminal fines and penalties upon "two (2) or more of the named defendants" if they "acted in concert pursuant to a common plan or design to violate any provision of section 425.31…" § 425.71.  Thus, a pro-life advocate and counselor who personally manages to avoid any of Chapter 425's trip wires would still be criminally and civilly liable for alleged violations by others deemed to be acting "in concert" with him or her.

78.   In sum, under the cited prohibitions and definitions of Chapter 425, pro-life advocates who advocate on the public sidewalks and rights-of-way adjacent to abortion facilities, including the Plaintiffs herein,  can be criminally prosecuted, sued by the County Attorney, and subjected to crushing monetary awards and injunctions in the following cases:

(a) allegedly transgressing the floating eight-foot bubble zone—which springs into existence after a pro-life advocate crosses the radius of the 100-foot "trigger" line—by an "approach" of any distance into the eight-foot bubble by any part of one's body or hand-held sign, unless one first obtains the required "consent" to speak to anyone inside the bubble—with the nature of the required "consent" being far from clear;

(b) allegedly "following" for any distance, even a step or two, within the 25-foot "no follow and harass" zone and "harassing" by speech deemed "seriously annoying" that does not cease after an express or merely "implied" request to cease;

(c) merely "attempting" to engage in an unspecified "course of conduct" or "repeated acts" placing another in "reasonable fear of physical harm";

(d)  physically "hinder[ing]", "restrain[ing]", "imped[ing]", or merely attempting

24

to physically "hinder", "restrain" or "impede", someone approaching or leaving an abortion facility by (based on the background of these provisions discussed below) merely offering literature, displaying a sign, occupying part of the sidewalk ("blocking"), or causing a delay by inducing conversation, even if no substantial physical obstruction is involved;

(e) "intimidation" or attempted "intimidation" in the form of statements that could be deemed "threatening," such as those deemed "threats" in the vacated decision in *Griepp I*, on which (as shown below), the Westchester County Legislators relied in drafting Chapter 425.[11]

(f) "interfering with" or merely "attempting" to "interfere with" the operations of an abortion facility in any way, by any form of conduct deemed to constitute "interference", including "deceptive means or otherwise" such as speech or other expressive conduct causing another to "stop," or "preventing" another from entering a facility, or causing even momentary delay, even if there is no actual physical obstruction of access to a "reproductive health care facility."

(g) allegedly acting "in concert" with anyone who violates or even attempts to violate any of these challenged provisions and related definitions of Chapter 425, even without violating that provision oneself, thus giving rise to guilt by

---

[11] For example, in the now-vacated decision, the Second Circuit panel majority found that mere preaching about "the fragility of life" with such statements as "[y]ou never know when you're going to die" and "they never know when death may come," were true threats. *Griepp I*, 991 F.3d at 115. That decision having been vacated by the panel itself, the District Court's constitutionally sound rejection of that spurious claim is now the only law of that case.

association with other pro-life advocates and sidewalk counselors at the same location.

### THE IMPACT OF CHAPTER 425 ON THE PRO-LIFE SIDEWALK ADVOCACY AND COUNSELING OF PLAINTIFFS HULINSKY, MOLINELLI AND WP-40DFL

79.  Because of the challenged provisions of Chapter 425, Plaintiffs HULINSKY, MOLINELLI and WP-40DFL (referred to hereafter as the "local pro-life advocate Plaintiffs") can no longer, without risk of civil and criminal liability, effectively approach cars or people accessing the facility at the locations of their advocacy to have a conversation or offer literature or gather on the public sidewalks and rights-of-way abutting abortion facilities.   In particular:

80.  The 100-foot "trigger" for the eight-foot bubble zone, the 25-foot "no follow and harass" zone, and the multiple no-"interference" prohibitions would require the local pro-life advocate Plaintiffs  to risk criminal and civil liability for:

(a)  Merely "approaching" less than eight feet to another to speak about certain officially disfavored topics without the other party's "consent," with what constitutes "consent" having no clear definition. §§ 425.21 (a) and 425.31(i).[12]

(b)  "Following" for even one or two steps. § 425.31(c).

(c)  "Harassing" by merely speaking or engaging in other expressive conduct after an express or "implied" request to cease, with what constitutes an "implied" request being undefined. § 425.21(c) and § 425.31(c).[13]

---

[12]  As the legislative history presented below reveals, the legislators viewed § 425.31(i) as establishing a *presumption of non-consent* to speech inside the eight-foot floating bubble zone, requiring the listener's "affirmative" consent to avoid criminal liability for transgressing the zone.
[13]  As the legislative history presented below also reveals, the legislators viewed what constitutes an "implied" request to cease otherwise protected speech as a matter that will be "up to a court to determine" at a trial for alleged "harassment" in violation of §425.31(c).

(d) "Interfering with" or merely attempting to "interfere with" the operation of the subject facilities, with "interference" broadly and vaguely defined to include "stop[ping]" (even momentarily) or "prevent[ing]" "through deceptive means or otherwise"—i.e., any speech or other expressive conduct arbitrarily deemed "deceptive." § 425.21(d) and 425.31(h);

81.  Even if the local pro-life advocate Plaintiffs were able to initiate a conversation outside the 100-foot "trigger" line at a normal conversational distance, it would have to cease immediately and they would have to retreat to a distance of eight feet to accommodate the floating eight-foot bubble zone once the other party has passed the 100-foot "trigger" line, unless the other party "consented" to continuing the conversation—"consent" (whatever that might mean) having to be proved in any criminal proceeding initiated against Plaintiffs under Chapter 425.

82.  The gathering of Plaintiff WP-40DFL pro-life advocates on the sidewalk and public rights-of-way at the Planned Parenthood facility in Greenburgh, as shown in **Exhibit B**, would violate Chapter 425's overly broadly defined prohibition of "Interfering with" or merely attempting to "interfere with" the operation of the subject facilities by "stop[ping]" (even momentarily) or "prevent[ing]" access to the facility in keeping with the rationale of the *Griepp* decision as reflected in the challenged provisions of Chapter 425.

83.  Moreover, as previously noted, any ability to engage in effective communication within the 100-foot radius is illusory. This is shown by the following facts.

84.  Annexed hereto as **Exhibit J** is an aerial and frontal view depicting the sweep of the overlapping zones and prohibitions at the Planned Parenthood facility where Plaintiff HULINSKY has frequently advocated and counseled.

85.     Annexed hereto as **Exhibit K** is an aerial and frontal view depicting the sweep of the overlapping zones and prohibitions at the Planned Parenthood facility in Greenburgh where Plaintiffs MOLINELLI, WP-40DFL and, on occasion, Plaintiff HULINSKY engage in the First Amendment-protected activities described above, including the offering of literature to expectant mothers and their companions.[14]

86.     As can be seen from **Exhibit J** and **Exhibit K**, the overlapping speech-restricting zones and prohibitions at both locations render effective sidewalk advocacy anywhere near the facilities impossible without risk of criminal liability.  Because the 25-foot "no follow and harass" zone overlaps almost entirely with the 100-foot trigger for the eight-foot bubble zone, even if the local pro-life advocate Plaintiffs remained eight feet away from the intended recipients of their message, they could still be charged under the "follow and harass" provision of § 425.31(c) based on a mere "implied" request to cease their otherwise protected speech, and the "no interference" prohibitions of §425.31(e), (f), and (h) merely for offering pro-life literature in a manner that causes a woman "to stop" or step around the stationary sidewalk advocate.

87.     Worse, the supposed ability to interact at an 8-foot distance within the 100-foot radius is illusory because, as shown in both **Exhibit J** and **Exhibit K**, virtually all of the area circumscribed by that 100-foot radius is located either within the 25-foot "no follow and harass" zones, which encompass the public sidewalk and public driveway access normally available for First Amendment-protected activity, or out in the middle of a street or even across the street on the private property of homeowners.

---

[14] Exhibits J and K are based on Google Maps satellite view with distances provided by the Google Maps function.  The views have been modified to add distance markers and zones, to delineate premise details for clarity, and to delete the building addresses and personal names of tenants.

88.    Apart from these prohibitions, even outside the "no-follow" and eight-foot bubble zones, and even beyond the 100-foot "trigger" line, under Chapter 425 the local pro-life advocate Plaintiffs would be liable to criminal and civil penalties for alleged actual or attempted "physical obstruction" or "blocking" defined as merely to "hinder", "restrain" or "impede" (whatever that might mean), which could happen through speech (such as sign-holding) or mere occupancy of the sidewalk by pro-life advocates, or approaching cars in order to speak with pro-life advocates, causing a delay (hindrance) for any length of time, no matter how fleeting.[15]

89.    For all the same reasons, local pro-life advocate Plaintiffs could also be subjected to criminal penalties, crushing monetary awards, and injunctions based on the acts, or even the attempted acts, of others at the same locations based on Chapter 425's "in concert" liability provision.  *See* § 425.71.

90.    The hair-trigger provisions of Chapter 425, coupled with its vague and overbroad definitions and its "in concert" liability provision, have a chilling effect on the local pro-life advocate Plaintiffs' advocacy and sidewalk counseling and/or offering of literature and even their mere presence anywhere within the 100-foot "trigger" for the eight-foot floating bubble zones arising therein, and indeed the entire vicinity of the clinics, given the overlapping  25-foot "no follow and harass" zones, the "no-interference" prohibitions, and the "no-physical-obstruction", "hinder[ance]", or "block[ing]" (however fleeting) prohibitions, including speech or other expressive conduct that might momentarily delay, "stop" or "prevent" [sic] persons associated with or patronizing the clinic.

---

[15]This *de minimis* trigger of criminal liability is as envisioned by the legislators in keeping with the vacated *Griepp I* decision that explicitly provided the rationale for Chapter 425's prohibitions of "unwanted" speech, as shown in the legislative history set forth below.

91.   Because of the enactment of Chapter 425 on June 27, 2022 and the many snares it lays for the potential prosecution of otherwise protected activity:

(a)   Plaintiff HULINSKY has been reduced to praying across the street from the usual location, and also in her car, unless another pro-life advocate is present, in which case she will stand far away from the entrance to the New Rochelle facility, while refraining from offering literature or conversing with persons approaching or leaving the facility, because all of Chapter 425's multi-tiered and hair-trigger prohibitions encompass the site of her First Amendment-protected activity. *See* **Exhibit J.**

(b)  On December 8, 2022, Plaintiff HULINSKY advised a pro-life advocate attempting to offer literature to women at the New Rochelle facility to go across the street with her and pray instead, as Plaintiff HULINKSY, who was standing far away from the entrance, did not wish to incur the risk of being accused of acting "in concert" with the other advocate if he were charged with violating one of the many speech restrictions of Chapter 425.  The other advocate, recognizing the risk, complied with this request.

(c)   Plaintiff MOLINELLI has entirely ceased her sidewalk pro-life advocacy and counseling at the aforementioned abortion facilities in Westchester County for fear of criminal and civil liability.

(d)  Plaintiff MOLINELLI has elected not to be present at all at her usual location, pending judicial intervention, as the driveway that was her primary point of encounter with persons approaching or leaving the Planned Parenthood facility

is now included within Chapter 425's multi-tiered hair-trigger prohibitions. *See*

**Exhibit K.**

(e) On information and belief, some WP-40DFL volunteers have curtailed their

participation in Local Vigil activity, either partially or entirely, at the Planned

Parenthood facility in Greenburgh. Some have ceased approaching cars on the

public portion of the facility's driveway access to offer literature or speak to the

occupants of any car, lest they violate the 8-foot "bubble zone", the "no follow

and harass" provision and other above-noted speech restrictions in Chapter 425.

This information and belief is confirmed by the Declaration of Brian Burke,

annexed hereto as **Exhibit Q**, who has personal knowledge of this matter.

