## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

**40 DAYS FOR LIFE,** a nonprofit corporation of the State of Texas,

**WHITE PLAINS 40 DAYS FOR LIFE**, an unincorporated association of the State of New York,

**OKSANA HULINSKY,** and

**REGINA JOY CREARY MOLINELLI,**

Plaintiffs,

v.

**COUNTY OF WESTCHESTER**,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 7:22-cv-6950-PMH
[related case: 7:22-cv-09370]

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 2

   I.   Plaintiffs' Sidewalk Counseling and Advocacy. ................................................ 2

   II.   Chapter 425's Background and Prohibitions. .................................................. 3

     A. Purported Purpose: ................................................................................... 3

     B. Prohibitions ............................................................................................. 4

     C. Limitation of Pre-Enforcement Challenge ............................................. 6

     D. Targeted Impact on Pro-Life Speech: ..................................................... 6

ARGUMENT ................................................................................................................... 8

   I.   Standing. ............................................................................................................ 8

     A. Pre-Enforcement Standing ...................................................................... 8

     B. Organizational Standing .......................................................................... 10

     C. Associational Standing ............................................................................ 11

   II.   Plaintiffs Are Likely to Succeed on the Merits. ............................................... 12

     A.   Chapter 425 is unconstitutionally overbroad. ........................................ 16

     B.   Chapter 425 is a content-based regulation of speech, and fails strict scrutiny. ............ 18

     C.   Chapter 425 would fail intermediate scrutiny as well. ................................. 24

   III.   Irreparable Harm. ............................................................................................. 24

   IV.   Public Interest. ................................................................................................. 25

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Agudath Israel of Am. v. Cuomo,*
   983 F.3d 620 (2d Cir. 2020)................................................................. 8

*Bano v. Union Carbide Corp.,*
   361 F.3d 696, 713 (2d Cir. 2004)......................................................... 11

*Boos v. Barry,*
   485 U.S. 312 (1988)................................................................. 20, 23

*Brown v. Ent. Merchants Ass'n,*
   564 U.S. 786 (2011)......................................................................... 23

*Carson v. American Brands, Inc.,*
   450 U.S. 79 (1981)........................................................................... 2

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC,*
   142 S. Ct. 1464 (2022)..................................................................... 18

*City of Chicago v. Morales,*
   527 U.S. 41 (1999)................................................................. 12, 13, 18

*Coates v. City of Cincinnati,*
   402 U.S. 611 (1971)......................................................................... 13

*Cuomo v. Barr,*
   7 F.3d 17 (2d Cir. 1993)..................................................................... 2

*Dorman v. Satti,*
   862 F.2d 432 (2d Cir. 1988)............................................................... 18

*Elrod v. Burns,*
   427 U.S. 347 (1976)......................................................................... 24

*Farrell v. Burke,*
   449 F.3d 470 (2d Cir. 2006)............................................................... 12

*Grayned v. City of Rockford,*
    408 U.S. 104 (1969) ......................................................................... 15, 16

*Griepp II,*
    997 F.3d 1258 (2d Cir. 2021) ........................................................... 15, 16

*Griepp III,*
    11 F.4th 174 (2d Cir. 2021) ................................................................... 7

*Hill v. Colorado,*
    530 U.S. 703 (2000) ................................................................... 7, 21, 23

*Hunt v. City of Los Angeles,*
    638 F.3d 703 (9th Cir. 2011) ............................................................... 13

*Joelner v. Vill. of Wash. Park,*
    378 F.3d 613 (7th Cir. 2004) ............................................................... 24

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................. 14

*Madsen v. Women's Health Ctr.,*
    512 U.S. 753 (1994) ......................................................................... 1, 18

*Massachusetts v. Oakes,*
    491 U.S. 576 (1989) ............................................................................. 16

*McCullen v. Coakley,*
    573 U.S. 464, 488-89 (2014) ........................................................ *passim*

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan,*
    519 F. App'x 714 (2d Cir. 2013) ......................................................... 11

*N.H. Right to Life PAC v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) ..................................................................... 10

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682(2d Cir. 2013) ............................................................. 8, 10

*New York C.L. Union v. New York City Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012) .................................................................................... 10

*New York ex rel. Spitzer v. Operation Rescue National*,
  273 F. 3d 184 (2001) ................................................................................... 17, 21, 24

*New York Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) .................................................................................... 24

*New York v. Griepp*,
  991 F.3d 81 (2d Cir. 2021) .......................................................................... 1, 7, 16, 17

*Niemotko v. State of Md.*,
  340 U.S. 268 (1951) ................................................................................................. 21

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011) .................................................................................... 11

*People v. Golb*,
  23 N.Y.3d 455 (2014) ......................................................................................... 13, 17

*Picard v. Magliano*,
  42 F.4th 89 (2d Cir. 2022) ...................................................................................... 8, 9

*Police Dep't of Chicago v. Mosley*,
  408 U.S. 92, 95 (1972) ....................................................................................... 18, 21

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................................................... 18, 23

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ................................................................................................. 25

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ........................................................................................... 17, 19

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ............................................................................... 10

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ............................................................................ 9

*Texas v. Johnson,*
491 U.S. 397 (1989) ............................................................... 9, 20, 23

*U.S. v. Stevens,*
559 U.S. 460 (2010) ..................................................................... 16, 17

*United States v. Alvarez,*
567 U.S. 709 (2012) ............................................................................ 19

*United States v. Hill,*
893 F.Supp. 1034 (N.D. Fla. 1994) .................................................... 5

*Vermont Right to Life Comm., Inc. v. Sorrell,*
221 F.3d 376 (2d Cir. 2000 .............................................................. 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ........................................................................... 21

*Village of Hoffman Estates v. The Flipside,*
455 U.S. 489 (1974) ..................................................................... 12, 14

*VIP of Berlin, LLC v. Town of Berlin,*
593 F.3d 179 (2d Cir. 2010) ........................................................ 12, 15

*Virginia v. Am. Booksellers Ass'n, Inc.,*
484 U.S. 383 (1988) ................................................................. 8, 10, 24

*Vitagliano v. County of Westchester,*
2023 WL 24246 (S.D.N.Y. Jan. 3, 2023) ........................................... 2

*Whole Woman's Health v. Jackson,*
142 S. Ct. 522 (2021) .......................................................................... 6

**Statutes**

Westchester County Law § 425.11 ............................................... 15, 24

§ 425.81(b) .............................................................................................. 6

§ 425.21(c) ............................................................................................................ 13, 20

§ 425.21(d) ....................................................................................................... 5, 14, 18

§ 425.21(h) ................................................................................................................... 5

§ 425.31 ................................................................................................................... 6, 13

§ 425.31(a) ............................................................................................................... 5, 19

§ 425.31(b) ................................................................................................................... 23

§ 425.31(d) ..................................................................................................................... 6

§ 425.31(c) ............................................................................................................... 5, 20

§ 425.31(e), (f) ......................................................................................................... 5, 19