92. Given the designedly chilling effect of the challenged provisions of Chapter 425, as

shown by the legislative history set forth below, WP-40DFL issued the following plea to its

volunteers:

> Of note, it is important for you all to be aware, as mentioned in a previous email,
> that the Clinic Access Bill was passed by the Westchester Board of Legislators.
> ***This law is designed to intimidate pro-lifers and scare them off the sidewalks in
> front of abortion facilities***. We cannot allow it to achieve that goal.

93. Because of the enactment of Chapter 425, Plaintiff WP-40DFL, as an

unincorporated association of pro-life advocates, has suffered concrete and particularized injury

to its ability to engage in the association's aforementioned First Amendment-protected

activities, as to which it is not necessary to "name names." *Bldg. & Const. Trades Council of

Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006).

94. The challenged provisions of Chapter 425 injure Plaintiff WP-40DFL as an

association by chilling its protected activities via exposure of its members to the risk of criminal

liability, including criminal liability for the conduct of those who are not even members of the association but could be deemed to be acting "in concert" with Plaintiff WP-40DFL.

95.     Plaintiff WP-40DFL also has standing as a representative of its members because its members are suffering immediate or threatened injury to their individual First Amendment rights as a result of the challenged provisions of Chapter 425, such that the affected members could themselves have brought suit. *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.,* 675 F.3d 149, 156–57 (2d Cir.2012).

96.     The local pro-life advocate Plaintiffs seek judicial intervention barring enforcement of the challenged provisions of Chapter 425, including the aforesaid definitions of their operative terms, in order to remove, going forward, the above-described chilling effect on their advocacy. In particular, without limitation, the next "40-Days for Life" Local Vigil at the Planned Parenthood facility in Greenburgh is scheduled to begin on February 22, 2023 during the Season of Lent.

### THE IMPACT OF CHAPTER 425 ON THE
### PRO-LIFE ORGANIZATIONAL ACTIVITY OF PLAINTIFF 40DFL

97.     As an international organization whose pro-life mission depends on the willingness of local volunteers to engage in sidewalk pro-life advocacy, including prayer, fasting, sidewalk vigils, sidewalk outreach, distribution of literature, and interacting peacefully with people and their companions approaching or leaving an abortion facility, and passersby, Plaintiff 40DFL is harmed by any state or local law that inhibits such activities in violation of the First Amendment.

98.     Chapter 425 is such a local law because, on its face and as applied, it perceptibly impairs and frustrates Plaintiff 40DFL's mission and the achievement of its goals by criminalizing and subjecting to injunctions and crushing awards of triple damages the First Amendment-protected activity of the volunteers in Westchester County who conduct "40 Days for  Life" vigils

and the above-described related activities as members of Plaintiff WP-40DFL. *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294–95 (2d Cir. 2012).

99.   Because Plaintiff 40DFL does not have members, local chapters or other associated legal entities, but sues only on its own behalf, it need not identify "members" that have standing. *New York C.L. Union*, 684 F.3d at 294–95. However, because the participants in Plaintiff WP-40DFL as a local unincorporated association are instrumental to Plaintiff 40DFL's non-profit, volunteer-driven, First Amendment-protected mission, without which Plaintiff 40DFL's mission in Westchester County cannot be accomplished, Plaintiff 40DFL properly claims injury-in-fact to its organizational interest. *Id.*

100.   Plaintiff 40DFL has also suffered injury-in-fact because Chapter 425 ordinance has not only impeded its ability to carry out its mission locally but has forced it to divert resources away from its current activities in order to contest the challenged provisions of Chapter 425 so that its mission in Westchester County can be pursued without unconstitutional restraints on First Amendment-protected activity.  This diversion of resources includes identifying and interviewing potential witnesses, studying the challenged provisions, consulting with counsel about a constitutional challenge to Chapter 425, and concomitant diversion of financial resources for salaries and office expenses otherwise devoted to pro-life work. *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013).

101.   Absent judicial intervention to remedy said injury-in-fact, Plaintiff 40DFL's mission in Westchester County will be materially impaired by the challenged provisions of Chapter 425. Moreover, the threatened harm is imminent in that the next Local Vigil by WP-40DFL, as noted above, is scheduled to begin on February 22, 2023.

### THE EXPLICIT LEGISLATIVE INTENT TO TARGET SIDEWALK
### PRO-LIFE ADVOCACY AND COUNSELING

102.  The legislative history of Chapter 425 is rife with indications of official targeting and

hostility toward the speech and expressive conduct of pro-life sidewalk counselors and advocates,

and an intention to disguise that targeting as much as possible.  This is shown by the following

facts.

### The Leaking of the Draft Opinion in *Dobbs*
### "Enrages" the Chairman of the Board of Legislators

103.  On May 2, 2022, Politico published the infamous leaked draft of what would become

the Supreme Court's majority opinion in *Dobbs v. Jackson Women's Health Organization*, No. 19-

1392, 597 U.S. ___ (2022).

104.  The next day, May 3, 2022, Legislation Committee Chair Colin Smith, issued a press

release expressing his rage, denouncing "Republican deceit," and accusing the Trump-appointed

Associate Justices of the crime of lying to Congress:

> "I am enraged. Today our nation got a look behind the curtain at decades of
> Republican deceit to stack the Supreme Court with ideologues hellbent [sic] on
> destroying the lives of countless Americans. With some justices having blatantly
> lied to members of congress when considering their appointment, a majority of the
> Supreme Court has agreed to a leaked opinion that unravels *Roe v. Wade*."

*See* **Exhibit L** annexed hereto.

### The Board of Legislators Meeting of May 9, 2022

105.  On the same day as Smith's outburst, what appears to be the first draft of Chapter

425, bearing the date May 3, 2022, appeared in the public record of the Board of Legislators'

proceedings on that date.  That draft was discussed at the meeting of the Board on May 9, 2022,

along with a Memorandum dated May 3, 2022.  *See* draft statute and Memorandum at **Exhibit M**

annexed hereto.

106.  The stated premise for proposing enactment of Chapter 425 is "individuals who may exceed the boundaries of lawful First Amendment expression by engaging in activities that physically prevent individuals from accessing reproductive health care facilities or obtaining reproductive health care services; or by engaging in activities that unlawfully harass or intimidate individuals trying to access such facilities and services." *See* **Exhibit M**

107.  The only example cited was the non-violent sit-in by the "Red Rose Rescue" group on November 27, 2021 referred to above, for which "three men were found guilty of unlawfully trespassing at All Women's Health & Medical Services, a reproductive health care facility in White Plains" and "prior similar conduct [by the same individuals, elsewhere]—each has now been convicted multiple times of such conduct…"

108.  As shown above, however, the challenged restrictions of Chapter 425 have nothing to do with preventing unlawful trespass on private property, for which convictions have already been obtained as noted above.  Rather, their intent is to criminalize otherwise First Amendment-protected conduct on public sidewalks and rights-of-way, as the subsequent proceedings of the Board make clear.

109.  In fact, the legislative record is devoid of evidence that any of the Plaintiffs—or any other sidewalk pro-life advocate or counselor, as distinct from the altogether different activism in the form of peaceful civil disobedience of the Red Rose Rescue group—has ever violated any law in connection with peaceful First Amendment-protected activity at the subject locations or any other location in Westchester County.

110.  The Memorandum of May 3 reveals that enactment of Chapter 425 was unnecessary to address purported legislative concerns over threats, violence and trespass at "reproductive health care facilities," including the earlier sit-in at a White Plains abortion facility. As the Memorandum

states, Chapter 425 "is modeled upon various federal, state, and municipal laws, including the federal Freedom of Access to Clinic Entrances, of 1994 ('FACE'), 18 U.S.C. § 248; the New York State Clinic Access Act, N.Y. Penal L. §§ 240.70-240.71, [and] N.Y. Civil Rights L. 79-m…"— laws that already address those purported concerns.

111.   The provisions of Chapter 425 that duplicate existing laws are merely a pretext for the ***addition*** of the challenged speech restrictions targeting pro-life sidewalk advocacy and counseling in the 100-foot "trigger" for the floating eight-foot bubble zone, the 25-foot "no follow and harass" zone, and the vaguely and overbroadly defined "physical obstruction" and non-"interference" provisions detailed above.

112.   The challenged restrictions criminalize pure speech and expressive conduct, versus the use of force, true threats of force, physical obstruction, and trespass. There is thus a telltale complete lack of fit between the purported legislative concerns over threats, violence and trespass expressed in the May 3 Memorandum—already addressed by preexisting laws—and the challenged provisions of Chapter 425.

**The Legislation Committee Meeting of May 23, 2022:
The Police Are Given "Marching Orders"**

113.   On May 23, 2022, the Legislation Committee of the Board of Legislators, chaired by Legislator Smith, met to discuss what appears to be a second draft of proposed Chapter 425, dated May 16, 2022. See **Exhibit N** annexed hereto.

114.   During the discussion at that meeting, Legislator Pierce complained about the rhetoric of the Red Rose Rescue group, who "use horrific language in describing what they are doing. They refer to these facilities as 'killing facilities', 'human butcher shops', 'veritable satanic temples

offering blood sacrifice', and it goes on and on and on.  And this is just comments in the last month alone."[16]

115.  This Red Rose Rescue group, Pierce further complained, "really do lean into this *grayness in the law*, which hopefully *we are about to fix* [emphasis added]."  Pierce praised:

> the importance of this bill in giving the police **clear marching orders**, so that there isn't that confusion, which was described, when the police come to an event like this, seems to be the most important thing that we can possibly deliver here.

> Because if they [the police] don't feel that they have **clear lines of action**, we're just going to be having this over and over again.  Because this is what they do over, and over, and over again.[17]

116.  Neither Legislator Pierce nor any other member of the Legislation Committee has ever explained *what the challenged provisions of Chapter 425 have to do with preventing sit-ins by a group whose members are willing to be arrested for criminal trespass, as opposed to peaceable pro-life sidewalk advocates and counselors, like the local pro-life advocate Plaintiffs here*, who have never committed trespass at any "reproductive health care" facility or violated any other law.

### The Legislation Committee Meeting of June 1, 2022

117.  On June 1, 2022, the Committee on Legislation, chaired by Legislator Smith conducted a meeting at which they discussed – and received advice from several invited legal experts concerning – the latest draft of proposed Chapter 425, dated May 25, 2022.  See **Exhibit O** annexed hereto.

118.  Chapter 425's floating eight-foot bubble zone provision in particular relies on the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703, 735, 120 S. Ct. 2480, 2499, 147 L.

---

[16] *See* time code 1:24:03 *et seq.*, online public video of Legislation Committee meeting, https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1437.
[17] *Id.* at 1:24:20 – 1:25:20

Ed. 2d 597 (2000), which upheld a virtually identical measure over a vigorous dissent by Justices

Scalia and Kennedy, who noted that *Hill* had departed from the Court's requirement of strict

scrutiny for content-based restrictions on speech. *Id.* at 741.

119.  The video-recorded colloquy[18] between the Westchester County legislators and the

legal advisors who were invited to assist them in drafting Chapter 425 during their June 1, 2022

Legislation Committee meeting reveals their knowledge that Chapter 425 would be vulnerable to

legal challenge because *Hill* would likely be overruled by the current Supreme Court majority in

an appropriate case, given the Court's later decisions in *McCullen v. Coakley*, 134 S. Ct. 2518,

2535 (2014) and *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).