§ 425.31(h) ............................................................................................................... 5, 19

§ 425.41 ......................................................................................................................... 6

§ 425.51 ......................................................................................................................... 6

§ 425.61 ......................................................................................................................... 6

18 U.S.C. § 248(d)(1) .................................................................................................. 10

18 U.S.C. § 248(e)(4) .................................................................................................... 5

28 U.S.C. § 1292(a)(1) .................................................................................................. 2

**Rules**

N.Y.C. Admin. Code §§ 10-1003(a)(4) ...................................................................... 13

**Other Authorities**

Michael New, "Mainstream media misleads on NAF's Violence and Disruption Report," The Paradise, July 27, 2022, https://theparadise.ng/mainstream-media-misleads-on-nafs-violence-and-disruption-report/.............................................................................................................4

Tom Strode, "Pregnancy Centers Continue To Serve Despite Attacks," Church Leaders, Aug. 8, 2022, https://churchleaders.com/news/431364-pregnancy-centers-continue-to-serve-despite-attacks-bp.html; https://www.dailysignal.com/2022/11/02/doj-attacks-on-pro-life-pregnancy-centers-can-be-prosecuted/............................................................................................................4

**INTRODUCTION**

When the "government makes it more difficult to engage" in pro-life "sidewalk counseling, … normal conversation and leafletting on a public sidewalk," it "imposes an especially significant First Amendment burden." *McCullen v. Coakley*, 573 U.S. 464, 488-89 (2014). Laws regulating this activity must give "adequate breathing space to the freedoms protected by the First Amendment." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994). Westchester County ignored these warnings by enacting a welter of speech restrictions near "reproductive health care facilities" that leave *zero* breathing space for sidewalk counseling, conversation and leafletting.

Four days after *Dobbs* overturned *Roe v. Wade*, the County adopted the Chapter 425 of the Laws of Westchester County ("Chapter 425"), creating *seven different tiers* of restrictions on pro-life sidewalk advocacy on pain of fines, imprisonment and treble damages. Chapter 425's restrictions, being *vague, overbroad, and content-based*, burden "substantially more speech than necessary." *McCullen*, 573 U.S. at 486. The County justified these restrictions by relying *expressly* on the opinion in *New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021) (*Griepp I*). Second Amend. Verif. Comp. ( "Comp.") ¶¶130-148 That patently erroneous decision was *vacated in its entirety* more than a year ago. *See Griepp II*, 997 F.3d 1258 (2d Cir. 2021).

"When you're walking down the street and people are *handing out leaflets* . . . and you *ignore that person*, that's implied: 'Leave me alone.'" Comp. ¶ 146. That is how the County views the sweep of Chapter 425, which (adopting the error of *Griepp*) prohibits conduct that continues after "an express or *implied* request to cease." *See* 425.21(c). As a result, Plaintiffs have been forced to *cease or curtail* their peaceful pro-life speech outside of abortion clinics.

Plaintiffs have not moved for preliminary injunctive relief as to one of the challenged restrictions, §425.31(i) of Chapter 425, because a motion for preliminary injunctive relief as to that "bubble zone" provision would be a vain exercise and a waste of judicial resources, given the

Court's decision in *Vitagliano v. County of Westchester*, 2023 WL 24246 (S.D.N.Y. Jan. 3, 2023), and the Court's statements at the pre-motion conference on January 18 that "I *am not going to change my mind* on what I have written in *Vitagliano*, *period*." and that "…I have indicated to you already that *I am not going to grant an injunction* in this scenario because it's *exactly the same as* [] *Vitagliano*…" (emphasis added) (Tr., p. 9, lines 10-11 and p. 17, line 23).

Accordingly, in light of *Vitagliano*, the January 18 conference, and this Court's order (ECF 64) declining to provide a formal order reflecting its determination, even on consent of defense counsel, Plaintiffs will seek appellate review of the effective denial of injunctive relief as to §425.31(i). *See Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) (district court's denial of joint motion to approve consent decree effectively denied injunction and was immediately appealable under 28 U.S.C. § 1292(a)(1). *Cuomo v. Barr*, 7 F.3d 17 (2d Cir. 1993) (appellate courts have jurisdiction over partial denials of injunctive relief under same standard as *Carson*).

This Court should grant preliminary injunctive relief on Plaintiffs' remaining challenges.

## BACKGROUND

### I. Plaintiffs' Sidewalk Counseling and Advocacy.

Plaintiffs Oksana Hulinsky and Regina Joy Creary Molinelli are sidewalk counselors outside Planned Parenthood abortion clinics in Westchester County. (Comp. ¶¶26-49.) They engage in conversational speech and leafletting effectively prohibited by Chapter 425. (Id.) In particular, Plaintiffs' First Amendment-protected activity includes peacefully approaching expectant mothers and others entering or leaving the facilities to engage in short, quiet conversations at a normal conversational distance about alternatives to abortion, including offering literature on abortion alternatives, the physical and psychological risks of abortion, and on fetal development. (Id.) Plaintiff Molinelli, who has received training in pro-life sidewalk counseling, (Id. ¶¶35-37), also offers "Blessings Bags" to persons approaching or leaving the Planned

Parenthood facility, which are often the bridge to conversations about abortion alternatives. (Id. ¶¶40, 44.) If a car stops in the public portion of the driveway entrance to engage with Plaintiff Molinelli, she approaches to speak and offer literature and "Blessing Bags." (Id. ¶45.)

Plaintiff 40 Days for Life ("40DFL"), an international pro-life advocacy non-profit corporation, relies on local associations such as Plaintiff Westchester 40 Days for Life ("WP-40DFL") to conduct 40-day-long "Local Vigils" on the public ways outside abortion facilities during the spring and fall, including in Westchester County. (Id. ¶¶15-25.) In addition to prayer, 40DFL trains and encourages Local Vigil participants to peacefully approach, converse, and/or offer literature to persons entering or leaving a facility or passersby. (Id. ¶18.) WP-40DFL and its members regularly gather outside the Planned Parenthood facility in Greenburgh, where they pray and/or approach persons entering or leaving to converse and/or offer literature. (Id.¶¶22-23.)

All Plaintiffs recognize that the moments before expectant mothers enter or leave a Planned Parenthood facility are the last best hope of encouraging them to consider abortion alternatives, and that it is crucially important in those moments to be able to approach these women to engage in conversation rather than shouting slogans or holding signs at a distance. (Id. ¶¶35, 47.) **There is no evidence that Plaintiffs or other pro-life sidewalk advocates in the County (versus the "Red Rose" trespassers) violated any law**. (Comp.¶95.)