120.  The following statements by members of the Board of Legislators during that June 1,

2022 meeting evince their intent to criminalize disfavored pro-life speech and expressive conduct

on public sidewalks and rights-of-way adjacent to "reproductive health care" facilities in

Westchester County while attempting to create the facial appearance of content-neutrality,

knowing full well that what they were doing was subject to First Amendment challenge and could

end with the overruling of *Hill*:

a. **Legislator/Vice Chair Barr says pro-lifers should not be allowed to disturb patients with harsh rhetoric:**

**Barr** [55:07]: "This is a private citizen who is trying to get medical care and there are other people who are trying to prevent them.  And I really feel like that's the issue here and that's how it should be viewed.  And I very much disagree with the idea that *–I'm not saying the Supreme Court wouldn't disagree with it –* but *I disagree with the fact that some stranger has the right to come up to you in your face and tell you 'You're making a big mistake, you're a murderer', you know, 'You shouldn't do this'....**I don't understand how that could really be protected**.*" [19]

---

[18] https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1454
[19] To this outburst, Shannon Wong of the ACLU replied that disturbing speech is protected: Wong [56:14]: "I certainly, *in my heart I agree with you* that people should be able to access unburdened care; but I do think *it's generally if someone is shouting things at you in enter or exit that is going to be speech that as I said may be uncomfortable or unpleasant, but generally the laws that have*

b. **Legislator Shimsky says women should not have to be exposed to the "maximum fury of the First Amendment" and the "culture war," that they should have the same "protection" as CEOs of private corporations:**

**Shimsky** [1:11:55]: Well, here's the deal, okay?  If I'm the CEO of a corporation, just as if I'm a Supreme Court Justice, and just as if I am a politician of a certain level, um, I can get all kinds of distances blocked off.  I could get things cordoned off, I could get things covered with fabric so people cannot see me enter or leave the building …

*As I said, these women are not politicians; they're not culture warriors…but the full force and fury – of the maximum fury, for want of a better word, of the First Amendment can be visited on them.  That CEO will never have to deal with me putting a leaflet in his hand.  I guarantee it.*

c. **Board of Legislators Chair Borgia declares people should not be confronted in public about their personal decisions, *which is why "we want these zones"*:**

**Borgia** [1:20:40] *This is something that we have to talk a little bit about, in the greater world, especially as we're gonna have a very hot* [public] *hearing where, you know, people are going to claim that they know about the legality or illegality of provisions of this law.*
*But it really is the same thing as someone coming up to, let's say, um, a parent and a child in the supermarket and saying 'I don't think you should buy that sugar cereal*, your children look like they have enough sugar, why are you doing that, you're gonna destroy their lives, you're gonna give them Type 2 diabetes'…"

*There's a certain element of why we want these zones*, **is so that there doesn't get to that ratcheted up level** …. *Part of the validation of why we need these buffer zones…and this is selling more to the public than probably to the court* … this idea that people do have a right to peacefully go about their business and access services that are legal ….. I think that's a very legitimate point for us to remember as we're introducing this law to the greater public.

d. **Legislator Shimsky wants to be sure that "content-neutrality" means that in the floating eight-foot bubble pro-life advocates cannot hand anything to anyone, not just leaflets or handbills:**

**Shimsky** [1:13:35]: Now, what kind of bubble are we going to want or are we not going to want? You know, I think that at that point, if people come running and screaming at us, you know, 'We need protection,' well, you know, we're going to have to have the real talk about content neutrality, right?

---

*been upheld allow for space for people to share that speech with people* who are going in and out to receive medical care."

And, in terms of content neutrality…keeping it to handing any materials as opposed to specifying materials, is that to make the bill more content-neutral? So that way**, *if there's something that we haven't thought of that someone else on the other side may want to hand***, *it's all illegal, that bubble is a bubble?"* [20]

e.  **Board Chair Borgia declares that pro-lifers should not be allowed to hand any objects to anybody without consent, and if that provision is struck down by the Supreme Court, it's "severable" and the legislators should be "bold" in their legislation:**

**Borgia** [1:24:39]:   I think if …we're really trying to stop people handing objects – whatever they are -- that it should probably say either objects or material – and the idea of food, liquid or other materials is what I like the best…

[1:25:33] The other thing I want us to think about as a body – I've mentioned this to a lot of my colleagues – *is that we have a good amount of evidence about the way that the Supreme Court is moving, but we don't know the future, we don't know what's going to happen and what could happen.  And I think that that's Professor Waldman's point which is that we're going on the law as it exists now and we do have severability, so if there are parts of this law that do get struck down, we still want to provide the protection that we are able to provide*, and I would recommend that we be as careful as possible**, but that we also be kind of bold…you know this is the thing that we feel is important….the stars are aligned for us to do this, and that we should move forward**.[21]

f.  **Legislator Maher declares pro-life advocates should not be allowed to create a "gauntlet" of "intimidating" speech, which is like "the n-word," and agrees with Borgia that the Board should be "bold" in regulating pro-life sidewalk counseling *according to the Board's values* rather than what the current majority of the Supreme Court thinks:**

**Maher:** [1:27:35]:  We had an advocate – a pro-choice advocate who said – you know, there's a context and history to this – and that is, the gauntlet – either actual or metaphorical that women have had to traditionally face in terms of singling out, intimidation, punishment for inferred sexual activity. I guess my question is**:** *are people allowed to set up that sort of gauntlet, and if so – quite practically – we're trying to work out what the boundaries are.*

*Can you stand on the sidelines and say "You bad murderer person" or very politely say "You bad murderer person"….nice little old lady saying "You blank-blank n—*

---

[20] Here Shimsky reveals that she perceives her role as legislator in this matter as that of an opponent of "the other side" in the debate and national divide over legalized abortion.

[21] Here Borgia reveals that she perceives her role as legislator to be that of "boldly" providing "protection" from speech she deems unacceptable, even if the proposed speech restrictions are of dubious constitutionality.

*person", or "You terrible person*", which again is a word that has a history and context.

But then again, you know, ***does this Supreme Court care*** about that? *Do they care about the fact that there is this intimidation factor in going through the gauntlet which is quite clearly what the aim—one of the aims—of these folks are at these clinic protests… Is the gauntlet protected speech? And, if so, to what extent*? ....[22]

 [1:33:55]: Like the use of the 'n' word, for example….there's a history in context that makes it powerful beyond just a 6-letter word.  Likewise, the Scarlet "A" right in your face, "You're a bad, immoral person, and you're making it worse by murdering a child"…***The Supreme Court possibly would say "That's hard luck, don't be a snowflake. You have to be able to withstand the rigors of free speech and protest …."***

[1:36:25]:  ***I would stand with our Board Chair Madame Borgia….I think we should be bold***, we should be forthright.  ***It depends on what we think our values are here.***  And it goes back to what we talked about at the beginning …. the police didn't know what to do in this instance, which seems bizarre to me.

g.  **Legislator Gashi frets that he "worries" even about speech that is polite, which could still be "menacing" depending on the setting and circumstance – or even the clothing someone may be wearing – which is why it must be kept at a distance of eight feet:**

**Gashi** [1:45:39]: I kind of worry about this – I understand there's grey area – but this focus on, you know, this polite communication that we're so concerned about. I mean, we saw a video last week where a gentleman in military fatigue pants holding a bag that could have had anything in it – very politely, I'm sure in his own mind hoped to let us, you know, counsel or whatever, communicate. *He would have viewed it as polite but I certainly regard it as menacing.  I think a person seeking medical treatment could well regard that as menacing.*

I think the setting and the circumstance dictates and defines that speech as impolite. *So, I'm less motivated or moved by this notion of the polite speaker*. If the person wants to politely and calmly make that message known, they can do so at 8 feet. That would be my view.

h.  **As to the eight-foot floating bubble zone, Legislator Erika Pierce suggests that "impolite" speech by people with supposedly bad intentions is harassment, and that no one can consent to harassment:**

---

[22] The Second Circuit has specifically rejected the theory that a "gauntlet of aggressive and frightening approaches," without physical obstruction, can be proscribed by statute. *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001).

**Pierce:** [1:49:20]: We know from their own words that ***this is not polite speech***, um, that ***these are not people whose intentions, really, are good***, by the general context of the way they talk about patients and the individuals who they're talking to. ***So, I agree that we should stop kind of pretending that this is polite speech.***

[1:50:01] ***How do we get out of this trap of, you know, what constitutes consent? And can anyone consent to being harassed in the first place?*** Which I still wonder how we get to that spot. But I understand that is probably a question beyond our purview…. I wanted to be clear on my understanding of how it is that someone is supposed to be able to prove that they haven't given consent, since that really is the question here, not whether or not they've proved that they have given consent…

121. During the above-quoted colloquy, Legislator Maher also freely admitted that the Board's viewpoint discrimination was evident in its reliance on "our" pro-abortion "advocates" for input on drafting Chapter 425 so as to prohibit a "gauntlet" of disturbing pro-life speech:

**Legislator Maher** [1:29:30] One of our [pro-choice] advocates – and ***that can be used against us, I suppose, at some point … say it's a particular viewpoint***… uh, but I think that aspect is there. To what extent is that protected speech? In your face, or 10 feet away, 15 feet away, on either side; a gauntlet, I guess, has people on both sides.

122. A colloquy between legal expert Prof. Waldman and the legislators at the same Legislative meeting on June 1, 2022[23] reveals that under Chapter 425.31(i), there is *a presumption of non-consent* to "approach" closer than eight feet to engage in sidewalk counseling, even absent any express statement by the hearer:

a. **Professor Emily Gold Waldman, a legal advisor to the Board, replies that non-consent to speech is presumed under Chapter 425:**

**Professor Waldman** [1:50:49]: Unless someone says "Yes," like "can I come talk to you, or can I hand you this?" and unless the person says "Yes" ***they haven't given consent***. ***The default is that there isn't consent,*** unless it is given. And I believe this is the same language that was used in *Hill v. Colorado*, where it just said you can't do it unless the person consents. And I don't think it went further in terms of defining how consent can be manifested.

b. **Legislator Pierce replies to Waldman that this presumption of non-consent is "perfect," unlike before Chapter 425 where speech not "consented" to was "a**

---

[23] https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1454

free speech issue," and further enthuses that pro-life advocates will not be able to offer "Trojan Horse gifts" to anyone to create a "bridge" for conversation:

**Legislator Pierce** [1:51:15]: OK. Perfect. So then our police would obviously need to be educated that *it's not a freedom of speech issue if someone did not consent to this* treatment, I guess.  Is where we ended up *before*, where people have this treatment which they did not consent to, *but obviously it was viewed as being a freedom of speech issue.*

**Professor Waldman:**  The default is that you haven't given consent.  You would have to affirmatively do it.

**Legislator Pierce:** Actively.

**Professor Waldman: Right …. "Can I approach you? Can I hand you this leaf—?" "Yes."  Then the person can come.**

123.   In keeping with the aim of creating the mere appearance of content-neutrality while targeting pro-life handbills, leaflets, and the aforementioned "Blessing Bags" containing food offered by Plaintiff MOLINELLI, the draft version of Chapter 425 discussed at the same June 1, 2022 meeting, dated May 25, 2022, had deleted the reference to those specific items of pro-life speech and conduct and replaced it with a generic reference to "any material item or object" as shown in the following comparison of the two draft versions of Chapter 425:

| <u>Original Prohibitions in Floating  Eight-Foot  "Bubble" Zone</u> | <u>Prohibitions in Floating Eight-Foot "Bubble" Zone as of June 1, 2022</u> |
|---|---|
| i. knowingly approach another person within eight (8) feet of such person, unless such other person consents, **for the purpose of passing a leaflet or handbill or food or liquid** to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility. | i. knowingly approach another person within eight (8) feet of such person, unless such other person consents, **for the purpose of passing any material item or object to**, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way within a radius of one-hundred (100) feet from any door to a reproductive health care facility. |

124.   Further revealing the legislative intent to target pro-life speech, Legislators Smith, Pierce and Maher discussed how the phrase "any material item or object" was intended to capture

the pro-life advocates' use of roses and other "Trojan Horse" gifts as a "bridge" to sidewalk conversation:

> **Legislator Smith** [42:24]: In the instance that we had back in November, um, one of the objects that was being used were roses, you know, like long stem roses, I'm assuming, with thorns and stuff… but – you know – a rose with a stem with thorns on it could not be so funny if it lands on you or sticks ya. But the idea being that – you know – they weren't giving them because it was Valentine's Day or Mother's Day or something. *And so, that was what prompted us to add the section on "or other objects".*
>
> But you're suggesting that being too specific in this instance may perhaps put us in, subject us to more scrutiny – or I should say, if it's challenged, could ***leave us more exposed*** than if we are perhaps more general. Like, for example, unless such other person consents for the purpose of passing an object, or handing over an object, or giving an object, or something like that and maybe not listing – you know – what that might be – a leaflet, or a handbill, or food or liquid or something along those lines.
>
> **Legislator Pierce:** [1:51:52]: Hence the little roses and the other items that they're trying to use as the gifts, the Trojan Horse gifts, to create that bridge.
>
> **Legislator Maher:** [1:52:03]: I think everybody at this table has had the experience of "Can I hand you this?" and having somebody say "No, get away from me! Clearly, get away from me!"