## II.     Chapter 425's Background and Prohibitions.

**A. Purported Purpose:** At the Board's June 1, 2022 Legislation Committee meeting, Legislator MaryJane Shimsky stated that the "precipitating event" for Chapter 425 was a "Red Rose Rescue" in November 2021, in which three pro-life advocates held a peaceful sit-in at a County abortion facility—passing out roses and messages of hope to women contemplating abortion before being arrested and sentenced to three months in jail for trespassing. (Comp.¶¶2, 3.) The June 6, 2022 Committee Memorandum accompanying the final bill alleges that current

law failed to "adequately protect" the facility because "the trespassers refused to leave", and the two-hour delay in making arrests "demonstrates a need for clear legislative boundaries that provide safe access to reproductive health care facilities." (Ex. A, at p.2.) But such conduct is already prohibited by FACE and its state-law equivalent. The memo also claims, without evidence, that "several protestors swarmed outside the facility" and "disrupted access" during the incident.

The Committee Memo further "notes" a claim by the National Abortion Federation ("NAF") that "threats and acts of violence against abortion providers had already increased significantly" before the overturning of *Roe*. (Committee Memo, pg. 4.) But NAF is a *pro-abortion advocacy organization*[1] whose "data" show *a decrease* in "violent" incidents.[2] The Memo further states, without evidence, that "investments" for additional security "have been insufficient to preserve access to and maintain peace" outside facilities. (Id. at 4.) But it cites only Planned Parenthood Hudson Peconic as an example. (Id.) The Memo alleges "[s]ome recent instances" between a "protestor and patient escort," and "protestors throwing nails and other sharp metal objects" onto a facility driveway—with no supporting evidence or signs of involvement by sidewalk counselors like Plaintiffs. The biased Memo fails to "note" more than 100 *verified* attacks on *pro-life pregnancy centers* and churches since the leak of the draft opinion in *Dobbs*.[3]

**B. Prohibitions:** Chapter 425 enacts *nine different prohibitions*, seven of which restrict speech in the vicinity of "reproductive health care centers" in Westchester County. (§ 425.31(a)-

---

[1] https://prochoice.org/about/mission-leadership/ (stating its "mission" is to "support abortion providers").

[2] Michael New, "Mainstream media misleads on NAF's Violence and Disruption Report," The Paradise, July 27, 2022, https://theparadise.ng/mainstream-media-misleads-on-nafs-violence-and-disruption-report/.

[3] Tom Strode, "Pregnancy Centers Continue To Serve Despite Attacks," Church Leaders, Aug. 8, 2022, https://churchleaders.com/news/431364-pregnancy-centers-continue-to-serve-despite-attacks-bp.html; https://www.dailysignal.com/2022/11/02/doj-attacks-on-pro-life-pregnancy-centers-can-be-prosecuted/

(i).) Chapter 425 further relies on *12 specially defined terms*, many of which are repeated in the various prohibitions, rendering them substantially duplicative. (§ 425.21(a)-(l).)

**1-3. "Physical Obstruction" or Force §§ 425.31 (a), (e), (f).** These sections prohibit:

- "physically obstruct[ing] or block[ing] another person from entering into or exiting from the premises of a reproductive health care facility or a public parking lot serving" it "to prevent… obtaining or rendering… reproductive health care services …" 425.31(a).

- the use of "force" or "threat of force," or "physically obstructing or blocking" to actually or *attempt* to "knowingly injure, intimidate, or *interfere with* another person in order to *discourage* [them] from obtaining or providing," or "*because* such person was or is obtaining or providing… reproductive health care services ..." § 425.31(e)(f)

**"Physically obstruct or block"** is defined as merely "imped[ing]" or "hinder[ing]" in some unspecified manner, § 425.21(h), versus FACE, which requires rendering access "impassible" or "unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). Worse, "**interfere with**" is defined as "stop . . . or prevent, through deceptive means *or otherwise*." § 425.21(d).

**4. "Interference" simpliciter - Section 425.31(h):** Prohibits "knowingly *interfer[ing]* with the *operation* of a reproductive health care facility, or *attempt[ing]* to do the same, by *activities* including, *but not limited to*, interfering with… (i) medical procedures or treatments" at the facility; "(ii) the delivery of goods or services to" the facility; or "(iii) persons inside the facility." Again, the definition of "**interfere with**" is overbroad, vague, and content-based, as are the *undefined* terms "**operation of a reproductive health care facility**" and "**activities**."[4]

**5. "Follow and Harass" - Section 425.31(c):** Prohibits "follow[ing] and harass[ing] another person within twenty-five (25) feet" of a facility's premises or the entrance/exit of a "public parking lot serving" it. The term "**harass**" includes speech that "**seriously annoy[s]**" and

---

[4] Courts have deemed "interference" with clinic "escorts" on public sidewalks to be interference with "reproductive health services provided *in* . . . a facility" under FACE, *see, e.g., United States v. Hill*, 893 F.Supp. 1034, 1038-39 (N.D.Fla. 1994), which would trigger Chapter 425's sweeping prohibition of "interference" with "operation of a reproductive health care facility." §425.31(h).

"serves no legitimate purpose," including **speech "that continues after an express** or ***implied request[s] to cease***". The provision is vague, overbroad, and content-based, while the undefined term "**follow**" provides no real limit on the restriction. How many steps constitute "following"?

6. **"Attempt" to cause fear - § 425.31(d):** This provision is challenged to the extent that it prohibits a "course of conduct" or repeated "acts" that merely "*attempt to*" place another person in "reasonable fear of physical harm" as these terms are unduly vague, overbroad, and content-based (i.e., dependent solely on the listener's reaction).

While Chapter 425 states that it shall not be construed "to prohibit expression protected by the First Amendment" (§ 425.81(b)), its plain terms are so vague and overbroad as to chill Plaintiffs' speech, especially given that violation brings fines and jail terms. § 425.41. Chapter 425 also provides for a civil action for injunctive relief, treble damages and attorney fees for (a) "any person" whose access to a facility "*has been interfered with*"; (b) "any owner or operator"; (c) the building owner; (d) "any employee...any volunteer"; or (e) any invitee. § 425.51 (emphasis added). The County Attorney may sue for equitable relief "to *prevent* or cure" a violation. *See* § 425.61.

**C. Limitation of Pre-Enforcement Challenge.** In light of *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021), Plaintiffs seek pre-enforcement injunctive relief only against the criminal prohibitions of § 425.31 and the County's civil enforcement under § 425.61.

**D. Targeted Impact on Pro-Life Speech:** Chapter 425 plainly targets pro-life speech. Following its adoption, Legislator Shimsky stated that only pro-abortion organizations "worked on this bill."[5] (Comp.¶134.), which passed because "[w]e now have a pro-choice County Executive and a pro-choice super majority on the Board of Legislators." (Id.) At the signing ceremony,

---

[5] *See* NYCLU, "Reproductive Rights and Justice," https://www.nyclu.org/en/issues/reproductive-rights-and-justice.