125. County Attorney Nonna and his assistant further revealed that, ***at the request of the legislators***, in order to deny pro-life advocates the defense that their speech had "a legitimate purpose" and thus was not "harassment" as defined by the New York Penal Law, Chapter 425 adopted a broader "follow and harass" provision under which an amorphous "request to cease" triggers criminal liability for otherwise protected speech:

> **County Attorney Nonna** [1:53:45]: We originally put in the exact definition [of the New York Penal Law]. And the issue that I think was raised by some of the [pro-choice] advocates was—it said—at the end of the definition [of "harass"] we have—the definition in the Penal Law says—"without any legitimate purpose." ***And the claim will be made—in defense [against] a prosecution under that section*** [§ 425.31(c)]***—"Well, it was for a legitimate purpose***. *We wanted to communicate our opposition to abortion"* or something.

**Senior Assistant County Attorney McCleod** [1:54:11]: And if it was pure speech, that—it likely would be protected. What I think we are trying to do with the "follow and harass" provision…is really get at proscribable conduct that isn't pure expression that's protected by the First Amendment, with that 'follow and harass' provision.

Um, I think the word "follow" helps in the provision itself, um, to take it out of the pure speech arena. But yes, initially we had included the precise language "with no legitimate purpose." And then, ***based on the request of the legislators***, we had changed it to its current form which reads… "'Harass' shall mean to engage in a course of conduct or repeatedly commit acts that alarm or seriously annoy another person, ***where such conduct continues after a request to cease has been made.***"

126.   As shown below, the legislators would later up the ante on this already unheard-of speech restriction by changing "request to cease" to "an express or *implied* request to cease."

127.   By the time of the June 1 meeting the definition of "interfere with" had likewise been altered to be even more restrictive of pro-life sidewalk advocacy and counseling:

| Definition of "interfere with" in draft of May 16, 2022 | Definition of "interfere with" in draft of May 25, 2022 |
|---|---|
| d. "Interfere with" shall mean to stop or to restrict a person's freedom of movement. | d. "Interfere with" shall mean to restrict a person's freedom of movement, **or to stop, obstruct, or prevent, through deceptive means or otherwise.** |

128.   As alleged above, the terms "stop," "prevent" and "deceptive means *or otherwise*" are not defined and could readily be construed to embrace pure speech that even momentarily delays and allegedly "deceives" someone approaching or leaving an abortion facility so as to peaceably dissuade the other from entering—precisely the aim of pro-life advocacy against abortion.

129.   At the June 1, 2022 Legislation Committee meeting,[24] the Board was made fully aware by its legal advisors that Chapter 425 as written was vulnerable to First Amendment

---

[24] *Id.* at https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1454

challenges that could succeed:

**a. Legal expert Prof. Brettschneider observes that, as to sidewalk counseling, Chapter 425 may run afoul of the requirement of narrow tailoring:**

**Prof. Brettschneider** [30:20]:  One way to think about this...is what's the kind of speech that the Justices are likely to protect?  Certainly, the Court demands viewpoint and in almost all cases content-based neutrality….

***What I think is protected, I would say, on the majority of the Court's view at this moment is counseling, the attempt to persuade people walking into clinics not to do it because abortion is wrong*…** *the idea of counseling is core First Amendment protection* if it's done in a respectful, non-threatening way, non-harassing way – at least when it comes to criminal harassment.

[32:24] …I think even as I read the Roberts majority … [the question] is whether or not, to meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interest, not simply that the chosen route is easier. ***It's not enough to show that restrictions on speech serve some purpose, you have to show there's not some alternative way that you could have gone about protecting the clinic***, for instance, that substantially would make a difference.

**b. County Attorney Nonna acknowledges that Chapter 425 is vulnerable in the Supreme Court and hopes for a Second Circuit panel without Trump appointees:**

**County Attorney Nonna** [39:55]: If this legislation, or legislation like this, ever got to the Supreme Court, I have real questions.  Because when you look at some of the more recent cases … the Court [7th Circuit] excoriates [*Hill v. Colorado*]…Amy Coney-Barrett was on that Seventh Circuit Court.   Then there was a recent case involving a sign ordinance… where Thomas wrote a dissent excoriating Hill, and Gorsuch and Amy Coney-Barrett joined in that.

So hopefully our legislation never gets to the Supreme Court, and gets only the Second Circuit; ***and we actually draw the right panel on the Second Circuit, because there's some recent appointees by the former President on the Second Circuit that I don't think would support us here***.

[1:53:11] [speaking of § 425.31(i)]: *Hill* is still good law. I think ***we know*** what the Supreme Court would rule if this ever got there.  But it hasn't gotten there yet, and who knows when it'll get there.  So, I think this consensus to change the words, the individual words, "leaflet" and "handbills" to "material" and leave the other words in ["oral protest, education, or counseling"] at the present time.

c. **Prof. Brettschneider suggests that the original ban on leaflets and handbills, now disguised as "material," is broader than necessary and is not content-neutral:**

   **Prof. Brettschneider** [43:53]: ***I think that it's really an invitation – I do think the Supreme Court, by the way, is looking for a case that they can either reverse* Hill** or clarify its meaning as they often did without reversing it as they often do; and the more that you list core protected speech like…passing a leaflet, passing a handbill….displaying a sign, engaging in oral protest, education or counseling…which is one of their pet projects, the counselling idea… *you invite them to say "Oh look here, this is the kind of speech that is both content-based and viewpoint based.* What do you think those leaflets say, what do you think that sign says -- these are anti-abortion signs. What is the person counseling doing? They're trying to persuade you that abortion is immoral"…

   It focuses them on the content and viewpoint aspects of the speech, and ***I think invites them… to say this is not content or viewpoint-neutral, it's subject to strict scrutiny, there's another way to provide the security; as opposed to just protecting the door, which is what you're trying to do***…

d. **Prof. Brettschneider warns that the current Supreme Court majority could view Chapter 425 as content-based:**

   **Prof. Brettschneider** [51:28]: They could say for instance, "Look this statute is not neutral, it's based on an attempt to silence" – this is the more extreme version of the opinion – but it would say, yeah, "***This is not a neutral statute; this is evidence that this County is concerned to suppress the speech of protestors***; and so that's what this legislation is about at its core." ***That's my worry***…

e. **Prof. Brettschneider warns that impolite protest is protected:**

   **Prof. Brettschneider** [1:11:10]: [T]he thing…I'd urge you to in your deliberations to do… is to think about other examples outside the abortion context…you're all – I take it – all genuine, serious defenders of free speech, too, so think about an antiwar protest, for instance, where there's a protest outside a defense contractor – and you want to approach an employee or CEO with a pamphlet that talks about your argument against the war. Should you be able to do that without the consent of that person. ***Now I think on that, in the same space—not exactly polite, but not criminal harassment—that you should be able to do it … that that's part of the First Amendment***.

f. **Prof. Brettschneider again warns about the appearance of stopping counseling and protest in Chapter 425, as opposed to securing access to a facility's door:**

   **Prof. Brettschneider** [1:32:13]: To my mind, what's really important about what you're trying to do there is ***provide access to the door***. What I'm suggesting is the

more you talk about – you know, the intent looks like it's actually stopping the protest, you're stopping the counselling or displaying the sign. ***That to me looks really problematic, because if you're just displaying a sign, you're not obstructing the person, then that looks like it might be construed – I think it <u>would be construed</u> by the Court as an attempt to shut down anti-abortion speech.***

g. **Prof. Brettschneider advises that there is a constitutional right "to approach somebody" to convey a message by counseling or leafletting:**

**Prof. Brettschneider** [1:41:01]: I did want to add my voice as a defender of the idea of free speech to say that I think the way to strike the balance between the rights here is ***to protect the door*** and to make it clear that that's what we're trying to do, and not to ban explicitly – in the same way that I was trying to suggest *not to ban leafleting* – to not ban the signs explicitly, the counseling. *The more that you specify, the more you invite the Court to strike down at least this piece of the bill.*

And I do think as a First Amendment matter, too – and this is what I was trying to do in getting us to think about other areas outside the abortion context – ***that it is a constitutional right to approach somebody to say what you think*** – *take the environmental context, or war or any political issue… I think that's part of the First Amendment, the ability to do that….*

### The Board of Legislators Adopts Advisor Waldman's Erroneous Advice on the Second Circuit's Vacated Decision in *New York v. Griepp*

130.  During the meeting of June 1, 2022, the Board of Legislators was wrongly advised by Prof. Waldman that, in crafting Chapter 425's speech restrictions, the Board could be guided by the Second Circuit's vacated decision in *New York v. Griepp,* 991 F.3d 81 (2d Cir.)("*Griepp I*"), *reh'g granted and opinion vacated sub nom. People v. Griepp*, 997 F.3d 1258 (2d Cir. 2021), and on *reh'g sub nom. New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021) ("*Griepp* II").

131.  In *Griepp I*, a three-judge panel, with a vigorous dissent (and partial concurrence) by Judge Livingston, reversed the District Court's denial of the New York Attorney General's motion, under FACE and the New York City Clinic Access Act (NYCAA), for an injunction against pro-life sidewalk advocates and counselors, having found either no violation of those statutes or no irreparable harm as to two isolated and trivial incidents during "years of protest activity." *New*

*York by Underwood v. Griepp*, No. 17-CV-3706 (CBA), 2018 WL 3518527, at *42, 43-44, 48 (E.D.N.Y. July 20, 2018).

132.   The panel majority in *Griepp I* justified the reversal on the basis of the following patently unconstitutional, content-based rationale:

> The reproductive health context is a *particularly delicate one* …. That sidewalk counseling constitutes a legitimate First Amendment activity *is irrelevant when conduct at issue persists following a request to cease. . . . Defendants may have acted with a legitimate purpose in their first attempt to engage a patient, but once a patient makes an explicit or* **implicit** *request to be left alone, that legitimate purpose is vitiated.*

*Griepp I*, 991 F.3d at 122 .

133.   Over Judge Livingston's stinging dissent, *id.* at 142, 144, the panel majority further held that FACE and NYCAA criminalize "*de minimis* conduct" as "physical obstruction" that supposedly interferes with clinic access, including leafletting and the positioning of signs, and that merely touching a car that stops to engage with a pro-life sidewalk counselor renders clinic access "unreasonably hazardous or difficult" under FACE and NYCAA. *See, e.g.*, *id.* at 108, 153.