Legislator Borgia credited "the Westchester Coalition for Legal Abortion" and "the [New York] Attorney General's Office." The AG's involvement is key given its role in *Griepp*, where it sought an injunction against run-of-the-mill pro-life speech under FACE, the New York City equivalent to FACE, and the City's "follow-and-harass" law, arguing that it involved "physical obstruction," "force," and "threats of force". The AG deemed "harassment" to be merely "speak[ing] with patients who remain silent as they approach," including "sometimes mak[ing] a closing remark" "if a patient asks to be left alone." *Griepp I*, 991 F.3d at 121; *see also id.* ("harassment" includes continued speech after an "*implied* request[s] to stop"). Although *Griepp I* was vacated in *Griepp II*, the Second Circuit's dispositive opinion in *Griepp III* merely deferred to the District Court's "considerable discretion" in denying a preliminary injunction. *Griepp III*, 11 F.4th 174, 176 (2d Cir. 2021), failing to adopt Judge Livingston's dissenting constitutional analysis in *Griepp I*, leaving pro-life speech in the Circuit vulnerable to further error of the same sort.[6]

Moreover, the County plainly intended Chapter 425 to prohibit normal sidewalk counseling. County legal counsel advised that even if sidewalk counselors are "staying outside the bubble," "*a number of other provisions might kick in as well.*" (Id. ¶147) (emphasis added). **That series of "gotchas" aimed at sidewalk advocates is precisely the point of Chapter 425.**

Thus, apart from the eight-foot bubble zone, which this Court has already upheld under *Hill v. Colorado*, 530 U.S. 703 (2000), Plaintiffs risk prosecution for any of the following:

- "following and harassing" if they walk behind or alongside the intended recipient of their message, advocating for life despite an "express or *implied*" request to stop speaking;

_____

[6] This is especially true given the County Legislators' approach to enacting a "bubble zone," which they acknowledged the Supreme Court is likely to overturn, but "[f]or now, *Hill* is still good law, so . . . we can [adopt a "bubble zone"] until it's expressly overturned by the Supreme Court." (Comp. ¶122, Leg. McLeod; also ¶115, Prof. Waldman.)

- "physically hindering" even by standing stationary in a woman's path so as not to "approach" within eight feet, if the woman has to "delay" by going around;

- "interfering with" access to abortion, when enforcement authorities deem proffered literature (which *Griepp I* deemed to be physical obstruction), oral statements, or conduct to be "deceptive" or "otherwise" an "interference";[7]

- "interfering with" clinic "operations" if Plaintiffs' speech (including pro-life signs which many allege are "deceptive") or other expressive conduct causes an abortion "escort" or staffer to have a change of heart or respond violently to an "unwanted" message.[8]

All told, this is a brazen *suffocation* of pro-life speech—just as the County intended.

## ARGUMENT

To obtain a preliminary injunctive relief against government, Plaintiffs must show: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). Plaintiffs easily meet all these elements.

**I.     Standing.**

**A. Pre-Enforcement Standing**: The relevant standard for pre-enforcement challenges "is quite forgiving to plaintiffs … as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (cleaned up). This is especially true in First Amendment cases, where the "danger . . . is, in large measure, one of self-censorship… even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (First Amendment pre-enforcement challenges assessed "under somewhat relaxed standing and ripeness rules.").

---

[7] Much pro-life speech is labelled "deceptive" by pro-choice advocates. (Comp. ¶70.)

[8] 40 Days For Life, "Join . . . Abby," May 26, 2017 (noting many "abortion staffers" have stopped working for abortion facilities as result of public prayer campaign outside abortion facilities).

It suffices that "[plaintiffs]' intended conduct" is "*arguably* affected with a constitutional interest" and "'*arguably* . . . proscribed by the statute,' not that it was in fact proscribed under the best interpretation of the statute or under the government's own interpretation." *Id.*, 42 F.4th at 97, 98 (cleaned up) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)). Standing exists "if a plaintiff's interpretation of a statute is reasonable enough and under that interpretation, the plaintiff may legitimately fear… enforcement…" *Id.* at 98 (cleaned up).

Plaintiffs' sidewalk advocacy is plainly "affected with a constitutional interest" because laws restricting "*normal conversation* and *leafletting* on a public sidewalk" "impose[] an especially significant First Amendment burden." *McCullen*, 573 U.S. at 488-89. Moreover, the plain text of the challenged provisions—especially in light of the County's reliance on *Griepp I*— *at minimum* "arguably proscribes" Plaintiffs' pro-life speech in the immediate vicinity of clinic entrances or driveways, locus of the "last best hope" for persuasion. (Comp. ¶¶ 35, 47)

Instructive on this point is *Picard*, which invalidated a statute prohibiting speech "concerning the conduct of a trial" within 200 feet of the courthouse because it "arguably proscribed" Picard's *general* advocacy of jury nullification. *Picard*, 42 F.4th at 99-100. It was "at the very least plausible" that his message was forbidden, as "his advocacy would apply to any trial then being held in the courthouse"—*even if* the State's interpretation applying only to "a *specific* trial is *more persuasive*." *Id.* at 100 (noting that Plaintiff's arrest undermined State's interpretation even though the charge was dismissed,). So too here, as shown by the following facts:

- Chapter 425 applies to mere "continued" speech, as confirmed by County legal counsel: "When you're walking down the street and people are *handing out leaflets* . . . and you *ignore that person*, that's implied: 'Leave me alone.'" (Comp. ¶146.);

- *Griepp I* (expressly relied on by the County) deemed "physical obstruction" to include merely holding a sign on an empty sidewalk or leafletting that causes a "one second delay";

- "interference" (by *de minimis* "physical hindrance" or "actions") includes even causing another person "to stop" through speech (*i.e.*, "means") considered "deceptive" "or otherwise."[9]

It is *at least* "plausible" that Plaintiffs' advocacy violates these restrictions. Further, a credible threat of enforcement exists where, as here, Plaintiffs "reasonabl[y] fear that [they] will be subjected to penalties for [their] planned expressive activities," as their activities are arguably prohibited by the *plain terms of the statute. See Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383-84 (2d Cir. 2000); *accord Nat'l Org. for Marriage*, 714 F.3d at 690. On pre-enforcement challenges to "*recently enacted . . .* statutes that facially restrict expressive activity… courts will *assume* a credible threat of prosecution..." *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996). Here, the challenged provisions facially restrict Plaintiffs' speech.[10]

Finally, "litigants who are being chilled from engaging in constitutional activity suffer a discrete harm *independent of enforcement*." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). Chapter 425's multi-layered hair-trigger provisions have prompted Plaintiffs reasonably to engage in "self-censorship." *Am. Booksellers*, 484 U.S. at 393,

**B. Organizational Standing**: 40DFL has organizational standing because the challenged law frustrates and impairs its mission. *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294-95 (2d Cir. 2012). Chapter 425 has directly impeded 40DFL's promotion of Local

---

[9] *See* Joanna Smith, "Deception used in counselling against abortion," *Toronto Star*, Aug. 7, 2010, https://www.thestar.com/news/canada/2010/08/07/deception_used_in_counselling_women_against_abortion.html; NARAL Pro-Choice America, "Crisis Pregnancy Centers Lie: The Insidious Threat to Reproductive Freedom," 2015, https://www.prochoiceamerica.org/wp-content/uploads/2017/04/cpc-report-2015.pdf; *but see* Comp. ¶61.