134.   The Second Circuit's reading of FACE and NYCAA in *Griepp I* would have rendered both statutes facially unconstitutional, or at least unconstitutional as applied. As Judge Livingston noted, the panel majority had departed from all precedent and improperly "substitute[ed] its own judgment for that of the district court" on factual findings.  *Id.* at 153

135.   The panel majority's decision was so clearly erroneous that, upon the filing of a petition for *en banc* or panel rehearing, the panel majority took the extraordinary step of not only granting panel rehearing but vacating its own errant decision without further briefing, now affirming rather than reversing the District Court's denial of an injunction and thereby extinguishing its erroneous legal and factual analysis athwart that of the District Court.  *Griepp II*, 11 F.4th at 178.

136.  Yet Prof. Waldman incorrectly advised the Committee that the panel's self-vacated decision in *Griepp I* was still good law because only "a piece of this decision ended up getting picked up and rejected by a different Second Circuit panel, *but it had to do with other issues in the case, not this First Amendment confusion*."[25]

137.  During the June 1 meeting, Prof. Waldman further erroneously advised the Board that, consistent with the vacated *Griepp I* decision, Chapter 425 could regulate a novel category of "impolite" speech that can be prohibited even if it is not criminal harassment:

> **Prof. Waldman** [59:40]**:**  I think the question though is *whether there's a space between criminal harassment, clearly can be prohibited; but then on the other hand, sort of the example you're giving of just like super polite, quietly saying something to someone once.*   There's a space in between where – as it is, they can say all these things, and have all these signs as long as they're 8 feet away.
>
> So then the question is, once someone is coming within the 8 feet how can we address that, because it's often not going to be quiet and polite *even if it doesn't rise all the way to the level of being criminal harassment*.  *And I think that's what this is trying to capture* – is that situation where someone is coming very close to someone else, *it's not rising to the level of harassment*, but it is intimidating, it is unwelcome.

138.  During that same meeting, the Board was advised by Prof. Waldman to "force the issue" by passing  Chapter 425 as written, with the expectation that challenged provisions would have to be changed or severed based on Supreme Court decisions post-*Hill*:

> **Prof. Waldman** [47:24]: And so, if that is something you want to address, then I don't really see a way around having it in there and using the Hill language, *and I think it's true that Hill may get overturned*…but I think if that's gonna happen, that's gonna happen at some point anyway, and maybe until it is, protect people up to the point that you can under the current law.
>
> *If that really is a concern, I don't see a way around just addressing it and forcing the issue*.

---

[25]*See* https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1454 at at 19:55.

**Legislator Smith** [47:50]: [addressing Waldman] So what about the point that [Professor Brettschneider] Corey was making that the types of things in this particular statute – a leaflet, a handbill, a sign—sort of presuppose, you know, *content specific prohibition*. Is that something you'd be concerned with?

**Prof. Waldman** [48:19]: *I think it's definitely an issue*, I mean, as we said, even though *Hill v Colorado* is on the books, there have been more recent cases that call it into question, and the makeup of the Supreme Court has changed, and so there may not be a majority that supports *Hill* anymore; so I do see that as an issue, but I think if you really want to address this idea that *you don't want people sort of coming too close to people going in*, I don't really see how you get around that.

You may just say, you know what, we'd rather focus on other things because we think that's on too shaky ground now….the alternative is you leave it in and if *Hill* gets overturned, either in this case or a different thing, that's when you go back and deal with it….

I mean there are these specific different provisions. ***I don't think that the entire Bill would get thrown out. I think the piece… I think it would be considered sort of severable***, and the piece that was considered unconstitutional would get thrown out…. ***So maybe you just protect as much as you can until you can't anymore.***

139. During the June 1 meeting, the Board was further advised by Waldman that while banning the passing of "material" instead of leaflets or handbills did not completely disguise content discrimination, it did make it *"less blatant"* and *"less flagrant,"* and that – as to the ban on "oral protest, education, or counseling" within the floating eight-foot bubble zone – the Board should "leave it in," because if the Supreme Court strikes it down it could always be changed or severed:

**Prof. Waldman** [1:39.05]: [regarding wording of 425.31(i)]: I don't see any reason not to just speak more generally about passing any material, rather than specifying a leaflet or handbill…*in the end, if a Court were to say "Well there's a problem with a prohibition on handing a leaflet or handbill", I don't know that this solves it because 'material' would include that; but at least it doesn't make it as blatant. I think that's the idea, and I agree with that*.

So, changing a leaflet or handbill or food or liquid to just something like passing any material to, and then *at least it doesn't make it quite as flagrant* that you're including that.

Then there's second piece about "or engaging in oral protest, education or counselling with such other person" – and that's really the question. *I mean, on the one hand that's the thing that makes it – that potentially could get struck down. I agree, it could.*

On the other hand, right now, under *Hill vs Colorado* which hasn't been overturned by the Supreme Court, that is the language in *Hill vs. Colorado*… *let's leave it in and if* **Hill vs. Colorado** *gets overturned, that's when we'll have to change it; but let's not sort of preemptively on our own take it out.*

**The Legislation Committee Meeting of June 6, 2022:**
**the Vacated *Griepp* Decision  Becomes the Rationale for**
**Chapter 425's "Unwanted Speech" Prohibition**

140.   Having been wrongly advised by Prof. Waldman that the decision in *Griepp I*—with its hair-trigger standard for violations of FACE and NYCAA—was good law, the Board of Legislators continued to rely expressly upon that vacated decision in crafting the challenged provisions of Chapter 425 in keeping with the thinking revealed at the meeting of June 1.

141.   Accordingly, the Memorandum accompanying the latest draft of Chapter 425, dated June 4, 2022, now cites and quotes directly from the vacated conclusion of the panel majority in *Griepp I* as a rationale for Chapter 425's targeting of sidewalk pro-life advocacy and counseling, stating:

> "[T]he Second Circuit Court of Appeals, in *New York v. Griepp*, after characterizing the reproductive health context as particularly delicate, stated: 'That sidewalk counseling constitutes a legitimate First Amendment activity is irrelevant when conduct at issue persists following a request to cease.… Defendants may have acted with a legitimate purpose in their first attempt to engage a patient, but once a patient makes an explicit *or implicit* request to be left alone, that legitimate purpose is vitiated.'"[26]

---

[26] The same Memorandum cites the patently inapposite decision of the New York Court of Appeals in *People v. Shack*, 86 N.Y.2d 529 (1995). That case did not involve First Amendment-protected speech in the classic public forums of sidewalks and rights-of-way, but rather a series of harassing phone calls to a woman in the privacy of her home after the woman had demanded that the defendant, who was mentally ill, stop calling her.  As the Court of Appeals concluded: "permitting communications to be foisted upon an unwilling recipient **in a private place** would be tantamount to licensing a form of trespass."  *Id.* at 536.  The Court's decision was premised on the right to privacy in the home. *Id.* at 535–36.

*See* Memorandum and draft statute, **Exhibit P** annexed hereto.

142. By the time of the June 6, 2022 meeting,[27] the Legislation Committee had, accordingly, expanded the original definition of "harass" to include a merely "implied" request to cease "unwanted" speech, thus aping the vacated majority opinion in *Griepp I*:

| <u>Prior Definition</u> | <u>New Definition</u> |
|---|---|
| c. "Harass" shall mean to engage in a course of conduct or repeatedly commit acts that alarm or seriously annoy another person, where such conduct continues after a request to cease has been made. | c. "Harass" shall mean to engage in a course of conduct or repeatedly commit conduct or acts that alarm or seriously annoy another person and which serve no legitimate purpose. For the purposes of this definition, conduct or acts that serve no legitimate purpose include, but are not limited to, conduct or acts that continue after <u>**an express or implied**</u> request to cease has been made. |

143. During that same meeting, Legislator Smith thanked County legal counsel for adding the "consent" element to the definition of "legitimate purpose" (going beyond the New York Penal Law) in order to avoid the defense by pro-lifers that their political speech has a legitimate purpose, thereby alleviating the concern of "many of our stakeholders"—meaning pro-abortion lobbyers for the legislation—about the "problematic" term "legitimate purpose":

> **Legislator Smith** [1:23:31] And I think that – thank you for taking the time, working with our legal scholars and really fleshing out that point because I know *it was a point of concern for many of our stakeholders*, that the "no legitimate purpose" *would be problematic for us if there was not any further definition* of that, uh, which we've now included, *because anyone who is making, uh*, *what they feel is a political statement is going to say "Well, of course, that's a legitimate purpose*."….

144. During the June 6 meeting, County legal counsel clearly (however unwittingly) confirmed the content-based nature of Chapter 425's speech-restrictions by stating that, unlike the

---

[27] https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1463

law at issue in *Hill*, which covered *all* healthcare facilities, Chapter 425 covers only "*reproductive health care facilities*"—at which, of course it is precisely pro-life sidewalk advocacy that is taking place:

> **Senior Assistant County Attorney MacLeod** [1:22:05] …. And ours is a little more lean than the version that was upheld by the Supreme Court. The Colorado law that was upheld applied to *all* healthcare facilities, whereas ours applies only to reproductive healthcare facilities.

145. The Board was advised by County legal counsel that the issue whether someone has made an "implied" request that a pro-life advocate cease speaking for purposes of finding "harassment" will depend on whatever a court decides:

> **Legislator Maher** [1:26:15]:  I can imagine in these situations that part of *what they're doing is trying to shame women, right*?  And I can imagine there be those who are not going to say: "Please stop, get away from me!" and there are those who just want to duck their head down and get to their appointment and do what they want to do.
>
> Um, so what is "implied request" [to cease]?  If I duck? And, you know, shield myself? Am I – is that an implied request, or is it not? And they can just keep yelling at me?"
>
> **Senior Assistant County Attorney MacLeod** [1:27:20]: That being said, if you're talking about … an implied request to cease…the evidence is – once again, as we discussed before and the County Attorney has mentioned, particularly with the harassment statutes – ***it's gonna be about whatever evidence you present to a court***…***it will be up to a court to determine***, you know, ***was that enough*** to show that you wanted the conduct to cease.
>
> **Legislator Maher** [1:29:09]:  I can't picture… how someone is doing this implied request.

146.  Regarding the vague element of *Griepp I*'s "implied" request to cease speaking, Chief Deputy County Attorney Stacey Dolgin-Kmetz advised the Board that merely walking past someone handing out leaflets suffices to criminalize that conduct based on an "implied request" to cease:

**Chief Deputy County Attorney Dolgin-Kmetz** [1:29:24]:  Let me tell you one thing.  When you're walking down the street and people are handing out leaflets— I'm not even talking about a reproductive healthcare—you're walking down the street….let me finish…*and you walk past and you ignore that person, that's implied: "Leave me alone".*  So, to me, I don't see a problem with it….you put your head down, you walk by, and it's clear you don't want anything to do with this other person.  In my opinion.

**Legislator Maher** [1:30:18]: I hope [!] that's enough.

147.  During the above quoted exchange with Legislator Maher, Senior Assistant County Council McCleod further advised the Board that a pro-life sidewalk counselor would violate the "follow and harass" provision *even while outside the 8-foot floating bubble zone* and that *still other speech-restricting provisions could "kick in"* to penalize pro-life advocates*:*

**Senior Assistant County Attorney MacLeod** [1:26:51]: So, I just want to mention a couple of things very quickly.  First, our harassment – the word "harass" only appears in one violation of the prohibited conduct section, and it requires a "follow and harass" so it's not just harassing conduct, it's following and harassing as well.