[10] Chapter 425's proviso that none of its provisions shall be construed to prohibit First Amendment activity, § 425.81(b), is a fool's paradise given the *facial overbreadth, vagueness, and content-based* defects of its challenged provisions, its targeting of pro-life speech, and *Griepp I*'s unconstitutional interpretation of FACE despite FACE containing a similar proviso. *See* 18 U.S.C. § 248(d)(1); *see also Griepp I*, 991 F.3d at 142 (Livingston, J., dissenting).

Vigils at "abortion facilities *throughout* the United States," *including* at the "Planned Parenthood facility in . . . Greenburgh, NY." (Comp. ¶¶9, 15 (emphasis added).) An "important" part of this mission is to provide training for and encourage sidewalk advocacy via leafletting and counseling with 40DFL materials. (Id. ¶¶17-18.) Chapter 425 brazenly restricts these organizational activities, discouraging individuals from engaging in leafleting or sidewalk counseling and (for many) from participating in Local Vigils at all. *See infra*; *also* Burke Decl. at ¶¶7-16. By restricting Local Vigils in Westchester, Chapter 425 has chipped away at 40DFL's mission, requiring diversion of resources from normal activities to studying the law, consulting with counsel about the effects of Chapter 425's provisions, and identifying and interviewing potential witnesses. *See Nnebe v. Daus*, 644 F.3d 147, 156-57 (2d Cir. 2011); *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013). These are classic organizational injuries.

**C. Associational Standing**: WP-40DFL has associational and organizational standing. It has associational standing because (1) its members would otherwise have standing to sue in their own right, as do Plaintiffs Hulinsky and Molinelli, who have been chilled from approaching women to offer pro-life literature as part of their participation in WP-40DFL activities (Comp. ¶¶34, 37, 42, 49). So also has co-member (and non-plaintiff) Brian Burke (Id. ¶91(d); Comp. Ex. Q, ¶¶7-16), *see Bano v. Union Carbide Corp.*, 361 F.3d 696, 713 (2d Cir. 2004); (2) WP-40DFL's interests are germane to the organization's purpose: to advocate for life by encouraging women to choose alternatives to abortion (Comp. ¶¶21-25), *see Bano*, 361 F.3d at 713 ; and (3) the injunctive relief requested does not require participation of individual members in the lawsuit, which raises "pure question[s] of law" on as-applied and facial challenges respecting activities members of the association typically engage in (Id.), *Bano*, F.3d at 714. Further, as a result of Chapter 425, WP-40DFL experienced a 50% reduction in participants in its Fall 2022 Local Vigil in Greenburgh

(*see* Burke Decl., Comp. Ex. Q at ¶17). The remaining 50% risked the same feared harms and thus have the same common need for injunctive relief. WP-40DFL has itself suffered injury-in-fact and thus has organizational standing because Chapter 425 interferes with its mission to advocate for life on public sidewalks by approaching, conversing and offering literature. (Comp. ¶¶21-25.) *Id.*

## II.     Plaintiffs Are Likely to Succeed on the Merits.

A law violates the Due Process Clause "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). "When the statute is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands *a greater degree of specificity* …." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (cleaned up). "Vagueness may invalidate a criminal law … [if] (1) it fails to provide adequate notice that will enable ordinary people to understand what conduct it prohibits;" or (2) it "authorize[s] . . . arbitrary and discriminatory enforcement." *Morales*, 527 U.S. at 56. That is, a law can be impermissibly vague both facially and as applied.

Chapter 425 is facially vague because, in relevant part, "no standard of conduct is specified at all" and the challenged provisions discussed below "simply [have] no core." *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489, 495 n.7 (1974). Moreover, "[t]he general rule disfavoring facial vagueness challenges *does not apply* in the First Amendment context." *Farrell v. Burke*, 449 F.3d 470, 496 (2d Cir. 2006). The challenged provisions also suffer from as-applied vagueness because a "person of ordinary intelligence" has no "reasonable opportunity to know" if the *actual conduct at issue* is prohibited, and there are no "explicit[] standards for those who apply it." *Farrell*, 449 F.3d at 486; *id.* at 494 (danger of arbitrary enforcement dissipates *if* provision has clear "core" and "no reasonable officer could doubt [its] application" in a given context).

### 1.     Prohibition on "knowingly follow[ing] and harass[ing]." § 425.31(c):

This provision is **facially vague** because "harass" is defined to include even "conduct or acts that continue after an . . . *implied request to cease* has been made," § 425.21(c), which fails to provide a definition or examples and is thus standardless. *See Hunt v. City of Los Angeles*, 638 F.3d 703, 711 (9th Cir. 2011) (speech restriction that "fails to define or provide any examples of" is facially vague). It is "difficult, if not impossible, for an individual to determine whether his conduct is proscribed by [§ 425.31]." *Id.* Tellingly, County legal counsel advised that the meaning of "implied request to cease" "*will be up to a court to determine*," *based on* "*whatever evidence you present*." (Comp.¶147.) But "[t]he Constitution does not permit a legislature to… leave it to the courts to step in[] and say who should rightfully be [charged], and who should be set at large." *Morales*, 527 U.S. at 60 (invalidating law defining "loitering" as having "no apparent purpose").

That "harass" here means merely that one's "act" "alarm or seriously annoy" another person only adds to the problem. § 425.21(c). A prohibition on "annoying" people on public sidewalks is "an unascertainable standard." *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Thus did the New York Court of Appeals invalidate New York's aggravated harassment statute prohibiting "pure speech" that "inten[ds] to," and is made "in a manner that [is] likely to," "cause annoyance or alarm," because it "is not clear what [was] meant" by these terms and the "scope of the affected speech" was not "clearly defined." *People v. Golb*, 23 N.Y.3d 455, 467 (2014) (noting three federal judges also agreed). All the more do these authorities invalidate the punishment of pure speech after an *implied* "request to cease."

Finally, this provision is vague **as applied**. The definition of "harass" is just as standardless as "follow and harass" in N.Y.C. Admin. Code §§ 10-1003(a)(4), *et seq.*, upon which Chapter 425's version was expressly "modeled." (Committee Memo, p. 5.) As Justice Scalia opined concerning this law: "Is it harassment, one wonders, [] to ask a woman, quietly and politely, two

times, whether she will take literature . . . ? Three times? Four times?" *McCullen*, 573 U.S. at 500

(Scalia, J., concurring) (noting likely impermissibility of "so vague an offense" as "follow[ing]

and harass[ing]"); *see also id.* at 491 n.8 (majority opinion acknowledging that NYC's follow-and-

harass provision might be unconstitutional). "Follow and harass" has no "core" meaning. *Village

of Hoffman Estates*, 455 U.S. at 495 n.7. It suffers from as-applied vagueness.