**Legislator Maher** [1:27:11]: *They're staying outside the bubble, but they're walking along with them.*
**Senior Assistant County Attorney MacLeod** [1:27:14]: *Uh-huh. [affirmative]*
So, and as we talked about before*, a number of other provisions might kick in as well.*

148.  The following colloquy between Legislators Maher and Barr, and Senior Assistant County Attorney McLeod reveals that the reference to "oral protest, education and counseling" was retained because without that reference to content Chapter 425 "is not doing what you want it to do"—that is, restrict pro-life sidewalk advocacy and counseling:

**Legislator Maher** [2:15:25]: ...said not to change the next line after that ["engaging in oral protest education, or counseling"]

**Senior Assistant County Attorney McLeod**: Right, the Board requested that the first part be changed [to "any material, item, or object"]—

**Legislator Maher**: The first part being changed because it talks about pamphlets ….that would be the logical conclusion, or the conclusion a lot of people would

make being that we were aiming at the content, right?...*But oral protest, education and counseling, we're not talking about any particular contents.*

**Legislator Barr**: Well, I think there really wasn't a generic term for those things….

**Senior Assistant County Attorney McLeod**: There were suggestions. *I think the ultimate decision of the Board was to not change that portion* ["oral protest, education, or counseling"] to be closer to the original Colorado statute that was upheld in *Hill*. Although we can all recollect what the scholars were saying about that decision *being on sort of shaky Constitutional ground*, and *if the Supreme Court revisited it today, it might well say, "Look, education, counseling, oral protest – that's content based, because I have to look at what the message says in order to determine whether it's education."*

So, the Supreme Court might say now: "If I have to look at the language to determine whether it's a violation, you're content based." That's kind of a broad interpretation of where the precedent has been going, that is the opinion of some scholars. For now, *Hill* is still good law, *so we feel confident we can include it until it's expressly overturned by the Supreme Court*.

**Legislator Barr**: And as Professor Waldman said, you know, "Are you trying….what's your goal in making this law?" *You don't just water it down to the point where it's not doing what you want it to do.*

### The public hearing and vote of June 27, 2022:
### the County Legislators openly declare their antipathy to pro-life advocacy

149.  On June 27, 2022, the Westchester County Board of Legislators held a public meeting preceding the vote to adopt Chapter 425.[28]  A copy of the final form of the law as adopted and the accompanying Memorandum of the Legislation Committee, which continues to cite the vacated *Griepp I* decision as authority, are previously referenced above as **Exhibit I.**

150.  The June 27 meeting, at which the Board of Legislators voted 15-to-2 to adopt Chapter 425, served as a soapbox for the legislative supermajority to declare their outrage over the *Dobbs* decision while revealing that the passage of Chapter 425 – as was already clear from its sweepingly drafted provisions – had virtually nothing to do with the previous peaceful trespass by

---

[28] https://westchestercountyny.granicus.com/MediaPlayer.php?view_id=1&clip_id=1504

members of the "Red Rose Rescue" group but rather the overreaching regulation of public forum pure speech deemed by them to be unacceptable.

151. Yet, while voting to restrict clearly protected First Amendment activity, *the legislators disingenuously declared that Chapter 425 does not do so – at the same time they object to pro-life advocates "forcing" their beliefs on others and admit that they are establishing buffer and bubble zones to prevent this*:

> **LEGISLATOR/LEGISLATION COMMITTEE CHAIR SMITH** [41:44 – 44:54]: I just want to start by saying that right now I am absolutely terrified for every woman in America today … *I feel even more terrified for every American today who now lives in fear—in fear of a Supreme Court*, who for the first time in our nation's history has actually stripped away a constitutional right and have now made it unequivocally clear that they are willing to dismantle many others. Make no mistake, this is just the beginning. *And all in the name of what? Forcing one person's beliefs upon another?* ... *That is why I – as I stated earlier, I am proud to introduce the Clinic Access Bill this evening*. But not only that, I feel *compelled* to do so.
> …
> The federal government may no longer recognize a woman's right to reproductive autonomy. But here in Westchester County, we do. And we will vigorously defend that right by all means at our disposal. Tonight, we vote to expand those protections by *making it harder* for those who would try to physically *or verbally* harm or harass someone seeking medical advice or treatment at a reproductive healthcare facility. *The creation of safe zones* around the entrance ways to such facilities and nearby parking areas, it will not prevent protestors from protesting in those places. That is not the intent of the law ….

> **LEGISLATOR JEWEL JOHNSON** [44:58 – 48:04]: I just have to add on a personal note how much I echo my colleague…Legislator Smith's comments…. I can't imagine women not having options…. Everyone has the right to walk the entrance path without being blocked, *without declined or refused counseling*, harassment, threat, interference, disruption, obstruction, *intimidation or further traumatization*. *They have the right to not have their personal space disrupted or invaded. As human beings, they all have the right to privacy, to feel safe and to be respected* …. It should be noted, this legislation does not prohibit First Amendment freedom of speech….

> I am proud *this legislation will establish buffer zones and bubbles*, protects the safety and promotes the civil rights and the public health of those providing or accessing reproductive health services.

**LEGISLATOR CHRISTOPHER JOHNSON** [48:10 – 49:07]: *Last week we saw the gutting of the rights of not some but every American.* The government has a responsibility to both protect and respect the choices that we can and should be able to make in this nation, especially one that we consider a free society.

Here in Westchester, we will do everything we can to protect and respect the rights enumerated to us. I believe that everyone who makes a personal healthcare decision should have unobstructed access to the facility that they choose…

*Every woman should feel safe*, be safe and safely receive adequate services when her choice to seek healthcare has already been made…. *No one should feel terror while seeking medical care.*

152.  Legislator Shimsky exulted that while an attempt to pass similar legislation had been vetoed by the County Executive years before, now the "pro-choice" supermajority on the Board and the new "pro-choice" County Executive can accomplish their speech-restricting aims, with the help of pro-abortion organizations, including Planned Parenthood (no pro-life organization having been consulted):

**LEGISLATOR SHIMSKY** [51:40 – 55:00]: …. I and several colleagues [previously] sponsored a measure similar to this one: to protect people seeking medical treatment from being physically prevented or intimidated from seeking the care they need, including abortion. We passed the legislation … *only to see it vetoed by the then County Executive*….
Our circumstances are completely different now. We now have *a pro-choice County Executive and a pro-choice super majority on the Board of Legislators.* Also, the behavior of some clinic protestors has become alarmingly worse …. [The Red Rose Rescue protestors in November 2021] eventually were convicted of trespass, *but that's not good enough*, especially since there is no constitutional right to commit crimes on private property. Under our clinic access law, such behavior would be punishable by up to 6 months in jail.

Last week's Supreme Court decision overturning *Roe v. Wade* will encourage even more dangerous conduct. That makes this clinic access law crucial…. [T]he First Amendment does not give people the right to harass, intimidate, attack or prevent others from lawfully exercising their rights… and more than that, *the kind of behavior targeted by this law poses a threat to the public safety and the concept of ordered liberty* without which no society can function….

I'd like to thank everyone who worked on this bill with us*: the advocates at Planned Parenthood, the New York Civil Liberties Union, and WCLA Choice Matters, including their Directo*r.

153. Other legislators likewise expressed satisfaction with their ability, at long last, to provide "added protection" against the disturbing speech of pro-life advocates:

**LEGISLATOR CLEMENTS** [56:02 – 56:30]: This clinic access legislation is protecting the ability to enter the clinic for personnel and patients, to provide and receive medical attention *without harassment and intimidation*.

**LEGISLATOR PIERCE** [56:44 – 58:23]: …While the genesis of this legislation goes back many years …. and has nothing obviously to do with last week's Supreme Court decision, that decision and the seismic ripples we are now seeing emanating from that decision highlight just how important and timely this legislation is….

In this case we're talking about reproductive health care services, and that access should come *without harassment* and without physical impediments.  Historically, some protestors have tried to undermine that ability, *at times yelling at or pestering patients* … For patients, *this may be traumatizing and stop them from receiving care, which is of course, the protestors' end goal.*

In our current world, *with all of its stressors*, *our heightened level of anxiety* over increasing violence and all the difficulties post-pandemic of scheduling timely medical appointments, *we need to make certain that both doctors and patients alike are both safe and provided with the space and security* to do what they need to do to protect their own health and the health of their patients.  *This is the goal of this legislation*.

**LEGISLATOR ALVARADO** [1:00:49 – 1:01:59]: We are addressing harassment, you know, and *I happen to be one of those people that because of the way I look who gets pushed around*, just because people think that they can push us around.  I don't quite take it nicely anymore and I know my way around it, but access to healthcare?

*I have to fear that somebody is actually going to pray with me from entering?*  A woman's right to her body?  *Absolutely not – and not in Westchester, and not this type of harassment, not any harassment*…. Harassment has no place, much less when women are accessing advice, healthcare and options of their own body. So I absolutely support this bill, Madame Chair, *on behalf of all of us people that really know what harassment feels like.*

**LEGISLATOR GASHI** [1:02:03 – 1:02:33]: Abortion is clearly legal in New York State, but even in New York there have *been attempts to intimidate and harass* ….This bill is respectful of the right – the freedom of speech, the rights people have to make that speech, but *not the right to intimidate and harass.*

**LEGISLATOR PARKER** [1:05:33 – 1:05:56]: What we have is going to be *added protection for women* and – for  their reproductive health, which at the end of the day *after what happened on Friday with the Supreme Court every little action that we can take to protect that right is the right action.*

**LEGISLATOR BOYKIN** [1:10:00 – 1:11:14]: With the *Dobbs* decision on Friday, which overturned *Roe vs Wade*, we had already been working on this… *We think we have put together a law that will stand the test of a court challenge. We don't know, but we think so.* And this is not against anyone's First Amendment Rights.

**LEGISLATOR WOODSON-SAMUELS** [1:11:45 – 1:12:16]: To some of my colleagues that have brought up potential ramifications, well, listen, I'm a proud ally and I'm willing to go shoulder to shoulder with each and every one of you women here to fight that good fight…that everyone knows in Westchester County and New York State and the United States of America, that, you know, *this law that's been on the books for 50 years, we can't allow that to settle here in Westchester County.*

**CHAIRWOMAN BORGIA** [1:13:20 – 1:14:37]: [T]his piece of legislation also protects people, persons going into reproductive health care clinics for any reason, for any service, and *making sure that they are able to have safe passage into those clinics without any difficulty…Post **Roe***, *this is obviously a little bit more timely and feels more imperative*….

We do think post-*Roe*, however, that there will be more protests on our clinics. We know that anti-choice advocates have said that they are going to go to states and places where abortion remains legal, so we want people to know that if they come to Westchester County to access these services that there are laws in place, that there are people trained who know what to do to make sure people can access legal health care services *without being harassed or in any way intimidated*.

154. In her above quoted comments, Chairwoman Borgia also thanked the New York Attorney General's Office for its assistance in drafting Chapter 425 – the same Attorney General whose patently unconstitutional legal theories were wrongly accepted by the Second Circuit in the *Griepp I* [29] decision the Second Circuit itself was constrained to vacate almost a year earlier:

**CHAIRWOMAN BORGIA** [1:12:54 – 1:13:21]: One of the things that has really given us pause… is to make sure we are very, very, very committed to making sure that we are not abridging anyone's First Amendment Rights.  That is the reason that we worked with constitutional lawyers, with the New York Civil Liberties Union,

---

[29] *Griepp I,* 991F.3d at 131-34

with the Attorney General's Office, to make sure that we were protecting people's First Amendment Rights…"

155. Finally, the Board majority ignored the warnings of the minority that Chapter 425 as

written would invite legal challenges under the First Amendment:

> **LEGISLATOR NOLAN** [58:55 – 1:00:24]: …[This legislation] due to subsection [425.31] (i) is going to cause a serious problem. Eleven years ago, this law didn't get passed for a reason, *and it still is wrong today because*….*of cancelling someone's freedom of speech*. *For example, during this process, we have seen pro-choice advocates come in, but no pro-life advocates. They have expressed to me that they feel cancelled and locked out; they don't have a voice*.