### 2. Prohibition on "interfer[ing] with" or "attempt[ing] to" interfere with "the operation of reproductive health care facility" by "activities." § 425.31(h).

This prohibition is facially vague because, as noted, the definition of "interfere with"

applies even to conduct that merely causes another person "to stop . . . through" undefined

"deceptive means" (thus including speech) "or otherwise." § 425.21(d). The unqualified phrase,

"or otherwise," *literally* "has no core." *Village of Hoffman Estates*, 455 U.S. at 495 n.7.

"Deceptive means" is even more problematic than, for example, "credible and reliable"

identification being required by the police, which "contains no standard" and "vests virtually

complete discretion in the hands of the police to determine whether the suspect has satisfied the

statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). The term "deceptive means" "furnishes a

convenient tool for harsh and discriminatory enforcement… against particular groups deemed to

merit [official] displeasure." *Id.* at 360 (cleaned up). Indeed, as noted, pro-life speech is habitually

labelled "deceptive" by Plaintiffs' political opposition.

The problem is not cured by the requirement that one interfere with the "operation of a

reproductive health care facility," as this is further defined to prohibit undefined "activities" that

"include[], ***but [are] not limited to***," merely "***attempting*** to interfere with" "medical procedures or

treatments" at the facility, or "the delivery of goods or services". § 425.31(h) (emphasis added).

There is no "fixed time[]" and "fixed place" for the "imprecis[e]" prohibited "activities," *Grayned*

*v. City of Rockford*, 408 U.S. 104, 111 (1969), and it is a mystery what counts as "activities" that "interfere" or "attempt" to "interfere" with clinic operations (even "annoying" speech or prayer?).

Finally, this prohibition is vague **as applied** for similar reasons. It is entirely unclear whether Plaintiffs' "pure speech" against abortion, and the relevant sidewalk approaches, constitute "deceptive means or otherwise" or "activity" that "attempt[s] to" "interfere with" an abortion facility's "operations" by persuading women or staffers to turn away from abortion.

> **3. Prohibitions on "<u>interfering with</u>" "by force, threat of force or physical obstruction or blocking" "<u>to discourage</u>" obtaining or providing, or "because" another obtains or provides, reproductive health care services. § 425.31(e), (f).**

These facially vague prohibitions are not saved by the terms "physical obstruction" ("hindering" or "impeding" without an "unreasonably difficult" or "hazardous" qualifier) or "force". A statute's "stated" or "announced purpose" is key to assessing vagueness. *See VIP of Berlin, LLC*, 593 F.3d at 188; *Grayned*, 408 U.S. at 112. Chapter 425's statement of "Legislative intent" decries "activities that unlawfully harass or intimidate" *and thereby* "*interfere with*" access to facilities, and further declares an intent to "prohibit *interference with* accessing" facilities and service—with **no predicate of actual physical obstruction, force, or threat of force**. § 425.11, para. 2-3. Further, on the erroneous advice of Professor Waldman, the Board relied on the vacated decision in *Griepp I* as to "First Amendment" issues. (Comp.¶¶ 130-148.) *Griepp I* deemed "physical obstruction" to include holding a large sign on an empty sidewalk and other "de minimis conduct," and "force" as "incidental contact" when a "protestor [] reaches out to hand a patient a pamphlet." *Id.* at 119, 124. When the prohibitions on "interference" by physical obstruction or force are considered in light of the stated statutory intent and legislative history, Plaintiffs' reasonable fear of arbitrary and discriminatory enforcement **as-applied** is readily apparent.

**4. Prohibition on "physically obstruct[ing] or block[ing]" "to prevent" obtaining or providing of reproductive health care services. § 425.31(a).**

This provision is **facially vague** for the reasons discussed above. As already discussed, "physically obstruct or block" is defined to include a mere "attempt" to physically "hinder" or "impede" access to abortion, § 425.21(h), which goes well beyond FACE's requirement that one render access "impossible" or "unreasonably difficult or hazardous." This provision is also vague **as applied** for the same reasons discussed above.

**5. Prohibition on "*attempt[ing]*" to "intimidate," § 425.31(e)&(f), and "*attempt[ing]*" to "place[] another person in reasonable fear of physical harm" within the aforementioned 25-foot zone, § 425.31(d).**

These provisions are **facially vague** given *Griepp I*'s application of a *narrower* prohibition in FACE to mere preaching about "the fragility of the life." (Comp.¶78(e); *Griepp I*, 991 F.3d at 115.) They are additionally vague **as-applied** to the extent pro-life speech is deemed "threatening" under the loose standard applied in *Griepp I. Griepp I*, 991 F. 3d at 115.

**A.      Chapter 425 is unconstitutionally overbroad.**

First Amendment facial overbreadth arises when "a substantial number of [a law's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *U.S. v. Stevens*, 559 U.S. 460, 472 (2010). This rule "prevent[s] the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). The test is whether "the ordinance sweeps [in] what may not be punished under the First [] Amendment[]." *Grayned*, 408 U.S. at 114-15.

As noted, public sidewalks have from "time out of mind been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 115 (cleaned up). And "speech on public issues occupies the highest rung on the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452

(2011) (cleaned up). Chapter 425 is a "criminal prohibition of alarming breadth," *Stevens*, 559 U.S. at 474, and clearly sweeps in protected speech.

Critically, "the text of the statute's ban on" preventing "access" to facilities "nowhere requires that the [prohibited] conduct" *actually prevent* access. *See Stevens*, 559 U.S. at 474 (observing same disconnect regarding alleged ban on depicting animal cruelty). Chapter 425 ostensibly prohibits mere continued speech *after an* "*implied request to cease*," which County legal counsel said includes continuing to "hand[] out leaflets" to a person who has apparently "ignore[d]" an initial attempt. (Comp.¶¶146.) *See also Griepp I*, 991 F.3d at 81 (deeming "harassment" to include a "closing remark" after an express request to cease).

As noted, Chapter 425 also prohibits causing another "to stop" through speech deemed "deceptive" or "otherwise," where (1) such speech "attempts" to "interfere with" a facility's "operations" or (2) "attempts" to "discourage" a woman from choosing abortion "by [unspecified] activities." Given County's reliance on *Griepp I*, such activities could include causing a fleeting delay, narrowing a public sidewalk with a sign, touching a car door while speaking with the driver, "incidental contact" while offering a leaflet, or preaching about the fragility of life. *Griepp I* interpreted "physical obstruction," "force," and "threat of force" to reach exactly such protected speech, and Chapter 425's even broader definitions would do so as well. Id. at 104, 105, 107, 119.