> Now, yes, anybody that accesses a clinic and has wrong intentions is breaking the law with trespassing.  But there are federal laws that are set in place to help protect people walking into clinics.

> George Washington once said: "The Constitution is a guide I will not abandon." *We all took an oath and if we believe it or not, the First Amendment of Speech is being broken today if we vote for this* …. *I am very concerned that we now are opening the door to lawsuits*.

> *We made an oath to protect the constituents on both sides of this County, and we're going to be wasting County resources fending off this fight*…. *now we're opening floodgates to be sued; this has already been proven unconstitutional, and I ask you…to table this item for now.*

> **LEGISLATOR CUNZIO** [50:20 – 51:03]: As we know, and as was stated, we had [FACE and NYS version of FACE]. The actions that are unconscionable that happened at the White Plains Clinics, there were laws in place, and there were consequences.  Those people were arrested.

> The thing that I am the most concerned about is subsection [425.31](i) in this bill [establishing the eight-foot floating bubble zone], as many of you know, I spoke to you about it.  It's the one thing that really concerns me and can open up a slippery slope for the future.  *I am concerned about the legalities of it,* and we're not experts in that and we don't know what's going to happen…

156. Despite the likelihood of an immediate First Amendment challenge, on June 28,

2022, George Latimer, the County Executive, signed Chapter 425 into law.  This action followed.

## COUNT I

## VIOLATION OF THE FIRST AMENDMENT
## FREEDOM OF SPEECH AND ASSEMBLY
## (42 U.S.C. § 1983)

157.  Plaintiffs hereby reallege and adopt each and every allegation in the preceding paragraphs as if fully set forth herein.

158.  The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' freedom of speech in the form of advocacy and counseling against abortion in the quintessential traditional public forums of public sidewalks and rights-of-way.

159.  The Free Assembly Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiffs' freedom of assembly with others of like mind for the purpose of advocating and counseling the choice of life over abortion.

### Pre-Enforcement Challenge

160.  This pre-enforcement challenge to Chapter 425 is warranted because the local pro-life advocate Plaintiffs need not "demonstrate to a certainty that [they] will be prosecuted under the statute to show injury, but only that [they have] an actual and well-founded fear that the law will be enforced against [them.]" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689–90 (2d Cir. 2013).

161.  The local pro-life advocate Plaintiffs have such a well-founded fear because Chapter 425 is, on its face, and also as shown by its legislative history, designed to inhibit and criminally and civilly punish Plaintiffs' activities: gatherings during WP-40DFL vigils that non-obstructively use the sidewalk and rights-of-way, sidewalk pro-life advocacy and counseling, offering of literature, food, and even the display of signs. These are First Amendment-protected activities, not

62

prohibited by any other existing law, in which Plaintiffs have engaged for years without violating a single law, and in which they intend to continue engaging if enforcement of Chapter 425 is enjoined by this Court.

162. As the foregoing allegations demonstrate, the danger of the challenged statute "is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.*

163. For the above-stated reasons Plaintiff 40DFL, as a national organization, need not show that any of the local pro-life advocate Plaintiffs have actually been prosecuted under the challenged law in order to show injury-in-fact to its organizational interest.

**Content- and Viewpoint-Based Restriction**

164. Chapter 425, § 425.31(i), is a presumptively unconstitutional content- and viewpoint-based restriction on speech, both facially and as applied to Plaintiffs' First Amendment-protected speech and expressive conduct. *See also* Ch. 425, §425.21 (a)-(d), (h)-(j) *and* Ch. 425, § 425.31(c)-(f) and (h).

165. The obvious intent of § 425.31(i) is to end sidewalk counseling at abortion clinics in Westchester County by criminalizing and subjecting to injunctions and crushing awards of triple damages and attorney fees classic First Amendment-protected speech and expressive conduct in quintessential traditional public forums: i.e., "oral protest, education, or counseling." § 425.31(i).

166. Under the 100-foot "trigger" for the floating eight-foot bubble zone, "A speaker wishing to approach another for the purpose of communicating *any* message *except* one of protest, education, or counseling may do so without first securing the other's consent." *Hill*, 530 U.S. at 742 (Scalia, J., dissenting)(first emphasis in original, second emphasis added).

167.  Chapter 425 is facially content-based for the additional reason that the floating 8-foot bubble zone regulates "oral protest, education and counseling" "out of an apparent belief that only speech with this content is sufficiently likely to be annoying or upsetting as to require consent before it may be engaged in at close range." *Id.* But restrictions based on listener reaction to speech are inherently content-based. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014).

168.  Moreover, as the above-cited legislative history reveals, the Board of Legislators deliberately disguised its earlier express intention to employ the floating eight-foot bubble zone to ban the passing of a "leaflet, handbill, food, liquid" as offered by the local pro-life advocate Plaintiffs or other pro-life individuals or organizations, replacing those words with "material, item, or object" in order to make Chapter 425's content discrimination "*less blatant*" and "*less flagrant*" (per Prof. Waldman).

169.  In conjunction with § 425.31(i), establishing the floating eight-foot bubble zone within the 100-foot "trigger zone," the defined prohibitory terms in §425.21 (a)-(d), (h)-(j), and the prohibited acts enumerated in § 425.31(c)-(f), criminalize and impose civil liability on "approach[ing]", "harass[ing]", "seriously annoy[ing]", and "follow[ing]" in the overlapping floating eight-foot "no-approach" and 25-foot "no follow and harass" zones, as well as "hinder[ing]", stop[ping]", "prevent[ing]" and otherwise "interfering with" (including by "deceptive means or otherwise") generally without limitation to the zones or even the immediate area of a "reproductive health care facility."

170. Likewise, in keeping with the vacated decision in *Griepp I*, on which defendant Westchester County's Board of Legislators expressly and repeatedly relied in drafting Chapter 425, the terms "physically obstruct or block" and "intimidate" and "attempt to intimidate," as codified in § 425.31(a), (e), and (f), reach clearly protected speech and expressive conduct that

could be deemed "obstructive" or "threatening" according to the subjective reaction of the
recipient of the message: e.g., holding a sign that takes up part of the sidewalk, or saying "You
never know when you will die and face God's judgment." *See*, *e.g.*, <u>*Griepp I*</u>, 991 F.3d at 106,
115.

171.   These additional challenged provisions target "even the most gentle and peaceful
close approach by a so-called 'sidewalk counselor'—who wishes to 'educate' the woman entering
an abortion clinic about the nature of the procedure, to 'counsel' against it and in favor of other
alternatives" because this kind of speech "will often, indeed usually, [be] annoying or deeply
upsetting the woman who is planning the abortion." *Hill*, 530 U.S. at 747-48 (Scalia, J.,
dissenting).

172.   The facially content-based discrimination of Chapter 425 overall is revealed by the
limitation of its prohibitions to speech and conduct outside a "reproductive health care facility,"
where—as the County legislators and their legal advisors knew and extensively discussed—the
*only* relevant speech and conduct is that of pro-life sidewalk advocates and counselors. A
restriction that operates only on speech and expressive conduct in the environs of a "reproductive
health care facility" is transparently "a means of impeding speech against abortion." *Hill*, 530 U.S.
at 747 (Scalia, J., dissenting).

173.   Moreover, Chapter 425's actual intended operation and effect to prohibit and
otherwise restrict *pro-life* speech is blatant *viewpoint*-based discrimination and is thereby per se
unconstitutional.

174.   Even if Chapter 425's provisions were facially content neutral (which they are not),
the Supreme Court's "precedents have also recognized a separate and additional category of laws
that . . . will be considered content-based regulations of speech: laws that cannot be 'justified

without reference to the content of the regulated speech', or that were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed. v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Government may not deny use of a traditional public forum "to those wishing to express less favored or more controversial views," *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), nor may it restrict a group's speech because of "dislike for or disagreement with the [group] or their views," *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

175. But Chapter 425 manifestly restricts the local pro-life advocate Plaintiffs' First Amendment-protected activity on public sidewalks and rights-of-way, and consequently also injures Plaintiff 40DFL as an organization whose mission depends on local pro-life advocacy, including Local Vigils. While some participants in Local Vigils can and do limit themselves to prayer at the site of the abortion facility, 40DFL strongly encourages, as an integral part of its mission, witnessing, counseling, conversation, and distribution of literature on positive alternatives to abortion and related resources, including adoption services. The County's vehement disagreement with such pro-life activism by Plaintiffs is evidenced, without limitation, by the above-cited legislators' words and deeds, summarized as follows:

(a) deploring pro-life speech as *inherently* "impolite" (and thus unacceptable) by characterizing abortion as "murder," and comparing exposure to it as having to endure a "gauntlet" and attempts to "shame";

(b) comparing pro-life speech to hypothetically telling a mother in a grocery store not to give her children too much sugar;

(c) seeking to prevent the use of "Trojan Horse gifts" that create an unwanted "bridge" to women contemplating an abortion;

(d) revealing that "our stakeholders" were all pro-abortion advocates, who "worked on this bill" with the Board of Legislators, including Planned Parenthood, WCLA – Choice Matters, and the Westchester Coalition for Legal Abortion—with *no* pro-life organizational input;

(e) relying expressly on information and data from the abortion-advocacy organization National Abortion Federation (Committee Memo, pg. 4) without any counterbalancing data from a pro-life organization;

(f) admitting that the bill had passed, after a similar bill was vetoed by the former County Executive, because "We now have a *pro-choice* County Executive and a *pro-choice* super majority on the board of Legislators." ;

(g) insisting that no woman should be faced with the "maximum fury of the First Amendment" or "culture war" nor the "intimidation" of being subjected to an unwanted "approach" by a pro-life advocate.

176. None of the challenged provisions cited above is justified by any compelling governmental interest, nor are they narrowly tailored to achieve any purported government interest in securing access to abortion facilities, with narrow tailoring in the context of strict scrutiny requiring the least restrictive means available.  "Preserving the 'right to be free' from 'persistent importunity, following and dogging' does not remotely require imposing upon all speakers who wish to protest, educate, or counsel a duty to request permission to approach closer than eight feet," *Hill*, 530 U.S. at 754 (Scalia, J., dissenting)—let alone effectively requiring the local pro-life advocate Plaintiffs to avoid the vicinities of abortion clinics in their entirety, in light of Chapter 425's multi-layered hair-trigger prohibitions.

177.  Even assuming a purportedly non-content-related government interest in "protecting access" to facilities in which abortions are performed, "a law that has as its purpose something unrelated to the suppression of particular content cannot irrationally single out that content for its prohibition." *Id*. at 747; citing *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96(1972).  But that is exactly what Chapter 425 was designed to do, as the text itself and the entire legislative history reveals beyond any reasonable doubt.

178. Moreover, laws prohibiting trespass and harassment, including the federal Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248(a)(1), (c)(3)(A) and the New York Clinic Access Act ("NYSCAA"), N.Y. Penal Law § 240.70(1)(a)-(b)—if construed consistently with the First Amendment to prohibit only the use of force, threat of force, or physical obstruction without regard to the content of speech—already serve any purported government interest in securing access to abortion facilities.

179.  Plaintiffs' activities are undeniably in compliance with all pre-existing laws whose purported aim is to secure clinic access, which is precisely why Defendant Westchester County enacted Chapter 425: to reach the otherwise First Amendment-protected speech and expressive conduct of Plaintiffs and other pro-life advocates and organizations based on their message of opposition to abortion.

180. Chapter 425 as a whole was designed to prohibit "presumptively 'unwelcome' communications" by pro-life advocates.  It thus "fits precisely the description of prohibited regulation set forth in *Boos v. Barry,* 485 U.S. 312, 321(1988)," because "It 'targets the *direct impact* of a particular category of speech, not a secondary feature that happens to be associated with that type of speech.'" *Hill*, 530 U.S at 748 (Scalia, J., dissenting)(quoting *Boos*).