As the Second Circuit has cautioned, government should "not simply characterize [pro-life] protestor behavior with discussion of emotionally upset patients," as "bans based on such general characterizations are likely to sweep up legitimate behavior." *New York ex rel. Spitzer v. Operation Rescue National*, 273 F. 3d 184, 195 n. 4 (2001). Chapter 425 does the same: "a substantial number" of its "applications" "are unconstitutional" and it is thus overbroad. *Stevens*, 559 U.S. at 473; *see also Golb*, 23 N.Y.3d at 467 (prohibition on speech that "annoy[s] or alarm[s]"

both vague and overbroad); *accord Dorman v. Satti*, 862 F.2d 432, 437 (2d Cir. 1988) (undefined "interfere" and "harass" vague and overbroad).

**B.      Chapter 425 is a content-based regulation of speech, and fails strict scrutiny.**

Under the First Amendment, government "has no power to restrict expression because of its message, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws . . . are presumptively unconstitutional" and must satisfy strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "The vice of content-based legislation . . . is not that it is *always* used for invidious, thought-control purposes, but that it *lends itself* to use for those purposes." *Madsen*, 512 U.S. 753, 794-95 (Scalia, J., concurring in part) (emphasis in original).

A law can be facially content-based by (1) "defining regulated speech by particular subject matter," (2) "defining regulated speech by its function or purpose," or (3) prohibiting speech based on "undesirable effects… on its audience," or on "listeners' reaction to speech." *Reed*, 576 U.S. at 163-64; *McCullen*, 573 U.S. at 581 (cleaned up). A law can also be content-based, "though facially content neutral," if it (1) "cannot be justified without reference to the content of the regulated speech," or (2) was "adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (cleaned up). Chapter 425 ticks every box on the list.

**1. Function or purpose.** Chapter 425 draws facial distinctions based on the "function or purpose" of speech. "[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022).   Chapter 425's definition of "interfere with" necessarily applies to speech that has the *function or purpose* of "dece[iving]," § 425.21(d), which "depend[s] entirely on the

communicative content of the" prohibited "deceptive means." *See Reed*, 576 U.S. at 164 (restriction on signs "designed to influence" election content-based). While "the First Amendment has permitted [content-based] restrictions on . . . obscenity, defamation, fraud, incitement, and speech integral to criminal *conduct*, *Stevens*, 559 U.S. at 460, "[a]bsent from those few categories . . . is any general exception . . . for false statements," which are "inevitable if there is to be an open and vigorous expression of views in public and private conversation." *United States v. Alvarez*, 567 U.S. 709, 718 (2012) (cleaned up) (invalidating Stolen Valor Act).

As noted, § 425.31(h) forbids even *attempted* "interfer[ence] with" "the operation of a reproductive health care facility" by "deceptive" "activities" (i.e., speech). It also restricts "interfer[ence] with" another person "in order to *discourage*" someone from obtaining or providing reproductive health care services, or "*because*" they're doing so—expressly prohibiting speech whose *purpose or function is precisely "to discourage"* such services, § 425.31(e)&(f).[11] Additionally, insofar as § 425.31(a)'s prohibition on "physically obstruct[ing] or block[ing]" another person from entering a reproductive health care facility applies to speech such as leafletting—especially in light of *Griepp I*—it likewise restricts speech based on its "function or purpose" because it prohibits *only* speech that seeks "to prevent" another person "from obtaining or rendering . . . medical treatment or reproductive health care services." § 425.31(a).

**2. Communicative impact/justified by reference to content.** Speech "at a public place on a matter of public concern . . . cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. Accordingly, the Supreme Court struck down a statute

---

[11] Similarly flawed are the prohibitions of "intimidat[ing]" or "attempting to intimidate" another person "to discourage" them from obtaining or providing services, or because they did or are doing so. These restrictions apply to pure speech that even "attempts" to "place a person in reasonable apprehension of physical injury," § 425.21(e)—construed by the vacated opinion in *Griepp I* to prohibit even preaching about "the fragility of life." 991 F.3d at 115.

prohibiting within 500 feet of a foreign embassy any sign that "tends to bring that foreign government into 'public odium' or 'public disrepute,'" because it "regulates speech due to its potential primary impact" and "must be considered content-based." *Boos v. Barry*, 485 U.S. 312, 321 (1988). The Court also deemed content-based, at least as applied, a law prohibiting mistreatment of the Flag in a manner the offender "knows will seriously offend one or more persons likely to observe or discover his action" because the violation "depended on the likely communicative impact of his expressive conduct." *Texas v. Johnson*, 491 U.S. 397, 412 (1989).

Chapter 425 likewise restricts speech because of the likelihood that listeners will find it "offensive or disagreeable." *Id.* at 414. Hence its prohibition on "follow[ing]-and-harass[ing]," with "harass" defined to cover speech that "seriously annoys" another person and "continue[s] after" even an "implied request to cease." §§ 425.21(c); 425.31(c). Again, County legal counsel advised that "harass" could include "handing out leaflets" after "you walk past and you ignore that person." The prohibition punishes speech based on its "emotive impact" and is thus content-based.[12] *Boos*, 485 U.S. at 321. Indeed, *all* of Chapter 425's restrictions target emotive impact:

- "I disagree . . . that some stranger has the right to *come up to you* in your face and *tell you* '*You're making a big mistake*'" Comp.¶120

- Women should not have to face "the *maximum fury* . . . of the First Amendment" unlike a CEO with private security. *Id.*

- Pro-life speech is like walking up to a mom in the grocery store and exhorting her for uying *too much sugar* for her kids. *Id.*

- There is a need to restrict "the gauntlet" in these settings; the pro-life *message* is inherently "intimidating" even if stated "very politely"; pro-life speech "is *not polite* speech;" etc. *Id,*

---

[12] This is all the more so given that the 25-foot no-follow-and-harass zone overlaps the eight-foot bubble zone this Court has already declined to enjoin both here and in *Vitagliano*.

The Second Circuit has already held that government may not restrict pro-life speech by characterizing it as a "gauntlet of aggressive and frightening approaches," because "unpleasant" and "emotionally difficult" speech is "typically deserving of protection." *Operation Rescue Nat'l*, 273 F.3d at 195. As the Supreme Court more recently observed, the "offense or discomfort" caused by "speech outside [] abortion clinics" does "not give the [government] a content-neutral justification to restrict the speech." *McCullen*, 573 U.S. at 481 (buffer zone applied "irrespective of any listener's reactions"). Indeed, "even the most gentle and peaceful close approach by a [] 'sidewalk counselor' . . . will often, indeed usually [be] annoying or deeply upsetting [to] the woman who is planning the abortion [but] *that is not an effect which occurs without reference to the content of the speech*." *Hill*, 530 U.S. at 747-48 (Scalia, J., dissenting) (emphasis in original).

**3.** **Disagreement with pro-life message.** "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not . . . deny use [of a forum] to those wishing to express less favored or more controversial views." *Mosley*, 408 U.S. at 96. The Supreme Court—relying precisely on councilmembers' statements indicating animus toward Jehovah Witnesses' beliefs—struck down restriction of their speech "because of the City Council's dislike for or disagreement with … their views." *Niemotko v. State of Md.*, 340 U.S. 268, 328 (1951) Legislative history is *key evidence* of a governing body's "object" in this context. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977)). Chapter 425's legislative history is "rife with indications of official targeting" of pro-life advocacy. (Compl. ¶¶102-156).