181. For that reason, as pleaded above, the listener's non-consent to pro-life speech, triggering criminal liability, is *presumed* as to both the floating eight-foot bubble zone and the "follow and harass provision" of §425.31(c)—even without an express statement, or indeed any statement, by any listener that the speech is "unwelcome." As § 425.21(c) provides in its definition of "harass," the prohibited "conduct or acts that serve no legitimate purpose include, but are not limited to, conduct or acts that continue"—that is, *any* acts, even if completely lawful—"after an express or implied request to cease has been made." Still worse, as the above discussed legislative history reveals, the non-consent to listen to unwanted speech is ***presumed***.

182. There is no legitimate "governmental interest in protecting the right to be let alone" and "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Hill*, 530 U.S. at 751-52 (Scalia, J., dissenting)(emphasis in original)(quoting *Erznoznik* v. *Jacksonville*, 422 U.S. 205, 210, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

183. The challenged provisions of Chapter 425, individually and taken together, violate the bedrock First Amendment principle that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Schenck v. Pro-Choice Network Of Western New York,* 519 U.S., at 383 (cleaned up).

184. Because the challenged provisions of Chapter 425, individually and taken together, variously restrict only speech and expressive conduct outside facilities where pro-life advocates exercise their First Amendment rights in a manner deemed "unwanted" due to its upsetting content, Chapter 425 entirely fails the required strict scrutiny of content-based speech restrictions. The challenged provisions serve no compelling state interest, nor are they narrowly tailored to serve

any purported interest in preventing trespass, the use of force, true threats of force, or actual physical obstruction of clinic access, which none of the challenged provisions addresses.[30]

### Invalid as a Time, Place and Manner Restriction

185.  Even if Chapter 425 were content-neutral, its prohibitions are substantially broader than necessary to achieve any purported significant government interest. The challenged provisions of Chapter 425 are not narrowly tailored to achieve any such interest, and they fail to leave open ample alternative channels for oral protest, education, or counseling, including the offering of related literature, as the challenged measures preclude normal conversational interaction and criminalize all "unwanted" speech without even an express demand that it cease.

186.  For the reasons already stated, and given the threat of criminal and civil liability, the local pro-life advocate Plaintiffs are hindered and even prevented from engaging in the above-described activities:

(a) within 100 feet from the entrances to the premises where they had previously exercised their First Amendment rights, by having to stand at least eight feet distant from those with whom they wish to converse quietly while offering literature;

(b) within a 100-foot radius that falls immediately – in virtually all cases – within the overlaid 25-foot "no follow and harass" zone adjoining the clinic driveways

---

[30] Notably, Plaintiffs challenge § 425.31(a) (including its physical-obstruction provision) in light of its content- and viewpoint-based purpose and the legislative history and Committee Memo expressly relying on *Griepp I* for its meaning, which invalidly found quintessential speech—including holding a sign on an empty public sidewalk—to be "physical obstruction." Plaintiffs challenge § 425.31(d) (prohibiting conduct that places another in "reasonable fear of physical harm, *or attempt to do the same*") for similar reasons. But Plaintiffs do not challenge § 425.31(b) prohibiting actually obstructive physical contact.

and entrances of the premises which are the principal places of Plaintiffs'
encounter with the intended recipients of their message;

(c) anywhere in the vicinity of the usual sites of their advocacy, given the ill-defined
or undefined prohibitions of "hindering," "stopping," "preventing" or
"interfering with," "implied request to cease," or even "attempts" to violate these
vague prohibitions.

*See* **Exhibit J** and **Exhibit K**.

187.  Chapter 425 thus fails intermediate scrutiny of a time, place and manner restriction.

### Impermissible Overbreadth

188.  The challenged provisions of Chapter 425 are also facially overbroad, as well as
overbroad as applied to Plaintiffs' activities, because their sweeping and overlapping speech
restrictions mean that "a substantial number of [Chapter 425's] applications are unconstitutional,
judged in relation to any "legitimate sweep" of the statute. *Americans for Prosperity Found. v.
Bonta*, 141 S. Ct. 2373, 2387, 210 L. Ed. 2d 716 (2021).  *See* Ch. 425, §425.21 (a)-(d), (h)-(j) *and*
Ch. 425, § 425.31(a), (b)-(i)

189.  The challenged provisions of Chapter 425 are thus subject to strict scrutiny on
account of overbreadth, which they fail for lack of the required narrow tailoring.  *Id.*

190.  Alternatively, both facially and as applied, Chapter 425 fails the rational basis test
because its draconian prohibition of certain categories of speech and expressive conduct—but not
others—within the aforesaid zones and prohibitions has no rational relation to any legitimate
government interest in securing access to abortion facilities as opposed to prohibiting the
"unwanted" speech of pro-life sidewalk advocates and counselors in particular—a patently
unconstitutional purpose.

**Non-Severability**

191.  As the preceding allegations demonstrate, the challenged restrictions of Chapter 425, including its vague and overbroad definitions, are so pervasive and interwoven into the statutory scheme (e.g., "interfere with," "physically obstruct or block," "intimidate," "harass") that severance is not possible and enforcement of the Chapter 425 in its entirety must be enjoined.

**COUNT II**

**VIOLATION OF THE DUE PROCESS CLAUSE**
**OF THE FOURTEENTH AMENDMENT (VOID FOR VAGUENESS)**
**(42 U.S.C. § 1983)**

192.  The Fourteenth Amendment's guarantee that no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, entitles a person to be informed as to what a criminal statute commands or forbids.

193.  The challenged provisions of Chapter 425, both facially and as applied to Plaintiffs' activities, both advocacy by the local pro-life advocate Plaintiffs and the national mission of 40DFL which depends on such local advocacy by volunteers, are void for vagueness in that its terms "harass," "seriously annoying," "follow," "interfere with," "deceptive means," "prevent," "hinder," "implied request to cease," and to "stop" by "deceptive means or otherwise," as well as the "presumption" that pro-life speech is unwanted and thus subject to criminal prosecution unless "affirmatively" consented to, are not defined with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and subject to punishment as a crime.

194. Chapter 425 is unconstitutionally vague not because of the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proven,

but rather the indeterminacy of precisely what that fact is. *United States v. Williams*, 553 U.S. 285, 306, 128 S. Ct. 1830, 1846, 170 L. Ed. 2d 650 (2008).

195.  Further, Chapter 425 invites arbitrary and discriminatory enforcement by delegating unfettered discretion to policemen, judges, and juries, for resolution, on an *ad hoc* and subjective basis, of claims that the person charged has been guilty of "harassment," "seriously annoying" speech, "following," disregarding an alleged "implied request" to cease "unwanted" pro-life speech, or used "deceptive" speech "or otherwise." *Grayned v. City of Rockford,* 408 U.S. at 108–09.

196.  Chapter 425's vagueness also chills, and is chilling, Plaintiffs' exercise of their First Amendment right to freedom of speech and assembly because its uncertain meanings have inevitably led them to steer clear of the areas in which they were ***free to exercise their rights*** until the enactment of Chapter 425.  *Id.*

197.  Because Chapter 425 reaches expression sheltered by the First Amendment, the void-for-vagueness doctrine demands a greater degree of specificity of its operative terms than in other contexts.

198.  For the reasons stated in Count I, Chapter 425's impermissible vagueness cannot survive either strict or intermediate scrutiny.

199.  Alternatively, both facially and as applied, Chapter 425 fails the rational basis test because its draconian prohibitions of certain categories of speech—but not others—has no rational relation to any legitimate government interest in securing access to abortion facilities as opposed to prohibiting the "unwanted" speech of pro-life sidewalk advocates and counselors in particular—a patently unconstitutional purpose.

**COUNT III**
**VIOLATION OF THE FIRSTAMENDMENT –**
**FREE EXERCISE OF RELIGION**
**(42 U.S.C. § 1983)**

200.  Plaintiffs hereby reallege and adopt each and every allegation in the preceding paragraphs as if fully set forth herein.

201.  The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging the free exercise of religion by Plaintiffs HULINSKY and MOLINELLI.

202.  Said Plaintiffs have sincerely held religious beliefs that compel them to engage in sidewalk advocacy and counseling against abortion.

203.  Chapter 425, on its face and as applied, targets said Plaintiffs' sincerely held religious beliefs by effectively prohibiting their sidewalk counseling against abortion, for the reasons already stated.

204.  Chapter 425 is not a neutral law of general application, but rather is clearly designed to target and effectively prohibit religiously motivated conduct in opposition to abortion while leaving untouched comparable secular conduct including:  any conversation at all *not* involving "oral protest, education, or counseling" *against* abortion, motivated by religion, but simply *approving* of abortion (e.g. "Abortion is a right!"); small talk about non-controversial topics; commercial speech of all kinds, and so forth.  None of those conversations and interactions require the speaker to remain eight feet away from the hearer, obtain consent to approach the hearer, or cease speaking whenever the hearer, even "implicitly", demands it.

205.  Chapter 425 also fails the required strict scrutiny because it does not serve a compelling governmental interest, nor is it narrowly tailored to serve that interest by the least restrictive means available, for the reasons described above.

74

206.  Alternatively, both facially and as applied, Chapter 425 fails the rational basis test because its draconian prohibition of certain categories of speech—but not others—has no rational relation to any legitimate government interest in securing access to abortion facilities as opposed to prohibiting the "unwanted" speech of pro-life sidewalk advocates and counselors in particular—a patently unconstitutional purpose.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for relief as follows as to all Counts:

(A)  A temporary restraining order and/or preliminary injunction, followed by a permanent injunction, restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with, Chapter 425 in its entirety and/or each of its unconstitutional provisions on their face and/or as applied, including § 425.31(a), (c), (d), (e), (f), (g), (h), and (i) and the incorporated defined terms.

(B)  A declaratory judgment declaring that Chapter 425 and its aforesaid provisions, on their face and/or as applied to these Plaintiffs' activities, are unconstitutional, unlawful, and unenforceable.

(C)  An award of nominal damages of ONE DOLLAR ($1.00).

(D)  An award of reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988.

(E)  Such other and further relief as the Court deems equitable and just under the circumstances.

Dated: December 13, 2022          Respectfully submitted,

,                                  _____

CHRISTOPHER A. FERRARA, ESQ. CF7123
Special Counsel – Thomas More Society
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs*

MICHAEL G. MCHALE, ESQ.*
Counsel – Thomas More Society
10506 Burt Circle, Ste. 110
Omaha, NE 68114
Telephone: 402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

* Admitted Pro hac vice

**VERIFICATION**

I, STEVE KARLEN, am over the age of 18 and am employed by Plaintiff 40 Days for Life (40DFL). The allegations in this First Amended Verified Complaint pertaining to 40DFL's mission and activities, and the impact of Chapter 425 on its mission and activities, are true and correct based on my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated:   12-14-2022

*Steve Karlen*

_____

Steve Karlen

**VERIFICATION**

I, GERALD YEUNG, am over the age of 18 and am one of the organizers of the volunteers who comprise the unincorporated association Plaintiff White Plains 40 Days for Life (WP-40DFL). The allegations in this First Amended Verified Complaint pertaining to WP-40DFL's mission and activities, and the impact of Chapter 425 on its mission and activities, are true and correct based on my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated:   12-14-2022

_____
Gerald Yeung

## VERIFICATION

I, OKSANA HULINSKY, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated:

12/14/22

_____
Oksana Hulinsky

## VERIFICATION

I, REGINA JOY CREARY MOLINELLI am over the age of 18 and am a Plaintiff in this action.  The allegations that pertain to me in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently.  I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated: 12/14/2022

Regina Joy Creary Molinelli