In addition to the statements by County Legislators expressing dislike for such speech, Chapter 425 was introduced the day after the leak of the draft opinion in *Dobbs*—the same day Legislative Committee Chair Smith declared he was "enraged" by the draft's purported holding.

(Id. ¶¶104.) The Legislative Committee then made key changes to Chapter 425's initial version, further evincing bias and targeting, including:

- editing the eight-foot bubble zone from forbidding passing "a leaflet or handbill or food or liquid" to passing "*any material item or object* to"—specifically to capture "the little *roses* and *the other items* that *they're* trying to use as . . . *Trojan Horse gifts*, to create that *bridge*" to women considering or seeking abortion. (Id. ¶122(emphasis added));

- broadening the meaning of "legitimate purpose" in the definition of "harass," because "some of the [pro-abortion] advocates" and "stakeholders" being consulted were concerned that otherwise defendants could claim their conduct was for the "legitimate purpose" of "*communicat[ing] our opposition to abortion*" *or making* "*a political statement*," (id. ¶143);

- changing the definition of "interfere with" from covering only conduct that "stop[s]" or "restrict[s] a person's freedom of movement" to include "obstruct[ing]" or "prevent[ing]" "*through deceptive means or otherwise*." (Id. ¶127.)

Additionally, the Committee Memorandum accompanying the final bill relies on information from the abortion-advocacy organization NAF, with no countervailing information from any pro-life organization. And key legislative leaders admitted several abortion organizations "worked on this bill" (Comp.¶¶152, 175) and were "stakeholders" (id. ¶143), while a pro-life legislator revealed that pro-life organizations feel "*canceled and locked out*." (Id. ¶155.)

Finally, on the very day of Chapter 425's passage—three days after the promulgation of *Dobbs*—the Legislative Committee Chair declared that it would "mak[e] it harder . . . to physically *or verbally* harm or harass someone" and that it creates "*safe zones* around the entrance ways to such facilities and nearby parking areas." (Id. ¶151.) Other legislators (Comp. ¶¶ 151-155) proclaimed that Chapter 425:

- ensures access to clinics "without *declined or refused counseling*";

- passed because the Board of Legislators and Executive *are* "*pro-choice*";

- restricts "*pestering* patients";

- restricts "*pray[ing] with*" *someone* before entering a clinic, *which is* "*harassment*";

22

- ensures accessing "those clinics *without any difficulty*" and "*without being harassed or in any way intimidated*."

Especially given that multiple laws already prohibit blocking clinic access, force, threats of force, trespass, etc., Chapter 425 was plainly adopted "because of disagreement with the message" of pro-life sidewalk counseling and advocacy, *Reed*, 576 U.S. at 164, which "is the worst offense against the First Amendment." *Hill*, 530 U.S. at 746 (Scalia, J., dissenting).

**4. Chapter 425 fails strict scrutiny:** Chapter 425 neither "furthers a compelling interest" nor "is narrowly tailored to that end." *Reed*, 576 U.S. at 171. The Supreme Court has made clear that restricting "offensive or disagreeable" speech—exactly what Chapter 425 does—is not a compelling interest. *Johnson*, 491 U.S. at 414. Nor can government argue it is merely regulating conduct "where," as here, "regulation of that conduct is *related to expression*." *Id.* at 416

Further, the County cannot show Chapter 425's challenged provisions are "actually necessary" to solve an "actual problem." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). Chapter 425's "precipitating event" was supposedly the "Red Rose Rescue" for which the participants were convicted of trespassing. *See supra*.  FACE and New York Clinic Access Law already prohibit physical obstruction, force and threats of force. Chapter 425 itself prohibits anyone to "strike, shove, restrain, grab" clinic patrons, companions or staff. § 425.31(b). The "availability of alternatives such as" these laws "demonstrates that [Chapter 425 is] not crafted with sufficient precision to withstand First Amendment scrutiny." *Boos*, 485 U.S. at 329.

Finally, the Committee Memorandum states that Chapter 425 responds to a "need for clear legislative boundaries" (p. 2), and Legislator Pierce said it gives police "clear marching orders," and "clear lines of action." (Comp.¶115). "[B]ut the prime objective of the First Amendment is

not efficiency." *McCullen*, 573 U.S. at 496. Here, vague and standardless "marching orders" "burden substantially more speech than necessary" to further any compelling interest. *Id.* at 486..

C.    **Chapter 425 would fail intermediate scrutiny as well.**

"Even [if] [Chapter 425] is content neutral, it still must be narrowly tailored to serve a significant governmental interest." *McCullen*, 573 U.S. at 486. Chapter 425 also fails this test for the reasons already discussed.  Moreover, as noted, County legal counsel advised on the record that even if pro-life advocates are "staying outside the bubble," "a number of other provisions [of Chapter 425] might kick in." (Comp.¶147.) This "ma[kes] it substantially more difficult for petitioners to distribute literature to arriving patients," *id.* at 488—which is entirely unnecessary to ensure safe, orderly access to reproductive health care facilities. *See* § 425.11. Chapter 425 ignores the Second Circuit's warning that "government may not sanitize our public places of [pro-life] protest activity." *Operation Rescue*, 273 F.3d at 208. Nor did the legislators consider "different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494. **On the contrary, they boasted of the need to "be bold."** (Comp.¶120(e), (f).)

III.   **Irreparable Harm.**

In a First Amendment challenge like this one, "the likelihood of success on the merits will often be the determinative factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004)). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Chapter 425's overlapping, hair-trigger provisions have effectively stifled Plaintiffs' pro-life sidewalk advocacy at County abortion facilities. (Comp.¶¶ 32, 43, 79-101.) The "harm" of "self-censorship" has thus already been "realized." *Am. Booksellers Ass'n, Inc.*, 484 U.S. at 393. That irreparable harm is a direct result of Chapter 425's First Amendment violations.

## IV.    Public Interest.

"[S]ecuring First Amendment rights is in the public interest." *Id.* Moreover, "[t]he restrictions at issue here, by restricting or effectively barring" Plaintiffs' pro-life advocacy in the County, "strike at the very heart of the First Amendment's guarantee of [freedom of speech and] religious liberty." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020). Courts thus "have a duty to conduct a serious examination of the need for such a drastic measure." *Id.* There is manifestly no need to restrict, or even chill, Plaintiffs' peaceful pro-life sidewalk counseling and advocacy in order to facilitate safe access to reproductive health care facilities. A preliminary injunction here serves the First Amendment and thus the public interest.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated: February 1, 2023                                     Respectfully submitted,

/s/ Christopher A. Ferrara
Christopher A. Ferrara
Special Counsel – Thomas More Society
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: 718-357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael G. McHale
Michael G. McHale*
Senior Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
Telephone: 402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*  (*pro hac vice)